# 22-4554(L), 22-4555, 22-4556, 22-4560

# United States Court of Appeals
## for the
# Fourth Circuit

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

JOSEPH DUK-HYUN LAMBORN, YOUNG YOO,
PETER LE, TONY MINH LE,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# BRIEF OF APPELLANTS

G. Allen DuBois
Eric J. Brignac
OFFICE OF THE
   PUBLIC DEFENDER
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
(919) 856-4236

*Counsel for Appellant Lamborn*

GERALD T. ZERKIN
ATTORNEY AT LAW
Post Office Box 5665
Richmond, Virginia 23220
(804) 921-4885

*Counsel for Appellant Yoo*

ROBERT J. WAGNER
ROBERT J. WAGNER PLC
101 Shockoe Slip, Suite J
Richmond, Virginia 23219
(804) 814-8172

*Counsel for Appellant T. Le*

LANA MANITTA
LAW OFFICE OF
   LANA MANITTA, PLLC
140B Purcellville Gateway Drive #511
Purcellville, Virginia 20132
(703) 705-4428

*Counsel for Appellant P. Le*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................v

STATEMENT OF JURISDICTION.......................................................................1

STATEMENT OF THE ISSUES...........................................................................1

STATEMENT OF THE CASE................................................................................3

    A.    Background .................................................................................3

    B.    Pretrial Matters ..........................................................................3

    C.    Trial and the Verdicts ................................................................5

    D.    Sentencing ..................................................................................7

        i.    Peter Le ...........................................................................7

        ii.    Joseph Lamborn .............................................................7

        iii.    Young Yoo .......................................................................7

        iv.    Tony Le ...........................................................................8

STATEMENT OF FACTS ......................................................................................8

    A.    Differences In How the Groups Operated.........................................11

        i.    Drugs of Choice ...........................................................11

        ii.    Use or Threat of Violence.............................................11

        iii.    Brandon White .............................................................12

    B.    Appellants' Motions to Continue ......................................................13

    C.    Mr. Lamborn's Attorneys' Motion to Withdraw ..............................17

    D.    Special Conditions of Supervised Release Imposed on
        Appellants Peter Le, Lamborn, and Yoo..........................................22

SUMMARY OF ARGUMENT ..............................................................................25

    ISSUE I ...........................................................................................25

    ISSUE II..........................................................................................26

i

ISSUE III ........................................................................................27

ISSUE IV ........................................................................................28

ISSUE V .........................................................................................28

ISSUE VI ........................................................................................29

ISSUE VII .......................................................................................29

ARGUMENT ............................................................................................30

I.     APPELLANTS WERE DENIED A FAIR TRIAL BECAUSE
THE DISTRICT COURT DENIED THE DEFENSE'S
JOINT REQUEST FOR A CONTINUANCE AFTER A
LATE, VOLUMINOUS DISCOVERY DISCLOSURE ...................30

     A.    Standard of Review .................................................30

     B.    Argument .................................................................31

II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY
DETERMINING THAT MR. LAMBORN'S REQUEST
FOR A NEW ATTORNEY WAS UNTIMELY BECAUSE
IT DID NOT ADDRESS HIS PROFFER THAT HE HAD
EVIDENCE TO SHOW THAT HE ASKED HIS
ATTORNEYS TO FILE THE MOTION THREE MONTHS
BEFORE THEY DID ...........................................................32

     A.    Standard of Review .................................................32

     B.    The District Court Abused its Discretion .................32

     C.    The Error Was Not Harmless ....................................36

III.   DEFENDANT PETER LE'S, MR. YOO'S, AND MR.
LAMBORN'S WRITTEN JUDGMENTS EACH CONTAIN
CONDITIONS OF SUPERVISED RELEASE THAT ARE
NOT PART OF THEIR SENTENCES. THUS, THIS
COURT MUST VACATE THEIR SENTENCES AND
REMAND FOR FULL RESENTENCING ........................................38

     A.    Standard of Review .................................................38

     B.    Argument .................................................................38

IV.   THE DISTRICT COURT ERRED IN DENYING
APPELLANT YOO'S RULE 29 MOTION BECAUSE THE
EVIDENCE WAS INSUFFICIENT TO PROVE BEYOND
A REASONABLE DOUBT THAT HE WAS GUILTY OF
COUNTS 3 (VIOLENT CRIMES IN AID OF
RACKETEERING – MURDER), 4 (KIDNAPPING
CONSPIRACY), 5 (KIDNAPPING RESULTING IN
DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG
TRAFFICKING) ...................................................................39

    A.   Statement of Additional Facts...................................39

    B.   Standard of Review ..................................................42

    C.   Argument .................................................................43

        i.    Violent Crime in Aid of Racketeering – Murder
(Count 3).......................................................43

        ii.   Conspiracy to Commit Kidnapping and
Kidnapping Resulting in Death (Counts 4 and 5) .........47

        iii.  Killing While Engaged in Drug Trafficking
(Count 7).......................................................48

V.    THE DISTRICT COURT ERRED IN DENYING
APPELLANT PETER LE'S RULE 29 MOTION BECAUSE
THE EVIDENCE WAS INSUFFICIENT TO PROVE
BEYOND A REASONABLE DOUBT THAT HE WAS
GUILTY OF COUNTS 3 (VIOLENT CRIMES IN AID OF
RACKETEERING – MURDER), 4 (KIDNAPPING
CONSPIRACY), 5 (KIDNAPPING RESULTING IN
DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG
TRAFFICKING) ...................................................................49

    A.   Statement of Additional Facts...................................49

    B.   Standard of Review ..................................................53

    C.   Argument .................................................................53

VIII.  THE DISTRICT COURT VIOLATED TONY LE'S
SPEEDY TRIAL ACT AND SIXTH AMENDMENT
SPEEDY TRIAL RIGHTS.................................................56

    A.   Statement of Additional Facts...................................56

B.     Standard of Review.................................................................63

C.     Argument .................................................................................64

     i.    Tony Le's Speedy Trial Act Rights were
          Violated.........................................................................64

     ii.   Tony Le's Sixth Amendment Speedy Trial
          Motion was not Addressed by the District Court;
          Remand is Required......................................................72

VII.  THE DISTRICT COURT IMPROPERLY ENHANCED
TONY LE'S SENTENCING GUIDELINES BASED ON
ACQUITTED CONDUCT AND FAILED TO PROPERLY
ASSESS DEFENSE OBJECTIONS TO SENTENCING
ENHANCEMENTS, AND OTHER RELEVANT
SENTENCING FACTORS ANDEVIDENCE..................................74

A.     Statement of Additional Facts..................................................74

B.     Standard of Review.................................................................79

C.     Argument .................................................................................79

     i.    Acquitted Conduct.........................................................79

     ii.   The District Court Failed to Properly Assess and
          Make Necessary Findings as to Enhancements to
          Tony Le's Sentencing Guidelines; Therefore, his
          Sentence is Procedurally Unreasonable.........................83

     iii.  The District Court Failed to Conduct the
          Requisite Unwarranted Disparity Analysis under
          18 U.S.C. § 3553(a)(6) ..................................................86

CONCLUSION ...........................................................................................88

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Barker v. Wingo,*
407 U.S. 514, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972) ..........................62, 63, 73

*Bloate v. United States,*
559 U.S. 196 (2010)........................................................................64, 70

*Henderson v. United States,*
476 U.S. 321, 106 S. Ct. 1871, 90 L. Ed. 2d 299 (1986) ....................................71

*Hoffman v. Leeke,*
903 F.2d 280 (4th Cir. 1990) ................................................................32

*LSLJ Partnership v. Frito-Lay,*
920 F.2d 476 (7th Cir. 1990) ................................................................34

*McClinton v. United States,*
143 S. Ct. 2400, 216 L. Ed. 2d 1258 (2023)..........................................................81

*Morris v. Slappy,*
461 U.S. 1, 103 S. Ct. 1610, 75 L. Ed. 2d 610 (1983) ..................................30, 31

*Nye & Nissen v. United States,*
336 U.S. 613, 93 L. Ed. 919, 69 S. Ct. 766 (1949)...........................................44

*Powell v. Alabama,*
287 U.S. 45 (1932).........................................................................33

*Rosemond v. United States,*
572 U.S. 65, 188 L. Ed. 2d 248, 134 S. Ct. 1240 (2014) ...............................44, 54

*Stanko v. Stirling,*
109 F.4th 681 (4th Cir. 2024) ..............................................................34

*Strickland v. Washington,*
466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984) ...............................31, 32

*United States v. Aguilar,*
585 F.3d 652 (4th Cir. 2009) ............................................................48, 54

*United States v. Agyekum,*
846 F.3d 744 (4th Cir. 2017) ..............................................................85

*United States v. Alerre*,
  430 F.3d 681 (4th Cir. 2005),
  *cert. denied*, 547 U.S. 1113, 164 L. Ed. 2d 687,
  126 S. Ct. 1925 (2006)...................................................................42, 53

*United States v. Beck*,
  615 F.2d 441 (7th Cir. 1980) .............................................................44

*United States v. Blackledge*,
  751 F.3d 188 (4th Cir. 2014) .................................................. 33-34, 36

*United States v. Bostick*,
  767 F. App'x 512 (4th Cir. 2019) .......................................................85

*United States v. Clyburn*,
  1995 WL 578047 (4th Cir. Oct. 2, 1995) ...........................................72

*United States v. Copeland*,
  707 F.3d 522 (4th Cir. 2013) ..............................................................31

*United States v. Cronic*,
  466 U.S. 648 (1984)............................................................................31

*United States v. Davis*,
  75 F.4th 428 (4th Cir. 2023) ...............................................................42

*United States v. Di Stefano*,
  555 F.2d 1094 (2d Cir. 1977) .............................................................44

*United States v. Edwards*,
  188 F.3d 230 (4th Cir. 1999) ........................................................47, 54

*United States v. Espinoza*,
  622 F. App'x 745 (10th Cir. 2015) .....................................................73

*United States v. Gallagher*,
  90 F.4th 182 (4th Cir. 2024) ...............................................................43

*United States v. Gillespie*,
  27 F.4th 934 (4th Cir. 2022),
  *cert. denied*, 143 S. Ct. 164, 214 L. Ed. 2d 56 (2022)..................79, 84

*United States v. Habegger*,
  370 F.3d 441 (4th Cir. 2004) ..............................................................42

*United States v. Hart*,
  91 F.4th 732 (4th Cir. 2024) .........................................................66, 67

*United States v. Head*,
   927 F.2d 1361 (6th Cir.1991),
   *cert. denied*, 112 S. Ct. 144 (1991)........................................................44

*United States v. Hedgepeth*,
   418 F.3d 411 (4th Cir. 2005) .................................................................30

*United States v. Henry*,
   538 F.3d 300 (4th Cir. 2008) .................................................................67

*United States v. Horton*,
   693 F.3d 463 (4th Cir. 2012) ...................................................32, 35, 36

*United States v. Jarrell*,
   147 F.3d 316 (4th Cir. 1998) .................................................................65

*United States v. Keith*,
   42 F.3d 234 (4th Cir. 1994) .............................................................67, 68

*United States v. Lentz*,
   524 F.3d 501 (4th Cir. 2008) ...........................................................47, 54

*United States v. Lewis*,
   1993 U.S. App. LEXIS 32986 (4th Cir. 1993)..............................44, 54

*United States v. Love*,
   767 F.2d 1052 (4th Cir. 1985) .........................................................44, 54

*United States v. Margheim*,
   770 F.3d 1312 (10th Cir. 2014) .............................................................72

*United States v. Maxwell*,
   285 F.3d 336 (4th Cir. 2002) .................................................................38

*United States v. McAllister*,
   272 F.3d 228 (4th Cir.2001) .................................................................84

*United States v. Mearis*,
   36 F.4th 649 (5th Cir. 2022) ...........................................................63, 73

*United States v. Medley*,
   34 F.4th 326 (4th Cir. 2022) .................................................................81

*United States v. Miller*,
   529 F. App'x 331 (4th Cir. 2013) .........................................................85

*United States v. Moseley*,
626 F. App'x 399 (4th Cir. 2015) ..........................................................85

*United States v. Mullen*,
32 F.3d 891 (4th Cir. 1994) ................................................................35

*United States v. Orrico*,
599 F.2d 113 (6th Cir. 1979) ..............................................................43

*United States v. Ortiz-Orellana*,
90 F.4th 689 (4th Cir. 2024) ..............................................................43

*United States v. Osborne*,
514 F.3d 377 (4th Cir. 2008) ..............................................................79

*United States v. Pair*,
84 F.4th 577 (4th Cir. 2023) ..............................................................73

*United States v. Pearlstein*,
576 F.2d 531 (3d Cir. 1978) ..............................................................44

*United States v. Pena*,
952 F.3d 503 (4th Cir. 2020) ..............................................................36

*United States v. Perry*,
335 F.3d 316 (4th Cir. 2003) ..............................................................42

*United States v. Pratt*,
915 F.3d 266 (4th Cir. 2019) ..............................................................63

*United States v. Robinson*,
55 F.4th 390 (4th Cir. 2022) ......................................................63, 71, 72, 73

*United States v. Rodriguez-Amaya*,
521 F.3d 437 (4th Cir. 2008) ..............................................................63

*United States v. Rogers*,
961 F.3d 291 (4th Cir. 2020) ..............................................................38

*United States v. Samad*,
754 F.2d 1091 (4th Cir. 1984) ........................................................ 42-43

*United States v. Shealey*,
641 F.3d 627 (4th Cir. 2011) ..............................................................63

*United States v. Singletary*,
984 F.3d 341 (4th Cir. 2021) ..............................................................38

*United States v. Small,*
    988 F.3d 241 (6th Cir. 2021) ........................................................47, 54

*United States v. Smart,*
    91 F.4th 214 (4th Cir. 2024) ..................................................66, 67, 68

*United States v. Smith,*
    451 F.3d 209 (4th Cir. 2006) ................................................................43

*United States v. Smith,*
    640 F.3d 580 (4th Cir. 2011) ........................................................32, 33

*United States v. Steffen,*
    741 F.3d 411 (4th Cir. 2013) ................................................................85

*United States v. Tipton,*
    95 F.4th 831 (4th Cir. 2024) ........................................................43, 54

*United States v. Velasquez,*
    52 F.4th 133 (4th Cir. 2022) ................................................................64

*United States v. Watts,*
    519 U.S. 148, 117 S. Ct. 633, 136 L. Ed. 2d 554 (1997) ....................81

*United States v. Weil,*
    561 F.2d 1109 (4th Cir. 1977) ..............................................................44

*United States v. Wheeler,*
    717 F. App'x 217 (4th Cir. 2018) ........................................................87

*United States v. Williams,*
    445 F.3d 724 (4th Cir. 2006) ................................................................30

*United States v. Winstead,*
    708 F.2d 925 (4th Cir. 1983) ........................................................44, 54

*United States v. Withers,*
    100 F.3d 1142 (4th Cir. 1996) ..............................................................87

*Zedner v. United States,*
    547 U.S. 489 (2006)..............................................................64, 66, 70

**Statutes & Other Authorities:**

U.S. Const. Amend. VI ............................................................*passim*

18 U.S.C. § 924(c) ...............................................................*passim*

18 U.S.C. § 924(j) ....................................................................6

18 U.S.C. § 1201 .....................................................................47

18 U.S.C. § 1201(a) ................................................................47

18 U.S.C. § 1201(a)(1) ..............................................................6

18 U.S.C. § 1201(c) ...................................................................6

18 U.S.C. § 1956 .......................................................................6

18 U.S.C. § 1959(a)(1) ..............................................................6

18 U.S.C. § 1959(b)(2) .............................................................43

18 U.S.C. § 1961 ..................................................................5, 43

18 U.S.C. § 1962(d) .............................................................5, 56

18 U.S.C. § 3161 ..............................................................*passim*

18 U.S.C. § 3161(c)(1) .........................................................65, 66

18 U.S.C. § 3161(h)(6) ..........................................64, 65, 70, 71

18 U.S.C. § 3161(h)(7)(A) ...................................................66, 67

18 U.S.C. § 3231 .......................................................................1

18 U.S.C. § 3553(a) ................................................................84

18 U.S.C. § 3553(a)(6) ..........................................30, 78, 86, 87

18 U.S.C. § 4248 .....................................................................34

21 U.S.C. § 241 .........................................................................6

21 U.S.C. § 246 .........................................................................6

21 U.S.C. § 841 ..............................................................6, 56, 57

21 U.S.C. § 841(b)(1)(A) .....................................................48, 75

21 U.S.C. § 841(b)(1)(B) .........................................................75

21 U.S.C. § 846 ..............................................................6, 56, 57

21 U.S.C. § 848(e) ...................................................................6, 48

21 U.S.C. § 848(e)(1)(A) .................................................................48

21 U.S.C. § 856 ...............................................................................6

21 U.S.C. § 960(b)(1)......................................................................48

28 U.S.C. § 1291 ..............................................................................1

4 Federal Trial Guide § 90.120 (Matthew Bender) ................................37

Fed. R. Civ. P. 29 ....................................................................*passim*

U.S.S.G § 1B1.3 ............................................................................80

U.S.S.G. § 2D1.1 .....................................................................76, 84

U.S.S.G. § 2D1.1(a)(5) ...................................................................76

U.S.S.G. § 2D1.1(b)(1) ...............................................76, 81, 83, 84

U.S.S.G. § 2D1.1(b)(2) ...........................................................76, 81

U.S.S.G. § 2D1.1(b)(12) .................................................................76

U.S.S.G. § 2D1.1(b)(16) .................................................................76

U.S.S.G. § 3B1.1 ...........................................................................85

U.S.S.G. § 3B1.1(a) .................................................................77, 84

This appeal arises from the criminal convictions of Appellants Joseph Lamborn, Tony Le, Peter Le, and Young Yoo on charges returned in a 37 count Superseding Indictment. (Fourth). Joint Appendix ("JA") 304. The cases were tried by a jury in the Eastern District of Virginia, Alexandria Division, the Honorable Liam O'Grady presiding. The District Court had jurisdiction pursuant to 18 U.S.C. § 3231.

The Orders of Conviction became final on September 12 and 15, 2022. JA4758-4781, JA4848. Mr. Yoo filed his Notice of Appeal on September 12, 2022. JA4846. Lamborn filed his on September 15, 2022. JA4756. Peter Le filed his on September 19, 2022, JA4854, and Tony Le filed his on September 21, 2022. JA4856.

This Honorable Court has jurisdiction over this appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

I.     APPELLANTS WERE DENIED A FAIR TRIAL BECAUSE THE DISTRICT COURT DENIED THE DEFENSE'S JOINT REQUEST FOR A CONTINUANCE AFTER A LATE, VOLUMINOUS DISCOVERY DISCLOSURE

II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY DETERMINING THAT LAMBORN'S REQUEST FOR A NEW ATTORNEY WAS UNTIMELY BECAUSE IT DID NOT ADDRESS HIS PROFFER THAT HE HAD EVIDENCE TO SHOW THAT HE

ASKED HIS ATTORNEYS TO FILE THE MOTION THREE MONTHS
BEFORE THEY DID.

III.     PETER LE'S, YOUNG YOO'S, AND MR. LAMBORN'S WRITTEN
        JUDGMENTS EACH CONTAIN CONDITIONS OF SUPERVISED
        RELEASE THAT ARE NOT PART OF THEIR SENTENCES. THUS,
        THIS COURT MUST VACATE THEIR SENTENCES AND REMAND
        FOR FULL RESENTENCING

IV.     THE DISTRICT COURT ERRED IN DENYING APPELLANT YOO'S
        RULE 29 MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT
        TO PROVE BEYOND A REASONABLE DOUBT THAT HE WAS
        GUILTY OF COUNTS 3 (VIOLENT CRIMES IN AID OF
        RACKETEERING – MURDER), 4 (KIDNAPPING CONSPIRACY), 5
        (KIDNAPPING RESULTING IN DEATH), AND 7 (KILLING WHILE
        ENGAGED IN DRUG TRAFFICKING)

V.      THE DISTRICT COURT ERRED IN DENYING PETER LE'S RULE 29
        MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE
        BEYOND A REASONABLE DOUBT THAT HE WAS GUILTY OF
        COUNTS 3 (VIOLENT CRIMES IN AID OF RACKETEERING –
        MURDER), 4 (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING
        RESULTING IN DEATH), AND 7 (KILLING WHILE ENGAGED IN
        DRUG TRAFFICKING)

VI.     THE DISTRICT COURT VIOLATED TONY LE'S SPEEDY TRIAL ACT
        AND SIXTH AMENDMENT SPEEDY TRIAL RIGHTS

VII.    THE DISTRICT COURT IMPROPERLY ENHANCED TONY LE'S
        SENTENCING GUIDELINES BASED ON ACQUITTED CONDUCT
        AND FAILED TO PROPERLY ASSESS DEFENSE OBJECTIONS TO
        SENTENCING ENHANCEMENTS, AND OTHER RELEVANT
        SENTENCING FACTORS AND EVIDENCE

## STATEMENT OF THE CASE

A.    Background

The indictment in this case alleged that the Defendants engaged in a RICO conspiracy involving the "Reccless Tigers" and affiliated entities which conspired to traffic marijuana and other controlled substances. JA304. Although the Government alleged that members of the gang engaged in violence to command respect for, and obedience to the gang, much of the testimony suggested that the affiliates often acted on their personal agendas.  Furthermore, the affiliated entities, according to some witnesses, were only very loosely connected. The evidence suggested that often individuals were acting on their own personal agenda when engaged in violence or threats of violence. There were also incidents of drug trafficking characterized by the government as "gang activity" which appeared to be conduct engaged in by individuals for their own personal benefit, and which did not confer any benefit to the gang or its objectives.

B.    Pretrial Matters

This case lasted almost 4 1/2 years. The first indictment charged 3 individuals with one count of Conspiracy to Distribute Cocaine and Marijuana. JA128. It was returned on February 2, 2019. The Fourth Superseding Indictment was returned by a grand jury in the Eastern District of Virginia, Alexandria Division, in August of 2020. JA304. It charged 7 individuals but only 4 went to

trial. At one point during the proceedings there were 20 codefendants, many of whom were incarcerated pending trial.

Prior to the trial there were numerous issues regarding the disclosure of discovery due to its extraordinary volume. The court finally retained the services of an attorney in New York for the sole purpose of organizing the discovery so that it was more accessible to the attorneys in the case. Given the enormity of the discovery, the number of defendants and the pandemic, numerous issues arose regarding counsel's ability to consult with their clients regarding the evidence against them. Consequently, the case was continued a number of times, and ultimately began on April 11, 2022, and lasted through May 6, 2022.

On May 6, 2021, Tony Le filed a Motion to Sever based on the prejudice which would accrue to Tony Le given the disproportionate weight of the evidence against his co-defendants. JA458. This Motion was denied. JA502.

On February 25, 2022, Peter Le filed a Motion to Dismiss on the grounds that the government had, in the preceding month, propounded discovery which had been requested for several months. JA602. Not only were the disclosures late, but the enormity of the disclosures also rendered adequate preparation for trial impossible. *See id.* This motion was adopted by Mr. Yoo and Mr. Lamborn. JA609, JA612. By order dated March 8, 2022, the District Court denied said Motion. JA676.

4

On April 8, 2022, Peter Le, joined by Tony Le, Mr. Lamborn. and Mr. Yoo, filed a Renewed Motion to Continue. JA746. This Motion detailed the myriad of difficulties that defense counsel faced upon receipt of the most recent discovery release. *See id.* The sheer volume was itself the cause of technical difficulties and the format in which it was sent made keyword searches for information impossible. For example, the index of folder names was 30 pages in length which did not include the names of the files contained in the folders. This discovery contained vital *Jencks* and *Giglio* material. Counsel's inability to access, review and discuss this material crippled their ability to effectively represent their respective clients. The details of these issues are fully discussed in the Renewed Motion. JA746-754. This Motion was denied. JA757. Peter Le renewed the Motion to Continue each day of the trial. JA763, JA985, JA1323, JA1640, JA1909, JA2191, JA2448, JA2725, JA2938, JA3367, JA3554, JA3863.

C.    Trial and the Verdicts

The only individuals who went to trial were Peter Le, Tony Le, Mr. Yoo, and Mr. Lamborn. The jury found each of the four men guilty of Count 1, Engaging in a Conspiracy to Aid Enterprise Racketeering Activity in violation of 18 U.S.C. 1961 and 1962(d). JA4671-4715.

In addition to Count 1 the jury found Peter Le, Mr. Lamborn, and Mr. Yoo guilty of the following counts: Count 3, Murder in Aid of Racketeering in violation

of (18 U.S.C. 1959(a)(1); Count 4; Kidnapping Conspiracy in violation of 18 U.S.C. §1201(c); Count 5, Kidnapping Resulting in Death in violation of 18 U.S.C. §1201(a)(1); Count 6, Narcotics Conspiracy in violation of 21 U.S.C. §§ 241 and 246; Count 7, Killing While Engaged in Drug Trafficking in violation of 21 U.S.C. §848(e). Additionally, the jury found Mr. Lamborn guilty on Count 13, Firearms Murder in violation of 18 U.S.C. § 924(j). *Id.*

In addition to the foregoing charges the jury returned verdicts of guilt for Peter Le for the following offenses: Count 8-10, Maintaining a Drug-Involved Premises in violation of 21 U.S.C. § 856; Counts 11-12, Distribution of a Controlled Substance in violation of 21 U.S.C. § 841; Count 16, Using, Carrying and/or Possessing a Firearm or Destructive Device in violation of 18 U.S.C. § 924(c) and Count 21, Money Laundering in violation of 18 U.S.C. §1956. *Id.*

Mr. Lamborn was acquitted on Count 17, Using or Possessing a Firearm or a Destructive Device and Count 20, Obstruction of Justice. Mr. Yoo was acquitted of Count 2, Assault with a Deadly Weapon in aid of Racketeering, Count 13, Firearms Murder and Count 19, Using or Possessing a Firearm or Destructive Device. JA4727. Peter Le was acquitted of Count 13. JA4704.

In addition to Count 1, the jury also found Tony Le guilty of Count 6, Narcotics Conspiracy in violation of 21 U.S.C. §§ 841 and 846. JA4716. Tony Le

was acquitted of Counts 14 and 15, Using or Possessing a Firearm or a Destructive Device. JA4718-4719.

D.    Sentencing

Upon consideration of the presentence investigation reports, evidence presented and argument of counsel, the District Court imposed the following sentences:

i.    Peter Le

The district court imposed life sentences on counts 1, 3, 4, 5 and 7; 30 years on count 6; 240 months on count 8, 12, 21 all to be served concurrently and 60 months on count 16 to be served consecutively to counts 1, 3-7, 8-12 and 21. JA4781.

ii.    Joseph Lamborn

The district court imposed life sentences on counts 1, 3-5, 7; 180 months on count 6, all to be served concurrently and a life term on count 13, to be served consecutively to counts 1 and 3-7. JA4765.

iii.    Young Yoo

The district court imposed life sentences on counts 1, 3-5, 7 and 20 years on count 6, all to be served concurrently. JA4773.

iv.    Tony Le

The district court imposed 312 months on counts 1 and 6, with those
sentences to be served concurrently. JA4854.

## STATEMENT OF FACTS

In or around 2009-2010 in Centreville, Virginia, a young man named
Richard Pak—then a member of Young Korean Lokos—formed his own gang
known as the Reccless Tigers. JA1005, JA1007, JA3072, JA3254, JA3693. The
Reccless Tigers, made up at the time nearly exclusively of Asian young men and
boys, engaged in the sale of marijuana and cocaine in the Northern Virginia area.
JA1009-1011, JA3254. Some members also sold guns. JA1033. Early members and
associates of Reccless Tigers included Tony Le (who was a member of Asian Boyz
but maintained close relationships, including drug-business relationships, with
Reccless Tigers), Mr. Lamborn, and Mr. Yoo, as well as trial witnesses Ha Lim
Chung, Kyu Hong, and Kevin Aagesen. JA1029, JA1076, JA3255. Approximately
5-6 years later, two other groups formed, known as Club Tiger and Tiger Side.
JA1223-1225. Tiger Side arose out of a discussion between Richard Pak and Tony
Le in which they decided to part ways. JA3286, JA3320-3321, JA3513-3514,
JA4238. Tiger Side was later joined by Mr. Yoo, Soung Park, and others who left
Reccless Tigers to join the new group which was focused less on the "gang" life,
and more on making money. JA3286.

Club Tiger was also born of the separation of Pak's and Le's drug businesses, and it specialized in the distribution of marijuana and THC products. JA3257. Club Tiger advertised on social media, sold branded merchandise, and was made up of a group of young men who shared a love of all-things marijuana, including the money it brings in. *Seriatim*. Peter Le was a prominent member of Club Tiger and was, at least during the latter period (2016-2018), in charge of the group's marijuana distribution operation. *Seriatim*.

Confusion abounds as to who was a member of which group at what time, and the answers depend on who is asked. For example, only Spencer Pak, younger brother of Richard Pak, readily agreed with the government's assertion that Peter Le as a member of all three groups at the same time. JA3364. Others said Peter didn't really speak of Reccless Tigers. JA1486. Others understood Club Tiger to be a prospect group for Reccless Tigers. JA3056, JA3269, JA3432, JA3970. And yet, no one testified to actually having "graduated" *to* Reccless Tigers *from* Club Tiger (in fact, the two groups were generally at odds) and when asked, every witness identified *themselves* as having been (and in fact having only been *able to* be) a member of only one group at any given time. JA1223, JA3432, JA3445, JA3461, JA3474, JA3604, JA3643. (In fact, it was seemingly, only the Appellants' memberships were ambiguous and overlapping. *See, e.g.,* JA3631-3633).

Soung Park provided some insight into movement *between* the groups, as well as confirmed that they operated independently. Park and Peter Le were the original two members of Club Tiger. JA3432. Park later joined "Tiger Side" to "get right with Tony Le" after he initially rejected Tiger Side and instead joined Reccless Tigers and started selling cocaine with Kyu Hong. JA3445-3446, JA3461. He was no longer a member of Club Tiger at that point, and when he ultimately joined Tiger Side, he was no longer a member of Reccless Tigers. JA3452, JA3461. Park's experience illustrates the true dynamic between the three groups which was that despite any commonality, there were significant differences and on occasion, serious conflict, between them. JA3352, JA3450-3451, JA3469, JA3471, JA3513-3514, JA3533-3534, JA3687, JA3689-3690, JA3694, JA3696, JA3704-3705.

Park indeed explained that it was a "known thing" that Richard Pak and Tony Le, leaders of "two different groups," "weren't getting along" and "had some issues." JA3450-3451, JA3513. He described how he distanced himself from his old friend, Peter, and Club Tiger, because he didn't like the new members brought in by Peter Le. JA3471. The new members at the time were (non-Asian) young high school kids. JA3523. Kyu Hong—a founding member of Reccless Tigers— also described how Peter Le was not well liked amongst the Reccless Tigers, that he had beaten Peter Le up in 2016, and was not the only Reccless Tiger to have

done so. JA3690-3691, JA3699. So, too, Dane Hughes and Soung Park testified that Peter Le and Mr. Yoo did not like each other and "fought all the time," and Le beat Mr. Yoo with a baseball bat. JA1780-1781, JA3532.

A.    Differences In How the Groups Operated

      i.    *Drugs of Choice*

By the time there were three groups, Reccless Tigers' drug distribution—led by the Pak brothers—included significant quantities of cocaine. JA1003, JA3254-3255, JA3804-3805. Tiger Side focused on marijuana production, and Club Tiger focused on marijuana distribution. JA3075, JA3256, JA3632. On occasion, Club Tiger—including Peter Le himself—would tap into Reccless Tigers as a source for other drugs requested by customers, but Peter Le generally discouraged members and associates from dealing in cocaine. *See* JA2234, JA2242, JA2262.  The business model of Club Tiger was to offer a higher quality of marijuana on bulk discount to heavy users and/or already-established dealers (usually both), on consignment, or on "front." JA1550, JA1586, JA1597.

      ii.    *Use or Threat of Violence*

While Reccless Tigers had a reputation for being a group not to be trifled with, Club Tiger had a reputation for being a party group made up of "soft" and "weak" individuals, who were not interested in the "gangster life," and of whom, frankly, not much was expected. JA3524, JA3631, JA3694-3696, JA3971. It was

understood that those who crossed the Reccless Tigers were likely to fall victim to beatings or even firebombings. *See, e.g.,* JA1952, JA2512. Those who stole from, snitched on, or owed Club Tiger, however, might have rocks thrown at their house, but more often faced either no consequence or were offered a job—driving, making deliveries, or working at the grow farm that supplied the marijuana, out in California. JA1493, JA3383, JA3394. Even those who took "jobs" to pay down their debt, to a man, quit those jobs when they wanted to, and most never paid off their debt. *See, e.g.,* JA1503. It bears emphasis: nearly every trial witness who owed a debt to Club Tiger *still* owes their debt to Club Tiger and none were targeted for beatings, let alone kidnapping and murder. *See, e.g.,* JA3520

### iii. Brandon White

There were *many* individuals who associated themselves with each of the three relevant groups, and still more people associated with members of each group, but were not members themselves. Two of those associates were Abdoullah Sayf ("Sayf") and Brandon White ("White"). Sayf was the lifelong friend of Fahad Abdulkadir ("Fahad"), a member of Reccless Tigers, who sold marijuana he obtained from Peter Le. JA2846, JA2947-2950. Sayf was not a member of either group, and in fact hated "the Tigers." JA2879. He didn't care for Peter Le either, stole from him on two occasions, and planned to do it again. JA2879-2880. White was Sayf's dealer of choice for Percocet and Xanax. JA2846. White also,

coincidentally, had a small debt to Mr. Yoo—from 2013 or 2014—for marijuana. JA3278.

In the Summer of 2018, White was assaulted by David Nguyen, aka "Tiger," who was a member of Reccless Tigers. JA2565, JA2575. Nguyen had taken it upon himself to punish White for a years-old debt that White owed Mr. Yoo, despite Mr. Yoo's not asking him to do so and White's assuring him the issue had been resolved. JA2562-2563. Mr. Yoo specifically rejected advice that he kill White. JA3697-3698, JA3703. White testified at a hearing against Nguyen in November 2019 regarding the assault after negotiations for an accord and satisfaction broke down. JA2628-2630. White told Sayf and Dillon Abston that he was "talking to the feds" about "the Tiger incident." Sayf and Dillon Abston. JA2570, JA2850.

B.    Appellants' Motions to Continue

This case at one time had over 20 codefendants (JA194), and the litigation spanned years. *See* JA1-127. The case was continued multiple times due to superseding indictments, and COVID-related issues (including problems with scheduling and client access), and issues related to the extraordinary volume of discovery produced by the government. *See, id.* The issues related to the enormity of the discovery came to a head in the final months and weeks leading up to the trial which ultimately commenced on April 11, 2022.

13

On December 14, 2021, the government filed a Notice of Discovery Issues which indicated that they were not yet in receipt of a significant amount of discovery from the Fairfax County Police Department. JA546. The government conceded that they could not be certain when they would receive the omitted material from FCPD. JA549-550. The government followed that Notice with a Memorandum filed on January 4, 2022, which outlined the type of discovery that it anticipated producing as a result of the missing FCPD material. JA556. In that Memorandum the government indicated that it had already provided the defense with which included approximately 67,000 documents and approximately 368 gigabytes of discovery. JA557. That was in addition to "countless hours of telephone calls, video footage of gang activity, statements to law enforcement and relevant video from the [night] when the [defendants] were alleged to have kidnapped Brandon White." *Id.*

On January 4, 2022, the District Court convened a status conference in anticipation of the February 28, 2022, trial date. JA561. Based on the discovery issues and scheduling issues the trial was continued to March 28, 2022. JA600.

On February 25, 2022, the Defendants filed a Joint Motion to Dismiss, JA602, in which all the defendants joined, JA609-614. The motion was based on the sheer volume of the discovery produced since the hearing on January 5, 2022,

and the fact that the new discovery would necessitate another tolling of the Speedy Trial provisions. JA602.

On March 8, 2022, the Court convened another status hearing. JA632. Present at the hearing was Julie De Almeida, the Coordinating Discovery Attorney ("CDA"). The CDA had been appointed due to the volume of discovery and was charged with formatting the discovery into a structure for which search tools could be employed to review the discovery more quickly and efficiently.

The CDA indicated that the discovery (new discovery) she received since January 5, 2022, contained an additional 632 gigabytes consisting of 28 new phone dumps, bringing the total to 101 phones; 23 more categories of evidence, which the CDA's team typically organizes into separate files to facilitate efficient searches of the discovery. JA638. The files for the new discovery were so large that a single file could take "hours" to open. JA639. With regard to telephone dumps, the CDA's office normally generates a file for each phone with those files grouped together so that the attorneys can "search against all devices in one place." *Id*. Additionally, the new discovery contained 1,796 new jail calls, 4 Instagram accounts and other chat programs . . ." JA640. The approximate duration of the audio and video files in the new discovery was 349 hours. *Id*. The CDA advised the court that it would take her office approximately 2 to 2 ½ weeks from the date of the hearing to synthesize all the new discovery into a searchable database for the

attorneys. JA641. The new discovery not only included newly obtained material but also material that the government thought they had previously disseminated to the Defense in June and September of 2021. Those were Productions 11 and 12. JA650. It also contained the *Jencks* and *Giglio* material which the government provided to the defense 40 days prior to the anticipated March 28 hearing. JA664.

The Defense pointed out that the difficulty in reviewing the discovery was compounded by their inability to identify folders, subfolders, and files within the discovery. JA606, JA660. Furthermore, some of the files were so cumbersome that they either took an extremely long time to open or could not be opened at all. JA663.

In response to the District Court's inquiry about the basis for some of the late disclosures of evidence the government responded that it did not provide certain material because they were unaware of what defenses would be presented at trial. JA642. They also contended that the Defendants had not made any demands for specific information ". . .no questions, no concerns, no complaints," *Id.,* which was not the case, as counsel had months prior asked after the medical examiner's and forensic anthropologist's reports.

During the course of the hearing, the government pointed out that a large portion of the discovery was comprised of photographs, the vast majority of which were from license plate readers. JA645. They further delineated the contents of the

productions for the court indicating that much of the material was not relevant, and the court agreed. JA645, JA666, JA672. Therefore, it was their contention that the new discovery was not as extensive as it first appeared, suggesting that the defense lawyers should not have nearly the difficulty they anticipated, and the court agreed again. JA672.

Given the volume of the new discovery and the CDA's projected date for preparation of the discovery for the attorneys' review, the District Court denied the Motion to Dismiss and instead continued the case until April 11, 2022. JA678. Notably that left only two additional weeks to review the new material.

C.    Mr. Lamborn's Attorneys' Motion to Withdraw

On April 5, 2022, Mr. Lamborn's attorneys, Pleasant Brodnax and Alan Yamamoto, each filed motions to withdraw as counsel and for the appointment of new appointed counsel alleging, among other things, "irreconcilable difference which prevents effective representation." JA679, JA681.[1] The United States opposed, relying entirely on the timing of the motion—four days before trial. JA682.

---

[1] The attorneys technically filed the motions, but they filed them at Lamborn's request, so counsel will refer to them as Lamborn's motions in this brief.

Two days later, the district court held a pretrial motions hearing for the defendants. JA684. At that hearing, it addressed Mr. Lamborn's motion. JA727 – JA744. The attorneys said that "Mr. Lamborn had, in previous occasions, intimated that he was not happy with our services, both individually and collectively." JA727. They did not, however, file their motions to withdraw until four days before trial. JA679, JA681.

Mr. Lamborn then addressed the Court. He proffered several reasons that his attorneys were not providing him with effective assistance:

- When the case began, Mr. Yamamoto did not contact Mr. Lamborn for six months. JA729.

- His attorney did not give him discovery to look over, claiming that it was not ready even though at least one of the other defendants had been given discovery by his attorney months beforehand. Mr. Lamborn continued to ask for this discovery for months. *Id*.

- His attorney said that his office would "comb through" the multi-defendant discovery to mark for Mr. Lamborn the sections that applied to him. But even a cursory review of that "combed through" discovery revealed places where Mr. Lamborn "was mentioned but not bookmarked." JA730.

- His attorney did visit him for a period of three or four months, but then "the visits slowed down, and they just stopped altogether." JA731.

- His lawyer also stopped bringing him discovery "so to this day, [he's] seen less than one percent of [his] discovery."*Id*.

- But when he told his attorney months before trial that he still needed his discovery—for which he had been asking for three years—his attorney said that he thought that he had already provided it to Mr. Lamborn. When Mr. Lamborn expressed confusion, his lawyer

18

"quickly changed his answer and said 'COVID complications. Oh, now I remember, it was COVID complications.'" JA731. But, as Mr. Lamborn continued, COVID did not explain why his lawyers could not use that time to "comb through" his discovery and get it ready for him. JA731.

● Overall, his lawyers exhibited a pattern of abandoning him. As he states, "[s]o the first time I got a visit, it was almost -- it was probably over a year that I didn't have any visit, any call, no notification, no letters, anything to my family, nothing from my lawyers." JA733 – JA734.

Thus, Mr. Lamborn, about three months before trial and after nine months of no contact from his lawyers, told them, through his sister, to file a motion to withdraw and to appoint new counsel. JA734. At that point, his lawyers started to visit him, but he told them "I wanted a hundred percent put in a motion to get Mr. Yamamoto off my case because of this." JA735. As he noted, "the only time my lawyers chose to visit me is when I'm about to fire them, and I just don't feel like that makes a lot of sense to me." JA738.

He argued that he was not trying to create a delay, but he still wanted "a fair chance" to go over his discovery before trial. *Id*. He emphasized that he "really need[ed] time to go over [the discovery] because [he] believe[d] there's exculpatory evidence in the discovery that [he] [has not] even got a chance to peek at yet." *Id*. And, as he explained, "that's not my fault. And I don't feel like I should be faulted for that because I've been asking for the discovery for years, you know." *Id*.

The court denied the motion. JA742. The judge indicated that Mr. Lamborn's lawyers had been putting a lot of work into his case "based on the work that I've seen." *Id*. The court emphasized that "the motion is untimely. We're five days from trial or less." *Id*.

Mr. Lamborn interjected "Your Honor—" and the court said "Stop, stop, stop, stop, You're done. I'm telling you that they won't do things that you requested, you . . ." JA733.

But Mr. Lamborn continued, disputing that the late filing should be held against him:

> THE DEFENDANT: I am telling you that -- I told you that. I asked them to file for a motion for new counsel three months ago, and I got that in the text message that my sister sent to them.
>
> THE COURT: Okay.
>
> THE DEFENDANT: So I got that in black and white, so if you want to see it, I'll show it to you. I can get my sister to come down and –
>
> THE COURT: Stop. You could have written me a letter. If you wanted, other counsel could have done that. And I've heard you made conflicting statements about "I decided to wait" after you first said you wanted new counsel, and you decided because they said that they were going to work on your behalf.
>
> THE DEFENDANT: I never said that
>
> .

JA743 – JA744.

The court did not further inquire about Mr. Lamborn's assertion that he had asked his lawyers to file the motion three months earlier, nor did it address Mr. Lamborn's offer to bring written and testimonial proof of his request.

Instead, the court issued a short, written order reiterating that the motion was not timely filed because of the imminent trial date. JA4864. It also indicated that it did not perceive a breakdown in the relationship between Mr. Lamborn and his attorneys. JA4865. And it indicated that "[t]he Court is confident that Mr. Lamborn and his attorneys will be able to present a meaningful defense." JA4864.

The court's confidence was, unfortunately, unfounded. Mr. Lamborn's relationship with his attorneys was irrevocably broken, to the point of Mr. Lamborn almost physically attacking his lawyer on the 10th day of trial. JA3229. Without substitute counsel, he ended up representing himself for the remainder of the proceedings. *See* JA3230, *et seq*.

Mr. Lamborn did his best, but without legal training, he simply did not have the ability to present an adequate defense. His closing argument ended up disjointed because the government and the court had to interrupt and stop him eight different times in front of the jury because he kept making mistakes. JA4612, JA4613, JA4618, JA4619, JA4621, JA4624, JA4629, JA4630.

D.  Special Conditions of Supervised Release Imposed on Appellants Peter Le, Lamborn, and Yoo

As part of the sentences for Peter Le, Mr. Yoo, and Mr. Lamborn, the district

court announced special conditions of supervised release. For Peter Le, the court

announced

> As special conditions of supervised release, I'll order that you apply all moneys received to make the restitution payment; that you provide a probation officer with any financial information; that you not have any contact with gang members; that you participate in drug program as approved by the Probation Office if it's determined you need it; and also participate in mental health treatment.

JA4750.

For Mr. Yoo, the court announced

> that you apply all monies that you receive to making restitution; that you provide financial information to the Probation Office; that you not contact any gang members; that you participate in a substance abuse program as directed by the Probation Office; and that you also participate in mental health treatment as directed by the Probation Office.

JA4753.

For Mr. Lamborn, the court announced

> As special conditions, that you apply all monies received to the restitution; that you don't have any contact with known gang members; and that you participate in substance abuse and mental health treatment as directed by the Probation Office if you are allowed out on supervised release.

JA4757.

For each of the three defendants, their written judgments included conditions of supervised release that were not part of their sentence.

Peter Le's written judgment contained the following special conditions:

1) The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains, to the outstanding court-ordered financial obligation, or in a lesser amount to be determined by the court, upon the recommendation of the probation officer.

2) The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

3) The defendant shall provide the probation officer access to any requested financial information.

4) The defendant shall not knowingly have any contact, by any means, with anyone known to be a member or associate of a criminal street gang or other criminal organization, including, but not limited to, the Reccless Tigers and Asian Boyz, or any of their affiliates.

5) If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

6) The defendant shall participate in a program approved by the United States Probation Office for mental health treatment. The cost of this program is to be paid by the defendant as directed by the probation officer.

JA4784

Mr. Yoo's written judgment contained the following special conditions:

23

1. The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains, to the outstanding court-ordered financial obligation, or in a lesser amount to be determined by the court, upon the recommendation of the probation officer.

2. The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

3. The defendant shall provide the probation officer access to any requested financial information.

4. The defendant shall not knowingly have any contact, by any means, with anyone known to be a member or associate of a criminal street gang or other criminal organization, including, but not limited to, the Reccless Tigers and Asian Boyz, or any of their affiliates.

5. If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

6. The defendant shall participate in a program approved by the United States Probation Office for mental health treatment.

JA4776.

Mr. Lamborn's written judgment contained the following special conditions:

1.) The defendant shall apply all monies received from income tax refunds, lottery winnings, inheritances, judgments, and any anticipated or unexpected financial gains, to the outstanding court-ordered financial obligation, or in a lesser amount to be determined by the court, upon the recommendation of the probation officer.

2.) The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

3.) The defendant shall provide the probation officer access to any requested financial information.

4.) The defendant shall not knowingly have any contact, by any means, with anyone known to be a member or associate of a criminal street gang or other criminal organization, including, but not limited to, the Reccless Tigers and Asian Boyz, or any of their affiliates.

5.) If the defendant tests positive for controlled substance or shows signs of alcohol abuse, the defendant shall participate in a program approved by the United States Probation Office for substance abuse, which program may include residential treatment and testing to determine whether the defendant has reverted to the use of drugs or alcohol, with partial cost to be paid by the defendant, all as directed by the probation officer.

6.) The defendant shall participate in a program approved by the United States Probation Office for mental health treatment. The cost of this program is to be paid by the defendant as directed by the probation officer.

7.) The defendant shall make a good faith effort to obtain his GED.

JA4768.

This appeal follows.

## SUMMARY OF ARGUMENT

ISSUE I:

The denial of the defense's motions to continue due to the late disclosure of terabytes of discovery by the government effectively denied the Appellants' Sixth Amendment rights to counsel at the most critical of stages—trial, as counsel's ability to put the prosecution's case to a meaningful adversarial test was stifled by their inability to get through the material prior to trial.

ISSUE II:

The system abandoned Joseph Lamborn. The system would not even listen to Joseph Lamborn. Four days before trial, his attorneys filed a motion to withdraw as counsel and for the Court to appoint new counsel, alleging a breakdown in the attorney-client relationship. The district court, at a pre-trial motions hearing for multiple defendants, denied the motions as filed too late.

But Mr. Lamborn responded that he had asked his attorneys three months earlier to file the motions but that they ignored him. He explained that he had been in COVID quarantine and in pre-trial lockup and needed his attorneys to communicate his request, which they did not do. He told the court that his sister had a record of his asking his attorneys to file the motions three months before they did. He offered to bring a copy of that record to court and to have his sister testify that his attorneys had been asked to file the motion months before.

The district court ignored this information. It did not hold a hearing to attempt to determine what happened. Instead, it issued a short order saying that the motions were filed late, the lawyers were fine, and the motions were denied.

The district court abused its discretion by not exercising it. Mr. Lamborn told the court that he had asked his attorneys to file the motion months before trial and that they ignored him. He further indicated that he had a record of this communication. Instead of holding a hearing to determine what happened, the court

simply did nothing with this information, reiterating in its order that the motion was not timely filed.

Mr. Lamborn deserved more. When a criminal defendant indicates that he has a conflict with his attorneys, a district court has a basic obligation to address that concern. Here, the court did not, which was an abuse of its discretion.

This Court must vacate Mr. Lamborn's conviction and remand with for a new trial with new appointed counsel. In the alternative, this Court must vacate the conviction and remand for a hearing to determine whether Mr. Lamborn asked his counsel to withdraw three months before they filed the withdrawal motion.

ISSUE III:

A defendant has the right to be present at his sentencing. Thus, only conditions of supervised release announced at a defendant's sentencing are part of his sentence. Thus, if a written judgment included conditions not announced at sentencing, then it is erroneous. The remedy for this error is full resentencing.

Peter Le's, Mr. Yoo's, and Mr. Lamborn's written judgments each contain conditions of supervised release that are not part of their sentences. Thus, this Court must vacate their sentences and remand for full resentencing.

ISSUE IV:

The evidence was insufficient for the jury to find, beyond a reasonable doubt, that the defendant was guilty of Counts 3, 4, 5 and 7; the court, therefore, erred when it denied Mr. Yoo's Rule 29 motion.

As to Counts 3 and 7, the evidence did not prove that Mr. Yoo committed a murder, an essential element of VICAR murder and killing while engaged in drug trafficking. Moreover, the evidence did not prove that Mr. Yoo knew or had reason to know that others intended to kill the victim, rather than beating him. As to Counts 4 and 5, the kidnapping counts, the evidence did not establish that Mr. Yoo either planned or executed the plot to inveigle the victim to arrive at the site where the kidnapping was executed, or to seize him once the victim was there. There was also insufficient evidence to prove that Mr. Yoo participated in the continuing detention and the killing of the victim once the participants and others arrived in Richmond.

ISSUE V:

The evidence was insufficient as a matter of law for a jury to find beyond a reasonable doubt that Peter Le planned, knew, had reason to know, or agreed that Brandon White was to be kidnapped let alone killed, or that he knowingly participated in either act. The evidence as to what happened in the Giant parking lot was at best in equipoise as to whether Mr. Le made any contact with White. By all

accounts Mr. Le was himself without a weapon, and precisely what occurred in Richmond remains unknown; but in no accounting was Mr. Le a perpetrator of deadly violence against Brandon White.

ISSUE VI:

In response to Tony Le's motion to dismiss based on Speedy Trial Act violations under 18 U.S.C. § 3161, the district court failed to provide ends-of-justice and balancing test justifications for the denial of the motion and granting of continuances, as required by the Supreme Court and this Court. Further the "co-defendant" clause under the Speedy Trial Act fails to toll the speedy trial clock in this case because continuances of the case for all defendants suffered from the same infirmities. Two-and-a-half years between Tony Le's first appearance and trial, after numerous demands to protect his speedy trial rights and to sever the case, is simply too long under the Act. The charges against Tony Le must be dismissed based on these violations.

Regarding the Sixth Amendment speedy trial motion, the district court simply failed to render a decision. This failure requires that the matter be remanded to the district court for resolution of the motion.

ISSUE VII:

At sentencing, the district court treated Tony Le as if he had been convicted of all charges, imposing a trial penalty and enhancing his sentencing guidelines

based on acquitted conduct. The court further imposed sentencing enhancements that were not supported by the evidence. Additionally, the sentencing court failed to make a proper assessment of unwarranted disparities under 18 U.S.C. § 3553(a)(6), imposing a sentence on Tony Le far greater than those of more culpable co-defendants. The procedural and substantive defects in the district court's sentencing decisions require that the judgment be reversed and the case remanded for resentencing.

## ARGUMENT

I.    APPELLANTS WERE DENIED A FAIR TRIAL BECAUSE THE DISTRICT COURT DENIED THE DEFENSE'S JOINT REQUEST FOR A CONTINUANCE AFTER A LATE, VOLUMINOUS DISCOVERY DISCLOSURE

A.    Standard of Review

This Court reviews a trial court's denial of a continuance for abuse of discretion. *Morris v. Slappy*, 461 U.S. 1, 11-12, 103 S. Ct. 1610, 1616, 75 L. Ed. 2d 610 (1983); *United States v. Williams*, 445 F.3d 724, 738-39 (4th Cir. 2006). Generally, the trial court's decision will be upheld unless it was based on an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay. *Id.* Even if an abuse of discretion is found, the defendant must show prejudice, i.e., that the denial had a detrimental effect on their ability to present a defense or receive a fair trial. *See United States v. Hedgepeth*, 418 F.3d 411, 423 (4th Cir. 2005).

B.     Argument

As noted by the United States Supreme Court in *United States v. Cronic*, 466 U.S. 648, 659-60 (1984), "[t]he presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable . . .." The Court went on to note that "circumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.*; *See also United States v. Copeland*, 707 F.3d 522 (4th Cir. 2013) (citing *Morris v. Slappy*, 461 U.S. 1, 11–12, 103 S.Ct. 1610, 75 L.Ed.2d 610 (1983)).

In fact, trial counsel admitted to having failed to provide effective assistance during the trial. JA359. In one specific instance, counsel for Peter Le indicated that she neither consulted with nor retained a forensic anthropologist to assist in challenging the government's key evidence as to the injuries suffered by White. *Id.* While the *Strickland* standard for determining ineffective assistance of counsel permits counsel to "make a reasonable decision that makes particular investigations

unnecessary," counsel in this case were *unable* to make the permissible strategic

decisions, as they were not fully apprised of everything in the discovery prior to,

and far enough in advance of, trial to even *view* it all, let alone digest it and make

effective use of it. *Strickland v. Washington,* 466 U.S. 668, 691, 104 S. Ct. 2052,

80 L. Ed. 2d 674 (1984). *See,* JA359-360.

II.    THE DISTRICT COURT ABUSED ITS DISCRETION BY
       DETERMINING THAT MR. LAMBORN'S REQUEST FOR A NEW
       ATTORNEY WAS UNTIMELY BECAUSE IT DID NOT ADDRESS HIS
       PROFFER THAT HE HAD EVIDENCE TO SHOW THAT HE ASKED
       HIS ATTORNEYS TO FILE THE MOTION THREE MONTHS BEFORE
       THEY DID.

A.     Standard of Review

       This Court "review[s] the denial of [a defendant]'s motion for substitute

counsel for abuse of discretion." *United States v. Horton*, 693 F.3d 463, 466 (4th

Cir. 2012).

B.     The District Court Abused its Discretion

       "In all criminal prosecutions, the accused shall enjoy the right . . . to have the

Assistance of Counsel for his defense." U.S. Const. Amend. VI. This right extends

beyond "[t]he mere physical presence of competent counsel" *United States v.*

*Smith*, 640 F.3d 580, 588 (4th Cir. 2011). It instead "guarantees a defendant in a

criminal case the *effective* assistance of *competent* counsel." *Hoffman v. Leeke*, 903

F.2d 280, 285 (4th Cir. 1990) (emphasis added). "He requires the guiding hand of

counsel at every step in the proceedings against him." *Powell v. Alabama,* 287 U.S. 45, 69 (1932).

Thus, when the relationship between a defendant and his appointed attorney breaks down to the point where the attorney can no longer provide effective representation, the defendant has "the right to appointment of substitute counsel" which "spring[s] directly from the indigent defendant's right to counsel" under the Sixth Amendment. *United States v. Smith*, 640 F.3d 580, 588 (4th Cir. 2011).

When a district court denies a defendant's motion for substitute counsel, this Court's "review . . . has focused on three inquiries: (1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." *Id.* (internal citations and quotations omitted). Reviewing these factors reveals that the district court abused its discretion in denying the motion without further inquiry.

As the United States itself acknowledges, "one of the key factors in deciding a motion to withdraw is the timeliness of the request." JA682 (citing *Smith*, 640 F.3d at 588). And, indeed, the district court denied Mr. Lamborn's motion primarily on the untimeliness of the motion—mere days before trial.

Mr. Lamborn agrees that if he had told his attorneys to bring this motion only days before trial, then it would have been untimely. *See United States v.*

*Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014) (holding that a motion brought three days before trial was untimely).[2] But, critically, he told the district court that he asked his attorneys to file the motion three months earlier. Had they filed the motion then, it would have been timely. *See id.* (noting that motions filed two weeks and three weeks before trial had been considered timely).

And Mr. Lamborn did not merely assert that he asked his attorneys to withdraw. He told the district court that he had both a written record of that communication and a witness who would come testify about it. At that point, the district court had an obligation to inquire further as part of its discretionary determination. "[T]he abuse of discretion standard implies that the judge must actually exercise his discretion." *LSLJ Partnership v. Frito-Lay*, 920 F.2d 476, 479 (7th Cir. 1990) (internal quotation omitted).

The system placed Mr. Lamborn in an untenable position. He had to object to his attorneys' performance through his attorneys. This Court has "note[d] the circularity of requiring a defendant who is by hypothesis represented by counsel . . . to object to that representation through said counsel." *Stanko v. Stirling*, 109 F.4th 681, 686 n.1 (4th Cir. 2024) (discussing counsel with a conflict of interest).

---

[1] *Blackledge* involved a civil commitment proceeding under 18 U.S.C. § 4248, so the Sixth Amendment criminal right to counsel did not apply. *Blackledge*, 751 F.3d at 197. But this Court assumed without deciding that the Sixth Amendment standard applied to Mr. Blackledge's claim under the Due Process Clause and analyzed it under that standard, so *Blackledge* applies in this appeal. *Id.*

Here, the district court denied Mr. Lamborn's motion based on untimeliness when Mr. Lamborn claimed that the very untimeliness at issue stemmed from his attorneys.

"When a defendant raises a seemingly substantial complaint about counsel, the judge has an obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction." *United States v. Mullen*, 32 F.3d 891, 896 (4th Cir. 1994) (internal quotation omitted). Thus, the district court needed to further inquire into Mr. Lamborn's proffered evidence.

Because if Mr. Lamborn's evidence showed what he claimed—that he unequivocally asked his attorneys to file a motion to withdraw and they sat on that request for three months—then it would directly affect all three of the relevant factors: the court (1) failed to conduct an adequate inquiry into (2) the timeliness of the motion; and (3) whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense.

Because the district court did not inquire into Mr. Lamborn's proffer, "this Court is essentially left with an incomplete record upon which to determine the third factor: the extent of the breakdown in communication and whether it was so great that it prevented an adequate defense." *Horton,* 693 F3d at 467. And the courts have an obligation to address that factor. The district court mentioned several times that it was familiar with Mr. Lamborn's counsel and that it considered

them very good lawyers. But that assessment—even if true—is not enough. "[A]n attorney's competence cannot cut short the inquiry because, even if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense." *Blackledge*, 751 F.3d at 195 (internal quotation omitted).

The district court abused its discretion in failing to conduct an adequate inquiry and basing its holding on its inadequate review.

## C. The Error Was Not Harmless

This Court reviews a district court's erroneous denial of a motion for substitute counsel for harmless error. *See, e.g., Horton,* 693 F3d at 467. "In order to prevail on harmlessness, the government must show that an error did not affect a defendant's substantial rights." *United States v. Pena*, 952 F.3d 503, 512 (4th Cir. 2020) (internal quotation omitted). The government cannot make that showing here for multiple reasons.

First, without an adequate record, the government cannot show how deep the error went and how badly it prejudiced Mr. Lamborn. Mr. Lamborn claimed that his attorneys would go months and years without contacting him. He claimed that they did not send him discovery even when other defendants had theirs. He claimed that he asked them to file a motion to withdraw that they sat on for months. If true, these allegations would reveal a complete breakdown in communications that the government could not show did not affect Mr. Lamborn's substantial rights.

And, because the district court denied Mr. Lamborn's motion, he ended up going pro se—revealing that the district court likely would have found a more fundamental breakdown in the attorney-client relationship had it properly inquired into it. When Mr. Lamborn went pro se, he gave his own closing argument before the jury, which was disjointed and had to be constantly interrupted by the government and the district court. "Some lawyers and experts in trial communication consider the concluding phase of a closing argument to be the most critical few minutes of the closing argument, and possibly of the entire trial process." 4 Federal Trial Guide § 90.120 (Matthew Bender). The government cannot show that a more competent closing would not have resulted in a different outcome.

Mr. Lamborn appreciates the difficulties of a district court managing a pro se defendant. But the district court itself placed Mr. Lamborn into that position by denying his motion for substitute counsel without proper inquiry.

The district court abused its discretion. That error was harmful. This Court must vacate his conviction and remand for a new trial with new counsel or for the district court to re-conduct the inquiry into Mr. Lamborn's motion with the proper fact finding.

III. DEFENDANT PETER LE'S, MR. YOO'S, AND MR. LAMBORN'S WRITTEN JUDGMENTS EACH CONTAIN CONDITIONS OF SUPERVISED RELEASE THAT ARE NOT PART OF THEIR SENTENCES. THUS, THIS COURT MUST VACATE THEIR SENTENCES AND REMAND FOR FULL RESENTENCING

A. Standard of Review

This Court reviews "the consistency of [an] oral sentence and the written judgment de novo, comparing the sentencing transcript with the written judgment to determine whether an error occurred as a matter of law." *United States v. Rogers,* 961 F.3d 291, 296 (4th Cir. 2020) (internal quotation omitted).

B. Argument

"The terms and conditions of supervised release are a substantial imposition on a person's liberty." *United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002). And "all non-mandatory conditions of supervised release must be announced at a defendant's sentencing hearing." *Rogers*, 961 F.3d at 296. "This conclusion flows naturally from a fundamental precept: A defendant has the right to be present when he is sentenced." *Id.* If the written conditions differ from the sentence imposed, then the proper remedy is to remand for full resentencing. *United States v. Singletary,* 984 F.3d 341, 346 & n.4 (4th Cir. 2021).

Here, the written judgments for defendants Peter Le, Mr. Yoo, and Mr. Lamborn contain written conditions of supervised release that are not part of their

sentence. Thus, this Court must vacate their sentences and remand for full

resentencing.

IV. THE DISTRICT COURT ERRED IN DENYING APPELLANT YOO'S RULE 29 MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT HE WAS GUILTY OF COUNTS 3 (VIOLENT CRIMES IN AID OF RACKETEERING – MURDER), 4 (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING RESULTING IN DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG TRAFFICKING)

A. Statement of Additional Facts

Young Yoo was a member of Tiger Side, JA2394, which was a loose group, not run by one person, JA2412, that dealt marijuana. White, a/k/a/ "Bahim," owed Mr. Yoo money for marijuana he had fronted him. JA2736-2739. Although other gang members offered to intervene, Mr. Yoo declined their assistance. JA1838-1839, JA1890-1893.

Independent of Mr. Yoo, Fahad and Sayf initiated a plan to "deliver" White to Peter Le. JA2847-2860, JA2902, JA2906. According to Fahad, his good friend Sayf, who owed Peter Le a drug debt, was also a customer of White's, and so Fahad asked Sayf to help set up White. JA2850-2851, JA2961-2964. They devised a plan to deliver White to Peter Le and Mr. Lamborn. JA2852-2865, JA2907, JA2911.

Fahad and Sayf inveigled White to join them on a fictitious errand. JA2854-2856, JA2964-2969. They brought him to a rendezvous with Peter Le, Lamborn,

39

and others at Loehmann's Plaza. JA2861-2866, JA2965-2979, JA3101-3103. There was no evidence that Mr. Yoo was involved with instigating or planning the plot, or that there was a plan to kill White. Mr. Yoo expressed complete surprise when White showed up at Loehmann's Plaza: "Oh shit, that's him. That's Bahim." JA3103.

When White arrived at Loehmann's Plaza, Mr. Lamborn gestured to White, suggesting that he had a gun. JA2866, JA2872. Witnesses offered conflicting accounts of who pushed White into a car, but White wound up in a vehicle driven by Sascha Carlisle (aka "Wolf"), along with Peter Le and Mr. Lamborn. JA2864-J2866.  Mr. Yoo was sitting in, and remained in, another car. JA2866, JA2978-2980, JA3103, JA3105. While Sayf reported seeing Peter Le and Mr. Lamborn were wearing latex gloves, JA2866, JA2877, JA2980, no one testified that Yoo had them. Fahad, Sayf, and Kevin Aegeson, another gang member who was present, all thought that the object of the plan was to beat, or "jump," White. JA2892, JA3101.

The car driven by Wolf, containing Peter Le, Mr. Lamborn, and White drove to Richmond. The car in which Mr. Yoo, Aegesen, and Fahad were riding, followed. JA3105-3106. Once there, both cars parked at a traffic circle. JA3108-3109. Peter Le and Mr. Lamborn "headed towards the woods with White," and, only after they were in the woods, did Mr. Yoo exit the car and follow them.

JA3031-3033, JA3177-3179. After a few minutes, Aegesen heard gunshots. JA3036. All but White emerged from the woods and they left in the two cars.

Spencer Pak testified that Mr. Yoo told him that he and "Joe" "got Bahim from a parking lot." After indicating no one else "got him," he testified, with prompting by the prosecutor, that "two black guys" and Peter Le were also there. The prosecutor then misrepresented his testimony as to who was present and what they did – "did he say anything else other than Peter Le, Joe Yoo (sic), Trigger and YG [Mr. Yoo] got him into another car" - but Pak instead insisted, over the prosecutor's attempts to elicit different testimony - that Mr. Yoo *had not* told him that Peter Le was *not* "present in the parking lot," and had instead told Mr. Yoo "he had Bahim," and Mr. Yoo should come get him. JA3281-3283. Pak also claimed that Mr. Yoo told him Peter Le handed Mr. Yoo a knife, with which Mr. Yoo stabbed White, before "Joe" shot White. JA3284.

Suong Park testified that sometime after the killing, he saw Mr. Yoo and Douglas Martinez having a conversation. Mr. Yoo looked distraught and just kept saying it was all "just bad." Later, Mr. Lamborn said that "he killed the dude," that he took Bahim into the woods and shot him. JA3281-3283. Park also testified Mr. Lamborn had told him he had to lay low because he (Lamborn) had murdered White. JA3284.

41

Kyu Hong testified that Mr. Yoo did not want to do "missions" or live a "gangster life," and tried to talk gang members out of violence. JA3695-3696. Moreover, according to Hong, Mr. Yoo did not want to kill White; he wanted to pay him instead for the injuries he had suffered when a gang member beat him up. JA3703.

A pathologist testified that there were gunshot and sharp force wounds, but he could not say that arteries or organs were cut by sharp force. JA3765.

B.   Standard of Review

Mr. Yoo's Rule 29, F.R.Cr.P. motion was denied by the district court. JA4128-4130. This court reviews the denial of a Rule 29 motion *de novo*. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005), *cert. denied*, 547 U.S. 1113, 164 L. Ed. 2d 687, 126 S. Ct. 1925 (2006).

While "[c]onvicted defendants who challenge the sufficiency of the evidence against them face 'a heavy burden'" *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023) (quotation marks removed), this is not an insurmountable burden. *United States v. Habegger*, 370 F.3d 441, 444-445 (4th Cir. 2004). This Court must view the evidence in the light "most favorable to the prosecution" and assume the jury resolved all credibility disputes in the government's favor. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). However, a jury is entitled to make only reasonable inferences from the evidence. *See, United States v. Samad*,

754 F.2d 1091, 1097 (4th Cir. 1984) (quoting *United States v. Orrico*, 599 F.2d 113, 117 (6th Cir. 1979)).

"[The Court] must uphold the jury's verdict if it is supported by 'substantial evidence,' which means 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.' *United States v. Smith,* 451 F.3d 209, 216 (4th Cir. 2006)." *United States v. Gallagher*, 90 F.4th Cir. 182, 190 (4th Cir. 2024).

C.  Argument

The evidence was insufficient to prove the murder-based charges beyond a reasonable doubt and the District Court erred in denying Mr. Yoo's Rule 29 motion

i.  Violent Crime in Aid of Racketeering – Murder (Count 3)

"VICAR murder requires: (1) there be an enterprise' as defined in 18 U.S.C. § 1959(b)(2); (2) the enterprise be engaged in 'racketeering activity,' as defined in § 1961; (3) the defendant committed a murder; (4) the murder violated state or federal law; and (5) the murder was committed for a pecuniary purpose or for the purpose of gaining entrance to or maintaining or increasing position in the enterprise. *See United States v. Ortiz-Orellana*, 90 F.4th 689, 701 (4th Cir. 2024)." *United States v. Tipton*, 95 F.4th 831, 847 (4th Cir. 2024). The evidence was insufficient to prove the third element beyond a reasonable doubt.

> To prove the crime of aiding and abetting the government must show
> that the defendant knowingly associated himself with and participated

in the criminal venture. *Nye & Nissen v. United States*, 336 U.S. 613, 619, 620, 93 L. Ed. 919, 69 S. Ct. 766 (1949); *United States v. Beck*, 615 F2d 441, 448 (7th Cir. 1980); *United States v. Pearlstein*, 576 F2d 531, 546 (3d Cir. 1978); *United States v. Di Stefano*, 555 F2d 1094, 1103 (2d Cir. 1977). To prove the element of association, the government must show that the defendant shared in the principals' criminal intent. *United States v. Beck*, 615 F2d at 449. This requires evidence that the defendant be aware of the principals' criminal intent and the unlawful nature of their acts. *United States v. Pearlstein*, 576 F2d at 546.

*United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983). "[A] criminal defendant's mere presence at the scene of the crime or his knowledge of that crime is insufficient to establish that he joined a conspiracy or aided and abetted in the commission of the crime. Instead, the defendant's *active, knowing participation* is required before a conviction may be entered." *United States v. Love*, 767 F.2d 1052, 1059 (4th Cir. 1985) (emphasis added) (citing *United States v. Weil*, 561 F.2d 1109, 1112 (4th Cir. 1977)). *See, also, United States v. Lewis*, 1993 U.S. App. LEXIS 32986, *4 (4th Cir. 1993) (unpublished) ("Mere presence at the scene of the crime and guilty knowledge of the crime are not enough to convict a defendant of aiding and abetting. In such cases, the prosecution must show that the defendant 'acted or failed to act with the specific intent to facilitate the commission of a crime by another.' *United States v. Head*, 927 F.2d 1361, 1373 (6th Cir.1991), *cert. denied*, 112 S. Ct. 144 (1991)"). *See, also, Rosemond v. United States*, 572 U.S. 65, 71, 188 L.Ed.2d 248, 134 S. Ct. 1240 (2014) (". . . those who provide *knowing aid*

to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime") (emphasis added) (citation omitted).

There was no evidence that Mr. Yoo instigated or planned the inveiglement of White or his seizure. The kidnapping was instigated by Fahad and Sayf, who devised a plan to deliver White to Peter Le. JA2847-2860, JA2902, JA2906, JA2956. Indeed, Mr. Yoo expressed great surprise when White arrived at Loehmann's Plaza. JA3103.

Likewise, Mr. Yoo played no role in the execution of the plan. The inveiglement of White was done by Fahad and Sayf, who "delivered" White to Loehmann's Plaza. JA2852-2865, JA2869-2871. Nothing indicated that their intent was to kill White. Indeed, both Fahad and Kevin Aegeson, a gang member who was also present at Loehmann's Plaza, thought that White was just going to be beaten or "jumped." JA2850-2851, JA2892-2893, JA3892, JA3021, JA3101.

The two cars drove from Loehmann's Plaza to Richmond, stopped at a circle in a Richmond neighborhood, Peter Le and Mr. Lamborn exited their vehicle with White and headed into the woods. Only after they were in the woods did Mr. Yoo exit the car in which he had been riding and follow them. JA3031-3033, JA3177-3179. Thus, Mr. Yoo did not cause or encourage White to exit the vehicle, nor did he escort, lead, entice or direct White into the woods. Fahad also testified that he did not see Mr. Yoo with a weapon. JA3036. Consequently, the evidence did not

establish that Peter Le and Mr. Lamborn intended to kill White when they entered the woods, nor that Mr. Yoo would have assumed that Peter Le and Mr. Lamborn intended to kill White, just as Aegeson and Fahad did not.

After Peter Le and Mr. Lamborn had gone with White into the woods, and Mr. Yoo had followed, Fahad heard several gunshots. JA3037-3038. White was, in fact, killed by gunshots. JA3765. It would be improper to credit Spencer Pak's testimony as to Mr. Yoo's alleged descriptions of White's kidnapping or Mr. Yoo's alleged admission that he stabbed White, because it is inconsistent with the testimony of Fahad and Aagesen, who were actually present. JA286, JA3029-3030, JA3174, JA3278, JA3358-3359. Moreover, it cannot be assumed that the jury accepted his testimony, since it may have improperly found him guilty based upon his accompaniment of Peter Le and Mr. Lamborn to Richmond and his entry into the woods before White was killed.

Given the scant evidence about what happened in the woods, and the testimony of the government's own witness that Mr. Yoo did not want to do "missions" or live a "gangster life," discouraged violence by gang members, and, more specifically, wanted to pay White for his injuries rather than kill him, JA3695-3696, JA3703, there was no reasoned basis for concluding, beyond a reasonable doubt, that Mr. Yoo committed, or aided or encouraged the murder by Peter Le. Therefore, the evidence did not support the third requirement – that Mr.

Yoo committed a killing and the government did not prove this element of a

VICAR murder.

## ii. Conspiracy to Commit Kidnapping and Kidnapping Resulting in Death (Counts 4 and 5)

"To prove a conspiracy, . . . , the government must establish an agreement to

commit an offense, willing participation by the defendant, and an overt act in

furtherance of the conspiracy. *United States v. Edwards*, 188 F.3d 230, 234 (4th

Cir. 1999).

"[K]idnapping resulting in death, in violation of [18 U.S.C.] § 1201(a), . . .

require[s] the government to prove as essential elements: (1) that the victim was

seized, confined, inveigled, decoyed, kidnapped, abducted or carried away; (2) that

the victim was held; (3) that the victim was transported interstate; and (4)

that death resulted," *United States v. Lentz*, 524 F.3d 501, 512 (4th Cir. 2008), or,

in place of interstate travel, the government may prove that "the offender travels in

interstate or foreign commerce or uses the mail or any means, facility, or

instrumentality of interstate or foreign commerce in committing or in furtherance

of the commission of the offense." 18 U.S.C. § 1201. *See, United States v. Small,*

988 F.3d 241, 251 (6th Cir. 2021).

As discussed in relation to Count 3, Mr. Yoo did not instigate or participate

in the planning of the scheme to kidnap White. Likewise, Mr. Yoo played no role

in the inveiglement of White, causing him to come, or be brought, to Loehmann's

Plaza, or in his being seized and wrestled into Wolf's car. Mr. Yoo's trailing the car carrying White to Richmond does not satisfy the requirement that he knowingly joined a kidnapping conspiracy or aided and abetted the kidnapping.

Once in Richmond, Mr. Yoo remained in the car while Peter Le and Mr. Lamborn went with White into the woods. Only once they were in the woods did Mr. Yoo emerge from the car and follow them. JA3034-3035, JA3179. Although Pak testified that Mr. Yoo admitted to stabbing White, that would not mean he aided and abetted White's seizure, detention, confinement, inveiglement, carrying away, abduction or kidnapping; it would simply mean that he committed and aggravated wounding.

### iii. Killing While Engaged in Drug Trafficking (Count 7)

Section 848(e) provides, in relevant part:

> (1) In addition to the other penalties set forth in this section --
> (A) any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, [**14] or causes the intentional killing of an individual and such killing results, shall be sentenced to any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death . . . . 21 U.S.C. § 848(e)(1)(A).

*United States v. Aguilar*, 585 F.3d 652, 657 (4th Cir. 2009). To obtain a conviction under this statute, the government must prove that one of the reasons for the killing was related to the drug conspiracy. *See, id.* at 659-660.

For the reasons set forth above as to Count 3, the evidence was insufficient to prove, beyond a reasonable doubt, that Mr. Yoo intentionally killed White himself or that he aided and abetted his killing. And most certainly the government did not prove that Mr. Yoo counseled, commanded, induced, procured or caused White's killing,

For the foregoing reasons, Mr. Yoo's convictions on Counts 3, 4, 5 and 7 should be reversed and dismissed.

V.  THE DISTRICT COURT ERRED IN DENYING APPELLANT PETER LE'S RULE 29 MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE BEYOND A REASONABLE DOUBT THAT HE WAS GUILTY OF COUNTS 3 (VIOLENT CRIMES IN AID OF RACKETEERING – MURDER), 4 (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING RESULTING IN DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG TRAFFICKING)

A.  Statement of Additional Facts

In the days leading up to January 31, 2019, Sayf and Fahad came up with an unsolicited plan to "deliver" White to Peter Le in order to pay off their respective marijuana debts (though both Sayf and Fahad claim it was the other guy's idea). JA2851, JA2892, JA2998. On that night, Fahad and Sayf were with three friends when they told them they were going to pick up White and deliver him for a beating. JA2892. Those friends wanted nothing to do with it, so Fahad expedited a previously planned "purchase" of a vehicle from Peter Le—an older Mercedes registered to and in the possession of Jonathan Kinney. JA2893. Under the guise of

a Percocet purchase, Sayf arranged for him and Fahad to pick up White at White's grandmother's house. JA2852, JA2856. They did so, and at that point had no idea where they were going to bring him or to whom, since all of this—although discussed days earlier—was occurring very "spur of the moment" because Sayf and Fahad were "all bored" that day. JA3023.

The Mercedes broke down, and the trio wound up leaving the car at an Exxon and heading to McDonald's, where Fahad says he called Peter Le . . . to tell him about the car. JA2974, JA3026. Although *Fahad and Sayf* planned to "deliver" White to Peter, their decision to do so that day was impulsive and unplanned, and they had never arranged said "delivery" with Peter:

> I mean, it wasn't really, like, like an organized plan, like. It was just a time of the moment, so whenever the car broke, it was just -- it wasn't no certain location for me to take or drop -- meet up with Peter Le, Savage, it was just –

JA2974-2975.

While Fahad and Sayf were finding their unplanned kidnapping thwarted by a broken-down car, Peter Le, Kevin Aagesen, and Sascha Carlisle (aka "Wolf") were "chilling" at Peter's apartment, smoking marijuana. JA3099, JA3138. Mr. Yoo and Mr. Lamborn arrived from where they were staying in Maryland, where they had left Soung Park, indicating they were going on a mission and that he didn't need to come with them. JA3475-3476. Mr. Yoo, Mr. Lamborn, Peter Le, Aagesen and a fifth friend, Sascha Carlisle, left Peter Le's apartment in two

separate cars and drove to a Giant parking lot near the McDonald's. JA3101. The cars parked in front of the store—which was open and well-lit. JA3102, JA3143. Fahad and Sayf walked with White from McDonald's across the parking lot toward Giant to meet the group. Upon arrival, Mr. Yoo was surprised to see White, JA3871-3872, and Sayf—who planned to deliver White to Peter Le—felt "set up" when he saw Peter Le, who was not supposed to be there. JA2901-2902.

Shortly after the groups met up, White was pushed into one of the cars (two witnesses say the blue car, one says the white), by two people—Sayf and Fahad both say it was Fahad and Mr. Lamborn, but Aagesen says it was Peter Le and Mr. Lamborn. JA2866, JA22979, JA3104. Sayf ran away. JA2867. The rest of the young men traveled in both cars to Richmond, where at some point Mr. Lamborn, Peter Le and White walked off into an area that was not visible to the others. JA2984. According to Fahad, Mr. Yoo remained in the car as the others walked into the woods, and then said, "Oh, man" and ran after them. JA3035. And Aaegesen testified that Mr. Yoo didn't get out of the car until the other three had entered the woods. JA3178-3179. Two to three gunshots were heard, and all but White returned to the vehicles. JA2984, JA3111-3112.

No trial witness saw what happened to White, whose body was not discovered until December 5, 2019. JA3725. The skeletal remains were wrapped in a tarp, and a bullet was found nearby. JA3733. A second bullet was discovered

51

inside the tarp by the medical examiner. JA3748. A forensic anthropologist found evidence of at least three gunshot wounds, as well as defects to a rib, the bones of the arm, and bones in the neck which indicated "sharp force injuries." JA3759-3760, JA3783-3784, JA3787-3788, JA3790. Such injuries, according to the witness, are usually caused by a knife, JA3788, JA3790.

Three witnesses claimed to have been told details about the murder of White by either Mr. Yoo or Mr. Lamborn. Mr. Yoo allegedly told Spencer Pak what happened. JA3282-3283. Pak's version of events neatly implicated all three individuals charged with the murder, despite there being only two weapons. Pak said that, according to Mr. Yoo, Peter Le handed Mr. Yoo a knife, Mr. Yoo stabbed the victim, and Mr. Lamborn shot him. JA3284. Kevin Aagesen, however, who was in the white car with Mr. Yoo on the night of White's disappearance, testified that Mr. Yoo had a *firearm* on him on the way to *and* from Richmond. JA3107, JA3111. Pak's version didn't explain why Mr. Yoo didn't use a gun, whether he gave a gun to Mr. Lamborn and then took it back, or why he seemingly took direction from Peter Le, who was Club Tiger, not Reccless Tigers, and with whom he never got along.

Soung Park claimed to have heard Mr. Yoo speaking of something being "all bad," with Douglas Martinez who was asking "is he dead?" JA3478. But Mr. Lamborn was said to have discussed shooting White directly with both Park and

Ky Hong. JA3483, JA3607. Park claims to have burned a suitcase full of clothes and buried a knife for Mr. Yoo, but the knife could not be found when Park returned with law enforcement to show them where he buried it. JA3485. Hong suggested that the body should be moved, and on February 25, 2019, went to the scene with Park, Mr. Lamborn, and Richard Pak to move White's body. JA3486-3495.

CAST analysis on phones associated with Mr. Lamborn, Mr. Yoo, Sayf, Fahad, Hong, and Park concluded movement of those phones consistent with the movements of the relevant parties on January 31, 2019, as well as February 25, 2019. JA4061-4093.

B.     Standard of Review

As previously noted, this court reviews the denial of a Rule 29 motion *de novo*. *Alerre*, *supra*.

C.     Argument

Mr. Yoo correctly states the law applicable to this court's determination of the sufficiency of the evidence with respect to Counts 3, 4, and 5. A defendant's mere presence at the scene of crime is insufficient to prove participation in a crime, conspiracy to commit that crime, or aiding and abetting. For the sake of expedience, Peter Le incorporates by reference, Mr. Yoo's discussion of "mere presence" as set forth herein-above, and respectfully refers the Court to the same

authority, to wit: *United States v. Tipton*, 95 F.4th 831, 847 (4th Cir. 2024); *United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983); *United States v. Love*, 767 F.2d 1052, 1059 (4th Cir. 1985); *United States v. Lewis*, 1993 U.S. App. LEXIS 32986, \*4 (4th Cir. 1993) (unpublished); *Rosemond v. United States*, 572 U.S. 65, 71, 188 L.Ed.2d 248, 134 S. Ct. 1240 (2014); *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999); *United States v. Lentz*, 524 F.3d 501, 512 (4th Cir. 2008); *United States v. Small,* 988 F.3d 241, 251 (6th Cir. 2021); *United States v. Aguilar*, 585 F.3d 652, 657 (4th Cir. 2009)

As noted above, the evidence at trial established that Peter Le did not plan, solicit, or instigate the kidnapping of White, and there was insufficient evidence that he participated in the murder of White, having not even been in possession of a weapon or made any indication at any time that he desired to see White harmed.

Fahad and Sayf themselves testified that it was *their idea* to kidnap White. JA2891, JA2961. After all, Sayf had done it before—even to Fahad. JA2883. Sayf hated Peter Le, so he wasn't doing anything for him or at his direction. JA2890. While they both initially alleged that this was done in the hopes of avoiding a drug debt owed to Peter Le, they could not explain why, if that were the case, Sayf was so surprised to see Peter Le in the Giant parking lot. Ultimately, Sayf himself admitted he was not interested in paying off a debt. JA2890. Likewise, Peter Le had little to no knowledge of and no interest in White. White didn't owe Peter Le

any money, and Peter Le wasn't particularly close with David Nguyen, against whom White had testified (unlike Fahad).

Fahad, of course, told the jury the implausible tale that Peter Le asked him out of the blue if he could "find somebody who knew Brandon White" and it just so happened that his lifelong friend was that "somebody." Nevertheless, even he admitted that upon his and Sayf's self-directed "delivery" of White, he only believed White would be beaten up. JA2961, JA3002. Therefore, even taking the evidence offered in the light most favorable to the government, the two men who *did* inveigle White admitted that *they* planned to kidnap White and were not aware of any plan by *Peter Le* to kidnap White. It hadn't dawned on Fahad, and Sayf was surprised Peter was even present at the Giant parking lot. There was therefore insufficient evidence to prove either a plan or even a tacit agreement entered into by Peter Le to kidnap, let alone kill, White. JA2901, JA3096.

Furthermore, Peter Le was not driving or in control of *either* vehicle that went to Richmond, and he did not have a weapon. JA3040, JA3098, JA3143. Finally, no one witnessed what actually took place in the woods, and there was no physical or forensic evidence to suggest that Peter Le was an actual assailant against White.

## VIII. THE DISTRICT COURT VIOLATED TONY LE'S SPEEDY TRIAL ACT AND SIXTH AMENDMENT SPEEDY TRIAL RIGHTS

### A.    Statement of Additional Facts

In August of 2020, Tony Le was indicted under a Fourth Superseding Indictment, by a federal Grand Jury in the Eastern District of Virginia, Alexandria, Virginia, for the following charges: Racketeering Conspiracy, in violation of 18 U.S.C. § 1962(d) (Count One); Conspiracy to Distribute and to Possess with Intent to Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846 and 841 (Count Six); and Possession of a Destructive Device in Furtherance of Drug Trafficking Offense, in violation of 18 U.S.C. § 924(c) (Counts 14 and 15). JA304-357 (Indictment). Count One involved a maximum prison sentence of life, Count Two, a sentencing range of a mandatory minimum ten years and a maximum of life, and Counts Fourteen and Fifteen, a mandatory minimum sentence of 30 years.

At the arraignment of Mr. Le's co-defendants under the Second Superseding Indictment on May 2, 2019, the district court requested speedy trial waivers from each defendant. JA170-173. The court found that "each of the defendants have waived their right to the speedy trial. I find that there is good cause to extend the trial date beyond the Speedy Trial Act because of the nature of the charges, the multiple defendants, the calendars of the Court and of counsel." JA173. There was no finding on the record of any ends-of-justice propriety regarding the continuance,

nor that any balancing of interests was conducted by the court. Tony Le was not present for this proceeding as he had not yet been indicted. However, this proceeding is relevant to Mr. Tony Le because, at his arraignment on November 26, 2019, the district court set Tony Le's trial date for February 10, 2020 – a date outside the 70-day speedy trial limit (83 days) – "with the other co-conspirators." JA268. No other explanation was provided by the district court for the setting of the trial date. JA267-268.

Tony Le was arrested under the Third Superseding Indictment on October 30, 2019 in the Central District of California. JA43. This indictment charged Tony Le with Conspiracy to Distribute Controlled Substances in violation of 21 U.S.C. §§841 and 846. JA263. His first appearance in the Eastern District of Virginia was on November 19, 2019, when he made his initial appearance in federal court. JA264. He was detained on that date and a detention hearing was set for November 21, 2019. JA265. Arraignment was scheduled for November 26, 2019. JA47.

Tony Le was arraigned on November 26, 2019. JA266. He pled not guilty and the case was set for trial "with the other co-conspirators" on February 10, 2020 at 10:00 a.m. with a jury. JA268. This date for trial was 83 days from Mr. Tony Le's first appearance in the Alexandria district court. No findings or comments were made on the record with regard to speedy trial at arraignment. *See* JA269.

On January 9, 2020, the district court entered an Order continuing the case "indefinitely" upon "good cause having been shown." JA278. No ends-of-justice findings were made, nor was there any indication of balancing of interests in the Order continuing the case.

On February 14, 2020, the district court held a status conference at which time the government advised the court that discovery and investigation is ongoing, and that it was possible that the indictment was to be superseded. JA287-288, JA301-302. No trial date was scheduled at that time, but a status conference was scheduled for April 10, 2020. JA299. As of the date February 14, 2020, 87 days had passed from the date of Mr. Tony Le's initial appearance in federal court.

On April 2, 2020, the April 10, 2020, status conference was continued to June 26, 2020 (219 days from the initial appearance). JA303. (this was pursuant to general orders, 2020-03 and 2020-07, continuing cases due to COVID). On June 23, 2020, the June 26, 2020, status conference was continued to September 1, 2020 (286 days). JA60. Pursuant to EDVa General Order 2020-19, jury trials were to resume September 14, 2020. Trials were resuspended between November 16, 2020, and March 1, 2021(General Orders 2020-22, 2021-02).

Counsel for Tony Le moved to withdraw from representation on June 25, 2020. JA60. On July 16, 2020, that request was granted, and new counsel was appointed. JA60. A Fourth Superseding Indictment was returned by the Grand Jury

on August 20, 2020, adding the RICO charge (Count One) and the two destructive device charges under 18 U.S.C. § 924(c) (Counts 14 and 15). JA61, JA304-305.

At the status conference held on September 1, 2020, Tony Le asserted his speedy trial rights – twice - and moved the district court to sever his case. JA381 ("We also assert Mr. Le's right to a public, speedy trial."); JA389 ("Mr. Le is eager to have a trial date set as early as practically possible. He would not consent to any further extension of speedy trial."). Mr. Le also requested at that time that his case be severed from his co-defendants.[3] The government indicated that it was prepared to try the case "as early as January." JA394.

The district court indicated that it was going to set the case in March 2021. JA395. However, the case was set for September 21, 2021, over a year beyond the arraignment date. JA401. Without findings to indicate that the complexity of the case impacted the decision to set the case for September rather than February, the district court stated that he had "previously found the case to be complex," involved "very significant amounts" of discovery, and many counts and overt acts. JA397-398. No end-of-justice findings were made at that time, nor was there any reference to the balancing of interests placed on the record. The court further found

---

[3] "But we believe that the filing of the fourth superseding indictment as it relates to my client, that that should be revisited, and that if the Court is unable to accommodate his request while also respecting the rights of his fellow co-defendants, he would ask that his matter be severed out and that a trial date for him be set as early as possible." JA389.

that severance was not appropriate at that time but gave no reason or rationale for that finding. JA398.

A status conference was held on November 5, 2020 (JA402), at which time no decision had been made with regard to the government seeking the death penalty by the Department of Justice. JA407. This had no bearing on Tony Le's case, as he did not face a death eligible offense; he was not charged with the kidnapping or murder of Mr. White. At the end of the November 5 hearing, a status hearing was scheduled for January 28, 2021. JA423. That status hearing was ultimately rescheduled until April 2, 2021 (JA426), then continued to April 13, 2021. JA432. 236 days had passed between the date of the Fourth Superseding Indictment and the April 13, 2021, status hearing.

At the April 13, 2021, hearing, Tony Le expressed that he was not having any difficulties with discovery; he again asserted his speedy trial rights. JA442, 443. He reiterated to the district court that he had "previously objected to his trial date being set outside of the speedy trial parameters, he continues to do so, Your Honor. He continues his – urges this Court to set his trial date at the earliest possible date, even if it means severing him from his now charged co-defendants." JA443. Counsel then made himself available for trial on earlier trial dates, as early as September 2021. JA443.

The district court at that April 13 hearing continued the case from the September 20, 2021, trial date until February 7, 2022, for trial due to scheduling conflicts. JA438-451.

On May 6, 2021, Tony Le filed a motion in the district court to dismiss the case against him based on violations of his speedy trial rights under 18 U.S.C. §3161 and under the Sixth Amendment to the United States Constitution. JA464. He also moved to sever his case from his co-defendants, arguing principally that the spillover effect of the kidnapping and murder charges would be unduly prejudicial to him. JA458-462. His motion to dismiss articulated that his statutory speedy trial rights had been violated, which required the dismissal of his charges. The government in August of 2021 responded stating that there was no speedy trial violation (and argued in the alternative that any dismissal should be without prejudice). JA470. The government also filed a response objecting to the severance of Tony Le from his co-defendants. JA487.

The district court, without a hearing, denied Tony Le's Speedy Trial Act motion on September 2, 2021, principally on the basis that the case was "complex." JA503, JA505. Nowhere in the court's findings did the court articulate that this was an ends-of-justice speedy trial finding, nor did the court properly balance the interests of the defendant to a speedy trial and the competing interests to continue

the matter.[4] The district court further denied Tony Le's motion to sever, suggesting that he had failed to set forth the requisite level of prejudice required for severance. JA501.

The trial of the matter began April 11, 2022, almost 2 ½ years after Mr. Le's first appearance in district court in the Eastern District of Virginia in November of 2019. JA758. Tony Le was convicted under Counts One and Six of the Fourth Superseding Indictment (the RICO and conspiracy counts) and found not guilty of Counts Fourteen and Fifteen (the destructive device counts under § 924(c)). Tony Le filed his Notice of Appeal on September 21, 2022. JA4861.

Tony Le also moved the district court to dismiss his case based on Sixth Amendment speedy trial grounds, specifically relying on the four-factor test outlined in *Barker v. Wingo*, 407 U.S. 514 (1972). JA467. The government responded, also relying on *Barker*, but argued that the second and fourth *Barker* factors weighed in the government's favor. JA483-486. The government conceded that the first and third factors favored the defendant (length of delay and timely assertion of the speedy trial right) but argued that the second and fourth factors weighed in favor of the government (reason for delay and prejudice). JA484

---

[4] It should be noted that the COVID standing order in the Eastern District of Virginia suspending criminal jury trials went into effect on March 13, 2020, but was lifted September 14, 2020. *See* General Order 2020-19.

In its Order denying Speedy Trial Act relief, the district court failed to address Mr. Tony Le's Sixth Amendment speedy trial argument. JA503-506. The Order addressed only Tony Le's motion for relief under 18 U.S.C. § 3161, the Speedy Trial Act (JA503), but made no reference and rendered no decision with regard to his constitutional speedy trial motion.

B.    Standard of Review

This Court reviews, *de novo*, the legal conclusions in the district court's application of the Speedy Trial Act of 1974, as amended, 18 U.S.C. § 3161 ("the Speedy Trial Act"). *See United States v. Robinson,* 55 F.4th 390, 399 (4th Cir. 2022); *United States v. Shealey,* 641 F.3d 627, 631 (4th Cir. 2011). This Court reviews any related factual findings for clear error. *United States v. Rodriguez-Amaya*, 521 F.3d 437, 440 (4th Cir. 2008). For Mr. Tony Le's Sixth Amendment speedy trial argument, this Court also reviews conclusions of law *de novo* and factual findings for clear error. *See Robinson,* 55 F.4th at 399; *United States v. Pratt*, 915 F.3d 266, 271 (4th Cir. 2019); *United States v. Mearis*, 36 F.4th 649, 654 (5th Cir. 2022) ("We review the district court's factual findings for clear error and its application of the *Barker* factors *de novo.*").

C.    Argument

        *i.*    *Tony Le's Speedy Trial Act Rights were Violated*

In assessing Tony Le's Speedy Trial Act Motion, the district court erred by failing to render findings based on the required ends-of-justice standard, and by not applying the necessary balancing test, as articulated under *Bloate* v. *United States,* 559 U.S. 196 (2010), *Zedner v. United States,* 541 U.S. 489 (2006), and *United States v. Velasquez*, 52 F.4ᵗʰ 133, 141 (4ᵗʰ Cir. 2022). The district court failed to even reference the term "ends-of-justice" – much less, perform the required balancing test – for any of the numerous continuances and extensions of trial dates for Tony Le or his co-defendants. When Tony Le filed a motion to dismiss the charges based on Speedy Trial Act violations, the district court in its opinion again failed to mention "ends-of-justice" and failed to engage in the balancing test. JA503-505. The authority on point makes it very clear that these very particular and specific findings are mandatory and in the absence of such findings, the charges must be dismissed.

Under 18 U.S.C. § 3161(h)(6), which allows for a delay in the proceedings when "the defendant is joined for trial with a co-defendant," the 2 ½ year period between Mr. Le's first appearance and the trial of this matter by no means constitutes a reasonable period of time. Further, the time for trial under the co-defendant's statutory speedy trial rights had also run. A time period well in excess

of the 70-day limit under 18 U.S.C. § 3161(c)(1) passed without proper findings extending the speedy trial maximum time. Tony Le requested severance from his co-defendants on several occasions and pointed to significant prejudice he would suffer in the absence of severance. The district court erred in its Speedy Trial Act findings, denying Tony Le his statutory rights under §3161.

This issue of the district court's failure to justify continuances under the Speedy Trial Act is simple and straightforward. The facts are clear and the law is unequivocal. The words "ends-of-justice" were never referenced by the district court in its grants of continuances and settings of dates for trial, nor were those words mentioned in the court's Order denying Tony Le relief pursuant to his Speedy Trial Act motion. JA503-505. Further, the court never made the requisite findings required under the law, or engaged in the requisite balancing of interests, in continuing the case or in its denial of the speedy trial motion. The analysis to be applied under the "co-defendant" rule, 18 U.S.C. § 3161(h)(6), also weighs in Tony Le's favor. In its findings denying Tony Le's speedy trial motion, the court found that, "[i]n a case involving several defendants the time excludable for one defendant is excludable for all defendants," citing to *United States v. Jarrell*, 147 F.3d 316 (4th Cir. 1998). JA505. The same concerns with "ends-of-justice" findings regarding continuances and delays in the trial, and balancing test findings, apply to the continuances granted to co-defendants. As with Tony Le, such time of

delay in the trial would not have been excludable under the co-defendant's 18 U.S.C. § 3161 calculations.

The Speedy Trial Act entitles a defendant to dismissal of charges pending against him if he is not brought to trial within 70 days of his initial appearance or indictment. *See* 18 U.S.C. § 3161(c)(1). The Speedy Trial Act expressly excludes from the Speedy Trial Act time limit: "[a]ny period of delay resulting from a continuance granted by any judge on his own motion or at the request of the defendant or his counsel or at the request of the attorney for the Government, if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(7)(A). Courts have construed this provision very narrowly, specifically requiring that district courts honor the legislative directive presented under this statute, as Congress intended. *See Zedner v. United States*, 547 U.S. 489 (2006); *United States v. Hart*, 91 F.4th 732 (4th Cir. 2024); *United States v. Smart*, 91 F.4th 214 (4th Cir. 2024).

In calculating the running of the 70-day Speedy Trial Act period, and the appropriate assessment of tolling and continuance motions, the Supreme Court and this Court have specifically required that several requirements be met. Under *Zedner v. United States*, 547 U.S. 489, 506–07 (2006), the Supreme Court found that "if a judge fails to make the requisite findings regarding the need for an ends-

of-justice continuance, the delay resulting from the continuance must be counted,

and if as a result the trial does not begin on time, the indictment or information

must be dismissed."

> This Court, in *Hart*, stated the following:

> Under the Act, a court may exclude a period of delay if two
> things happen: (1) the "judge granted such continuance on the
> basis of his findings that the ends of justice served by taking such
> action outweigh the best interest of the public and the defendant
> in a speedy trial"; and (2) "the court sets forth, in the record of
> the case, either orally or in writing, its reasons for [the]
> finding[s]." § 3161(h)(7)(A); *United States v. Smart*, No. 22-
> 4209, 91 F.4th 214, 221 (4th Cir. Jan. 24, 2024). In other words,
> it first must be "clear from the record that the court conducted the
> mandatory balancing contemporaneously with the granting of the
> continuance." *United States v. Keith*, 42 F.3d 234, 237 (4th Cir.
> 1994). And, second, the court must set forth the reasons for its
> finding no later than when it rules on a defendant's motion to
> dismiss. *United States v. Henry*, 538 F.3d 300, 303–04 (4th Cir.
> 2008). If the district court fails to meet these requirements, then
> the delay is not excluded from the speedy-trial clock.

*United States v. Hart*, 91 F.4th 732, 739–40 (4th Cir. 2024). This Court pointed out

in *Hart* that the record failed to provide any evidence that the district court

"contemporaneously conducted ends-of-justice balancing or ever set forth reasons

for that finding." *Id*. at 740. Without such a finding in the record, this Court could

not make the requisite determination if such findings were made to justify the

continuances granted by the court.

The same problem is presented here. There were no contemporaneous ends-of-justice determinations made or balancing tests performed. Nothing in the district court's orders provide such documentation. In its findings on Tony Le's speedy trial motion, the district court never mentioned the term "ends-of-justice," and the court's order failed to make "requisite findings" with regard to the Speedy Trial Act motion. This Court has found that "it must be clear from the record that the court conducted the mandatory balancing contemporaneously with the granting of the continuance." *United States v. Smart*, 91 F.4th 214, 221 (4th Cir. 2024), citing to *United States v. Keith*, 42 F.3d 234, 237 (4th Cir. 1994). No such findings were made in this case.

In the instant case, Tony Le's speedy trial clock began on November 19, 2019—the date of his first appearance in the Alexandria court. JA264. His case was set for a jury trial with his co-defendants on February 10, 2020, a date already outside the 70-day speedy trial period. JA268. No ends-of-justice reasons were provided by the court and no balancing test was conducted; Tony Le's speedy trial rights were violated at that time. On January 9, 2020, an indefinite continuance of the case was granted by the court, allegedly for good cause shown. JA285, *see also* sealed government motion, JA5051-5060. A status conference was held on February 14, 2020, continuing the case until April 14, 2020. The status conference

was continued until June 26, 2020, and then to September 1, 2020, due to COVID. *See* JA60, 303.

The Fourth Superseding Indictment was returned on August 20, 2020, which added new charges. On the September 1, 2020, status call following the indictment, Tony Le specifically asserted his speedy trial rights and, in the alternative, asked that his case be severed from his co-defendants. JA389. The suspension of jury trials due to COVID was lifted on September 14, 2020 (*see* General Order 2020-19), so the concerns with COVID did not stand in the way of setting the case for trial. The district court stated that it intended to set the case for March 2021 (JA395), but due to scheduling conflicts, the case was set for September 21, 2021. JA401. The required findings under the Speedy Trial Act were not made by the district court at that time.[5]

Tony Le, again, at the April 13, 2021, hearing, specifically asserted his speedy trial rights and, again, asked in the alternative that his case be severed from his co-defendants. JA442-443. The district court not only failed to comply with Tony Le's requests, but set the trial farther out from the September 20, 2021, date until February 7, 2022, due to scheduling conflicts. JA438-451. The required Speedy Trial Act findings were not made at this April hearing.

---

[5] Status conferences were held on November 5, 2020 (J.A. 402), and April 13, 2021 (J.A. 432).

Tony Le filed his motion to dismiss based on speedy trial violations, and his motion to sever, on May 6, 2021 – over 250 days from the date the Fourth Superseding Indictment was returned, and over a year-and-a-half from the date when Tony Le was first arrested. JA464. The government filed its responsive pleadings, and the district court rendered its decision, never making any reference to the ends-of-justice findings required under *Zedner*, *Bloate*, and their progeny in the Fourth Circuit. Counts One and Six of the Superseding Indictment must be dismissed against Tony Le for the violation of his statutory rights.

Under 18 U.S.C. § 3161(h)(6), which allows for a delay in the proceedings when "the defendant is joined for trial with a co-defendant," the 2 ½ year period between Tony Le's first appearance and the trial of this matter by no means constitutes a reasonable period of time.

Section3161(h)(6) provides that the following period of time is excludable under the Speedy Trial Act: "A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." In this case, although no other defendant moved for dismissal under the Speedy Trial Act, the time for trial had run for all of the other defendants. The record is clear that the district court failed to make the requisite speedy trial findings for any of the co-defendants. All of the orders governing the continuance motions for all defendants in the case did not include the

requisite "ends-of-justice" or balancing interests language required to constitute valid tolling of the Act under § 3161. A two-and-a-half year time period between the first appearance and trial is by no means a reasonable period of time. Therefore, the co-defendant provision under § 3161(h)(6) does not toll the speedy trial clock as to Tony Le.

The Supreme Court has held that "[a]ll defendants who are joined for trial generally fall within the speedy trial computation of the latest codefendant." *Henderson v. United States*, 476 U.S. 321, 323 n.2, 106 S.Ct. 1871, 90 L.Ed.2d 299 (1986); *see also United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022). The speedy trial computation of the latest co-defendant is exactly the same as it was for Tony Le. Just because none of the co-defendants moved for dismissal based on a violation of their speedy trial rights does not mean that the computation of the speedy trial clock is any different for them. No ends-of-justice rationale for continuing their cases was provided by the district court nor were their balancing tests employed by the district court in assessing continuances for any of the co-defendants outside of the 70-day speedy trial time period.

It should also be noted that Tony Le made request after request to sever his case from his co-defendants throughout the pretrial process. JA389, 443, 458. These requests were improperly denied by the district court. He suffered significant prejudice due to his case being tried with a kidnapping/murder case when he had

nothing to do with this violent crime. The district court ignored Tony Le's persistent demands that his speedy trial rights were violated, and that his case should be severed in the absence of a speedy trial. In *United States v. Clyburn*, 1995 WL 578047, at *2 (4th Cir. Oct. 2, 1995) (per curiam), this Court looked to the defendant's attempts to move for severance, any prejudice to the defendant, and the length of the delay to determine whether the "co-defendant" Speedy Trial Act clause applied. Tony Le checks all of the boxes articulated in *Clyburn*. He repeatedly moved for severance, was tried in the prejudicial setting of a death penalty eligible kidnapping/murder case as a defendant with no involvement in the murder/kidnapping, and his delay spanned 2 ½ years. *See, e.g., Clyburn*, 1995 WL 578047, at *2 (147 days); *United States v. Margheim*, 770 F.3d 1312, 1319 (10th Cir. 2014) (10 months); *United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022) (8 months). In *Clyburn* and *Robinson* the defendants never moved for severance. *Clyburn*, 1995 WL 578047, at *2, *Robinson*, 55 F.4th at 399.

Based on the violation of Tony Le's statutory speedy trial rights, Counts One and Six must be dismissed.

> ii. *Tony Le's Sixth Amendment Speedy Trial Motion was not Addressed by the District Court; Remand is Required*

The district court failed to render a decision on Tony Le's Sixth Amendment speedy trial rights motion to dismiss. *See* JA464-469, 503-505. The only appropriate remedy is remand for the district court's consideration and decision.

Although this Court reviews the legal conclusions of the district court *de novo*, this Court must pay deference to the factual findings of the district court. *See United States v. Mearis*, 36 F.4th 649, 654 (5th Cir. 2022) ("We review the district court's factual findings for clear error and its application of the *Barker* factors *de novo.*"). Without factual findings, this Court has nothing to which it can defer. Under the *Barker* factors, findings of fact are essential. Consequently, remand for the district court's consideration is the only appropriate remedy. *See United States v. Espinoza*, 622 F. App'x 745, 748 (10th Cir. 2015) (Court of Appeals found that the district court failed to address the defendant's constitutional arguments; the appropriate remedy was remand).

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. Amend. VI. In determining whether there has been a violation of this right, the court must consider: (1) the "length of the delay"; (2) "the reason for the delay"; (3) "the defendant's assertion of his right"; and (4) the "prejudice to the defendant." *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *see also United States v. Robinson*, 55 F.4th 390, 400 (4th Cir. 2022).

As this Court has held, "[t]he constitutional and statutory rights to a speedy trial should ideally operate in tandem." *United States v. Pair*, 84 F.4th 577, 589 (4th Cir. 2023). The district court was required to make findings regarding each of

the four *Barker* factors, not just for the constitutional claim but also to consider the

statutory arguments in tandem with the constitutional arguments. In the absence of

such findings, there is nothing for this Court to review. Consequently, remand is

required.

VII.   THE DISTRICT COURT IMPROPERLY ENHANCED TONY LE'S
SENTENCING GUIDELINES BASED ON ACQUITTED CONDUCT AND
FAILED TO PROPERLY ASSESS DEFENSE OBJECTIONS TO SENTENCING
ENHANCEMENTS, AND OTHER RELEVANT SENTENCING FACTORS
ANDEVIDENCE

A.   Statement of Additional Facts

At the trial of this matter, Tony Le was convicted under Counts One and Six,

the RICO count and the drug conspiracy count, respectively, but was found not

guilty under Counts Fourteen and Fifteen, the Possession of Destructive Devices in

Furtherance of a Drug Trafficking Offense charges. *See* JA4718, JA4719. Attached

to each of those acquitted Counts 14 and 15 was a mandatory minimum sentence,

consecutive to any other conviction, of 30 years under 18 U.S.C. § 924(c).

The conspiracy to distribute controlled substances verdict under Count Six

included special findings by the jury. The jury found Tony Le guilty of Count Six,

the conspiracy count, and found that he was responsible for the following

controlled substances: Marijuana, Cocaine, THC products, and Marijuana Plants.

JA4716. The jury did not find that Mr. Le engaged in a conspiracy to distribute

either LSD or Alprazolam (Xanax).[6] As to quantities, the jury found Tony Le responsible for 1,000 kilograms or more of Marijuana, 1,000 Marijuana Plants or more, and 500 grams of more of Cocaine - not the 5 kilograms of Cocaine argued by the government. JA4716-4717. Under 21 U.S.C. § 841(b)(1)(A), 5 kilograms of cocaine, 1,000 kilograms of marijuana, and 1,000 marijuana plants carries a mandatory minimum sentence of 10 years. The jury's verdict in the case, a finding of 500 grams or more of cocaine, carries a mandatory minimum sentence of 5 years under 21 U.S.C. §841(b)(1)(B).

Notwithstanding the jury's verdicts on Counts Fourteen and Fifteen, and the finding that he was responsible for more than 500 grams of cocaine – not 5 kilograms - the district court treated Tony Le's sentencing as if he had been convicted of all charges. For example, even though the jury's verdict only convicted Tony Le of an offense involving 500 grams or more of cocaine, the presentence report and the district court attributed Tony Le with 15 kilograms of cocaine, well in excess of the 5 kilograms that were rejected by the jury at trial. JA5095. Tony Le was enhanced under the federal sentencing guidelines for acquitted conduct involving the firebombings, even though the jury found him not

---

[6] Defendant Peter Le was found guilty of Count 6 and the jury found that Peter Le conspired to distribute the LSD and Alprazolam as well as the other substances. JA4696.

guilty of possessing destructive devices (firebombs) in furtherance of the drug trafficking crimes.

Under the presentence report, a panoply of enhancements were attributed to Tony Le's offense level. To start, a base offense level of 32 was attributed to Tony Le due to cocaine weight of 15 kilograms under U.S.S.G. § 2D1.1(a)(5), in addition to the marijuana and THC quantities attributed to him. JA5095. A total drug equivalency weight of 8070 kilograms of marijuana was assessed against Tony Le. 3000 kilograms of that weight was from cocaine. JA5095. 500 grams of cocaine is essentially equivalent to 100 kilograms of marijuana. *See* U.S.S.G. § 2D1.1.

The following two-level enhancements were applied:

- Dangerous weapon (including a firearm) was possessed. U.S.S.G. §2D1.1(b)(1). JA5095.

- The defendant used violence, made a credible threat to use violence, or directed the use of violence. U.S.S.G. § 2D1.1(b)(2). JA5095.

- The defendant maintained a premises for the purpose of manufacturing or distributing a controlled substance. U.S.S.G. § 2D1.1(b)(12). JA5095.

- An enhancement under U.S.S.G. § 2D1.1(b)(16) (unclear as to which underlying provision was referenced). JA5095.

A four-level enhancement was added under U.S.S.G. § 3B1.1(a) for a leadership role. JA5095. The resulting adjusted offense level was 44; however, that level is capped at 43. Tony Le presented to the court with no criminal history; thus, his criminal history score was "0," with a criminal history category of I.

Prior to sentencing, Tony Le objected to several of the enhancements he received in the presentence report. JA5106-5108. He objected to the four-level leadership role enhancement on the basis that he did not join Reccless Tigers and was not a leader of Asian Boyz (JA5106); regarding the weapon enhancement, he specifically noted that he was acquitted under § 924(c) in Counts Fourteen and Fifteen (JA5106-5107); as to the cocaine quantity, since the jury attributed to him a quantity of more than 500 grams of cocaine, he objected to a finding of 15 kilograms (JA5107); to the threat/weapon enhancement – again he objected on the basis that he was found not guilty of the destructive device charges by the jury (JA5107); and he objected to the use of a minor enhancement, arguing that he did not knowingly use a minor in any offense conduct (JA5107).

In its findings at the sentencing hearing, the district court found that Tony Le possessed weapons but failed to specifically find that the weapons were connected with any drug trafficking offenses. JA4822-4824. The district court also found that, "[y]ou deserve a lengthy penitentiary sentence for your conduct and the conduct you were found guilty of in the racketeering charge and in the drug charge,"

making a distinction between charged conduct and uncharged conduct. JA4848.

Additionally, the district court made no reference at sentencing to Tony Le's

pristine criminal history despite his age of 28 at the time of his sentencing, aside

from simply stating he was a Criminal History Category I. *See* JA4825.

Tony Le raised unwarranted disparity concerns under 18 U.S.C. § 3553(a)(6)

in his sentencing position to the district court (JA5110, 5117), and in argument at

the sentencing hearing (JA4830). At sentencing, he pointed to the fact that he was

not involved in the murder. Tony Le discussed that several co-defendants received

far lower sentences than he and engaged in conduct at least as serious. They also

had criminal records at least as serious as his. Among those mentioned were

Richard Pak (a leader in the formation and activity of the conspiracy) (JA4628,

JA4636, JA4819, JA4820); Mr. Hong, "Starter," (directed firebombings,

distributed multi kilos of cocaine) (JA4830) and Sasha Carlisle (involved in murder

and firebombing) (JA4831). None received sentences greater than 18 years.

The only statement the district court made regarding the unwarranted

disparity argument raised was the following: "I gave other sentences, as you've

identified and Mr. Jenkins identified, that were less than the 30 years requested to

by the Government in this case. But the request is being made because you were

undeniably the leader." JA4848. No specific reference was made to the differences

between the sentences imposed on the defendants who pled guilty and did not go to

78

trial, and Tony Le. Some of the co-defendants who pled guilty were arguably more culpable than Tony Le, as they were involved with the kidnapping/murder, with firebombings, with greater quantities of cocaine and other drugs, and with other acts of violence. Considering Tony Le's criminal history score of "0," none of these co-defendants came to the district court with a more favorable criminal history. *See* JA5096-5097.

B.    Standard of Review

In determining whether a district court properly applied the advisory Guidelines, including application of any sentencing enhancements, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Osborne,* 514 F.3d 377, 387 (4th Cir. 2008). "A sentence is procedurally unreasonable if the district court committed a serious procedural error, such as improperly calculating the Guidelines range[.]" *United States v. Gillespie*, 27 F.4th 934, 944 (4th Cir. 2022).

C.    Argument

i.    *Acquitted Conduct*

The district court treated the enhancements to Tony Le's federal sentencing guidelines as if he were convicted of all charges and attributed the maximum quantities charged under the jury's findings. In its verdict, the jury failed to find that Tony Le was responsible for 5 kilograms or more of cocaine, as charged in the

79

indictment; its findings were for 500 grams or more. Tony Le was held accountable

for 15 kilograms of cocaine at sentencing. JA5095. The jury acquitted Tony Le of

possessing firebombs in furtherance of drug trafficking under Counts Fourteen and

Fifteen. His sentencing guidelines were enhanced on the basis of dangerous

weapons and use of violence, in apparent conflict with the jury's findings. JA5095.

As of November 1, 2024, such enhancements will be curbed under U.S.S.G.

§1B1.3.

This provision states the following:

> 3 (c) ACQUITTED CONDUCT. —*Relevant conduct does not*
> *include conduct for which the defendant was criminally charged*
> *and acquitted in federal court, unless such conduct also*
> *establishes, in whole or in part, the instant offense of conviction.*
> *Application Notes: Commentary.*[7]

If this matter is remanded for resentencing, the district court would be compelled to

comply with this newly minted – and long awaited – acquitted conduct provision of

the federal sentencing guidelines.[8] This significant change in the guidelines should

---

[7] The Application Note to § U.S.S.G § 1B1.3 further provides that: "*10. Acquitted Conduct. —Subsection (c) provides that relevant conduct does not include conduct for which the defendant was criminally charged and acquitted in federal court, unless such conduct establishes, in whole or in part, the instant offense of conviction. There may be cases in which certain conduct underlies both an acquitted charge and the instant offense of conviction. In those cases, the court is in the best position to determine whether such overlapping conduct establishes, in whole or in part, the instant offense of conviction and therefore qualifies as relevant conduct.*"

[8] Tony Le acknowledges that at the time of sentencing both the Fourth Circuit and

result in a remand to the district court so that the court can consider this very

relevant and significant guideline provision in Tony Le's case.

Under the Supreme Court's denial of certiorari in the acquitted conduct case,

*McClinton v. United States*, 143 S. Ct. 2400, 2401–03, 216 L. Ed. 2d 1258 (2023)

(internal citations omitted), the following was reported:

> As many jurists have noted, the use of acquitted conduct to
> increase a defendant's Sentencing Guidelines range and sentence
> raises important questions that go to the fairness and perceived
> fairness of the criminal justice system.

Consequently, this finding in *McClinton* referenced the Sentencing Commission's

much-anticipated amendment to address the concerns raised. *McClinton* found that

the Sentencing Commission "will resolve questions around acquitted-conduct

sentencing in the coming year." *McClinton*, 143 S. Ct. at 2403. As indicated above,

the Sentencing Commission has done just that. These findings and amendments

should be respected by this Court and should inure to the benefit of Tony Le.

The district court's enhancements of Tony Le for possessing a dangerous

weapon under U.S.S.G. § 2D1.1(b)(1) and for "use of violence" under U.S.S.G.

§2D1.1(b)(2) were contradictory to the jury's verdict of not guilty with respect to

---

the United States Supreme Court held that "a sentencing court may consider
uncharged and acquitted conduct in determining a sentence, as long as that conduct
is proven by a preponderance of the evidence." *United States v. Medley*, 34 F.4th
326, 335–36 (4th Cir. 2022); *United States v. Watts*, 519 U.S. 148, 157, 117 S.Ct.
633, 136 L.Ed.2d 554 (1997).

the firebombings, as pointed out by Tony Le in his sentencing objections to the district court. *See* JA5107. The district court found that, even though the jury acquitted Tony Le of the firebombing counts, "under the preponderance standard," the court found "sufficient evidence" for the enhancement. JA4823. As to the firebombings, again the Court pointed to "relevant conduct" to find that it was "absolutely foreseeable" that the firebombings were going on. JA4823. On remand, the district court would have to reconcile the dictates of the Sentencing Commission regarding acquitted conduct with the evidence presented and the jury's verdicts. Foreseeability and preponderance of the evidence are no longer the only considerations when assessing acquitted conduct in this situation.

Tony Le submits that permitting the use of sentencing based on acquitted conduct violates his due process rights, subverts the crucial role of juries in protecting constitutional rights, and contributes to the trial penalty. Punishing a defendant for acquitted conduct undermines the essential role of the jury and the defendant's Sixth Amendment rights to a jury trial. These protections are now enshrined in the federal sentencing guidelines and should be applied to Tony Le by this Court and on remand. Permitting the district court to override or nullify a jury's acquittal by sentencing a defendant based on acquitted conduct undermines Tony Le's crucial constitutional rights.

The district court found that Tony Le's trial testimony was not credible (JA4824), yet the jury acquitted him on the two most serious charges, arguably based on his testimony. There was a notable disconnect between the jury's findings and the district court's impressions and conclusions regarding Tony Le. Based on the recent acquitted conduct changes by the Sentencing Commission, and the deviation from those changes by the district court, this Court should reverse the findings of the district court and remand for resentencing based on the new amendments to the federal sentencing guidelines. The sentencing court's findings are in direct conflict with the jury's verdict. This Court should rectify that conflict.

Tony Le asks that this Court vacate his sentence and remand to the district court for resentencing based on the "acquitted conduct" amendment to the sentencing guidelines and Tony Le's constitutional rights.

> ii.     *The District Court Failed to Properly Assess and Make*
> *Necessary Findings as to Enhancements to Tony Le's Sentencing*
> *Guidelines; Therefore, his Sentence is Procedurally Unreasonable*

In addition to the acquitted conduct arguments, the district court approved of unwarranted sentencing enhancements for a firearm and for a leadership role, as argued by Tony Le at sentencing. To address these improper enhancements, the judgment in this case should be reversed and the case remanded to the district court for resentencing. The firearm enhancement under U.S.S.G. §2D1.1(b)(1) was unsupported by the record or the evidence in this case. The leadership enhancement

under U.S.S.G. § 3B1.1(a) was objected to by Tony Le; however, the district court did not point to evidence sufficient to justify the 4-level enhancement. These sentencing errors of improperly calculating the guidelines rose to the level of procedural unreasonableness.

A sentence is procedurally unreasonable if the district court committed a serious procedural error, such as improperly calculating the Guidelines range, treating the Guidelines as mandatory, failing to consider the § 3553(a) factors, selecting a sentence based on clearly erroneous facts, or failing to adequately explain the chosen sentence. *See United States v. Gillespie*, 27 F.4th 934, 944 (4th Cir.), cert. denied, 143 S. Ct. 164, 214 L. Ed. 2d 56 (2022).

For the firearm enhancement, the applicable guideline provides that, "[i]f a dangerous weapon (including a firearm) was possessed," the sentencing court is to "increase by 2 levels" the offense level. *Id.* § 2D1.1(b)(1). The relevant Application Notes provide that the weapon enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." USSG § 2D1.1 cmt. n. 3. The government bears the burden of proving that "the weapon was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." *United States v. McAllister,* 272 F.3d 228, 233-34 (4th Cir.2001). This Court characterized this enhancement as "possession of a firearm in connection with a

84

drug-trafficking crime." *United States v. Moseley*, 626 F. App'x 399, 400 (4th Cir. 2015). No connection under the evidence presented in this case was drawn between the firearms noted and drug distribution. This enhancement should be rejected by this Court.

This Court has articulated that, in assessing the leadership enhancement, courts are to "consider: the defendant's exercise of decision-making authority, the nature of his participation in the offense, recruitment of others, any claimed right to a larger share of the profits, the degree of participation in planning of the offense, the nature and scope of the offense, and the degree of control and authority exercised over others." *United States v. Agyekum*, 846 F.3d 744, 752 (4th Cir. 2017) (citing USSG § 3B1.1 cmt. n.4)). This Court has further found that the leadership role enhancement applies only if the defendant managed or supervised at least one other participant in the criminal enterprise, rather than managing property or assets. *United States v. Steffen*, 741 F.3d 411, 415 (4th Cir. 2013); *see also United States v. Bostick*, 767 F. App'x 512, 513 (4th Cir. 2019) (unpublished); *United States v. Miller*, 529 F. App'x 331, 8 (4th Cir. 2013) (unpublished) ("To merit the enhancement, the defendant must have exercised managerial responsibility over other persons, rather than over property, assets, or activities. USSG § 3B1.1 cmt. n.2.").

As pointed out at trial and by Tony Le at sentencing, he was not a member of Reccless Tigers. When he moved to California, he admitted that he became involved in the West Side Asian Boyz, but did not maintain a leadership role. *See* JA5106. Most of his interactions with co-defendants involved a buyer-seller relationship, selling marijuana. Such a relationship does not qualify for a leadership enhancement. This Court should also note that the jury's findings on cocaine quantity, types of drugs and § 924(c) acquittals weigh against a finding that Tony Le was in a leadership position.

### iii.    *The District Court Failed to Conduct the Requisite Unwarranted Disparity Analysis under 18 U.S.C. § 3553(a)(6)*

This Court should acknowledge that Tony Le's sentence would create an unwarranted disparity under 18 U.S.C. § 3553(a)(6), as argued by counsel in the sentencing proceedings. Section 3553(a)(6) instructs that courts should "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct."

The district court provided an inadequate explanation for its denial of relief based on the unwarranted disparity between Tony Le's sentence and the sentences of more culpable co-defendants.  Under 18 U.S.C. §3553(a)(6), the court must consider whether the sentence imposed constitutes an unwarranted disparity with defendants who present analogous offense characteristics and criminal histories. As Tony Le had no criminal history, such a comparison in criminal histories will

weigh in his favor. And, as this Court has found, district courts are required to address a defendant's arguments under §3553(a)(6) as to specific relevant comparable defendants raised to explain why the disparity exists. *See United States v. Wheeler*, 717 F. App'x 217, 220 (4th Cir. 2018); *United States v. Withers*, 100 F.3d 1142, 1149 (4th Cir. 1996).

The only findings the district court made under Tony Le's unwarranted disparity argument was with regard to his leadership role, which Tony Le has addressed above. JA4843. The district court stated that, "I gave other sentences, as you've identified and Mr. Jenkins identified, that were less than the 30 years requested to by the Government in this case. But the request is being made because you were undeniably the leader." JA4843. Richard Pak and Starter were significant leaders within the conspiracy (*see* JA4818, JA4820, JA4830). The district court needed to provide more context and justification for its rejection of the unwarranted disparity argument than simply referring to Tony Le's alleged leadership role. The district court failed to provide a sufficient explanation for imposing a sentence over 300 months when more culpable defendants – some who were involved in the kidnapping/murder, the focal point of this prosecution - received sentences of less than 18 years. More is required of district courts under these circumstances, especially with such stark evidence of unwarranted disparities.

The failure to properly address unwarranted disparities rendered the sentencing proceedings procedurally unreasonable. The judgment of the district court must be reversed and the case remanded for resentencing.

## CONCLUSION

For the above reasons, this court should reverse the judgment of the trial court as to Peter Le, Mr. Yoo, and Mr. Lamborn.

Tony Le asks that this Court reverse the district court pursuant to his Speedy Trial Act motion and dismiss Counts One and Six. In the alternative he asks that, based on the district court's failure to address his constitutional speedy trial arguments, the case be remanded to the district court. The judgment should further be reversed based on sentencing errors and remanded for resentencing.

## REQUEST FOR ORAL ARGUMENT

Appellants each respectfully request oral argument on this appeal.

/s/ Lana Manitta

LANA MANITTA
LAW OFFICE OF
  LANA MANITTA, PLLC
140B Purcellville Gateway Drive #511
Purcellville, Virginia 20132
(703) 705-4428

*Counsel for Appellant P. Le*

/s/ Robert J. Wagner

ROBERT J. WAGNER
ROBERT J. WAGNER PLC
101 Shockoe Slip, Suite J
Richmond, Virginia 23219
(804) 814-8172

*Counsel for Appellant T. Le*

/s/ G. Allen DuBois

G. Allen DuBois
Eric J. Brignac
OFFICE OF THE
  PUBLIC DEFENDER
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
(919) 856-4236

*Counsel for Appellant Lamborn*

/s/ Gerald T. Zerkin

GERALD T. ZERKIN
ATTORNEY AT LAW
2620 Stuart Avenue
Post Office Box 5665
Richmond, Virginia 23220
(804) 921-4885

*Counsel for Appellant Yoo*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 22-4554(L)   Caption: US v. LAMBORN et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 15,300 words or 1,500 lines. A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type. See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words. Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. R. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

[✓] this brief or other document contains ____21,013____ [*state number of*] words

[ ] this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

[✓] this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 _____ [*identify word processing program*] in
14 point Times New Roman _____ [*identify font size and type style*]; or

[ ] this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) /s/ Robert J. Wagner _____

Party Name appellant _____

Dated: 9/16/2024 _____