# 22-4554(L), 22-4555, 22-4556, 22-4560

# 𝔘𝔫𝔦𝔱𝔢𝔡 𝔖𝔱𝔞𝔱𝔢𝔰 𝔆𝔬𝔲𝔯𝔱 𝔬𝔣 𝔄𝔭𝔭𝔢𝔞𝔩𝔰

### *for the*

# 𝔉𝔬𝔲𝔯𝔱𝔥 𝔆𝔦𝔯𝔠𝔲𝔦𝔱

UNITED STATES OF AMERICA,

*Plaintiff/Appellee,*

— v. —

JOSEPH DUK-HYUN LAMBORN, YOUNG YOO,
PETER LE, TONY MINH LE,

*Defendants/Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA AT ALEXANDRIA

# CORRECTED BRIEF OF APPELLANTS

G. Allen DuBois
Eric J. Brignac
OFFICE OF THE
  PUBLIC DEFENDER
150 Fayetteville Street, Suite 450
Raleigh, North Carolina 27601
(919) 856-4236

*Counsel for Appellant Lamborn*

GERALD T. ZERKIN
ATTORNEY AT LAW
Post Office Box 5665
Richmond, Virginia 23220
(804) 921-4885

*Counsel for Appellant Yoo*

ROBERT J. WAGNER
ROBERT J. WAGNER PLC
101 Shockoe Slip, Suite J
Richmond, Virginia 23219
(804) 814-8172

*Counsel for Appellant T. Le*

LANA MANITTA
LAW OFFICE OF
  LANA MANITTA, PLLC
140B Purcellville Gateway Drive #511
Purcellville, Virginia 20132
(703) 705-4428

*Counsel for Appellant P. Le*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................v

STATEMENT OF JURISDICTION.......................................................1

STATEMENT OF ISSUES ...................................................................1

STATEMENT OF THE CASE...............................................................2

    A.    Background ...............................................................................2

    B.    Differences In How the Groups Operated..............................5

        i.    Drugs of Choice ............................................................5

        ii.    Use or Threat of Violence..............................................5

        iii.    Brandon White ...............................................................6

    C.    Motions to Dismiss and Continue Based on Discovery.......7

    D.    Lamborn's Attorneys' Motion to Withdraw .......................10

    E.    Trial and the Verdicts ..........................................................13

    F.    Sentencing ............................................................................14

        i.    Peter Le ........................................................................14

        ii.    Joseph Lamborn ..........................................................14

        iii.    Young Yoo ...................................................................15

        iv.    Tony Le ........................................................................15

    G.    Special Conditions of Pretrial Release Imposed on Peter, Lamborn, and Yoo................................................................15

SUMMARY OF ARGUMENT .............................................................15

    ISSUE I..................................................................................15

    ISSUE II.................................................................................16

    ISSUE III ...............................................................................17

    ISSUE IV ...............................................................................17

ISSUE V ...................................................................................................18

ISSUE VI ..................................................................................................18

ISSUE VII .................................................................................................19

ARGUMENT ..............................................................................................19

I.      APPELLANTS WERE DENIED A FAIR TRIAL BECAUSE
        THE DISTRICT COURT DENIED THEIR JOINT
        REQUEST FOR A CONTINUANCE AFTER A LATE,
        VOLUMINOUS DISCOVERY DISCLOSURE ...............................19

        A.      Standard of Review.................................................................19

        B.      Argument ................................................................................20

II.     THE DISTRICT COURT ABUSED ITS DISCRETION BY
        DETERMINING THAT LAMBORN'S REQUEST FOR A
        NEW ATTORNEY WAS UNTIMELY BECAUSE IT DID
        NOT ADDRESS HIS PROFFER THAT HE HAD
        EVIDENCE THAT HE ASKED HIS ATTORNEYS TO
        FILE THE MOTION THREE MONTHS BEFORE THEY
        DID. .................................................................................................21

        A.      Standard of Review.................................................................21

        B.      The District Court Abused its Discretion ...............................21

        C.      The Error Was Not Harmless...................................................24

III.    PETER LE'S, YOO'S, AND LAMBORN'S WRITTEN
        JUDGMENTS CONTAIN CONDITIONS OF SUPERVISED
        RELEASE THAT ARE NOT PART OF THEIR
        SENTENCES. THUS, THIS COURT MUST VACATE
        THEIR SENTENCES AND REMAND FOR FULL
        RESENTENCING................................................................................26

A.      Standard of Review .........................................................................26

B.      Argument..........................................................................................26

IV.   THE DISTRICT COURT ERRED IN DENYING YOO'S
      RULE 29 MOTION BECAUSE THE EVIDENCE WAS
      INSUFFICIENT TO PROVE HIM GUILTY BEYOND A
      REASONABLE DOUBT OF COUNTS 3 (VIOLENT
      CRIMES IN AID OF RACKETEERING – MURDER), 4
      (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING
      RESULTING IN DEATH), AND 7 (KILLING WHILE
      ENGAGED IN DRUG TRAFFICKING) .......................................27

      A.    Statement of Additional Facts....................................27

      B.    Standard of Review.................................................30

      C.    Argument ...............................................................31

            i.    Violent Crime in Aid of Racketeering – Murder
                  (Count 3)........................................................31

            ii.   Conspiracy to Commit Kidnapping and
                  Kidnapping Resulting in Death (Counts 4 and 5) ..........34

            iii.  Killing While Engaged in Drug Trafficking
                  (Count 7).......................................................35

      V.    THE DISTRICT COURT ERRED IN DENYING
            PETER LE'S RULE 29 MOTION BECAUSE THE
            EVIDENCE WAS INSUFFICIENT TO PROVE HIM
            GUILTY BEYOND A REASONABLE DOUBT OF
            COUNTS 3 (VIOLENT CRIMES IN AID OF
            RACKETEERING – MURDER), 4 (KIDNAPPING
            CONSPIRACY), 5 (KIDNAPPING RESULTING IN
            DEATH), AND 7 (KILLING WHILE ENGAGED IN
            DRUG TRAFFICKING) .........................................36

      A.    Statement of Additional Facts....................................36

      B.    Standard of Review.................................................40

      C.    Argument ...............................................................40

VIII. THE DISTRICT COURT VIOLATED TONY LE'S
      SPEEDY TRIAL ACT AND SIXTH AMENDMENT
      SPEEDY TRIAL RIGHTS.................................................42

      A.    Statement of Additional Facts....................................42

B.      Standard of Review ................................................................45

C.      Argument ................................................................................45

        i.       Tony's Speedy Trial Act Rights were Violated ............45

        ii.      Tony's Sixth Amendment Speedy Trial Motion
                was not Addressed by the District Court;
                Remand is Required ........................................................51

VII.    THE DISTRICT COURT IMPROPERLY ENHANCED
       TONY LE'S SENTENCING GUIDELINES ....................................52

A.      Statement of Additional Facts.................................................52

B.      Standard of Review ................................................................55

C.      Argument ................................................................................55

        i.       Acquitted Conduct ........................................................55

        ii.      The District Court Failed to Properly Assess and
                Make Necessary Findings as to Enhancements to
                Tony's Sentencing Guidelines; Therefore, his
                Sentence is Procedurally Unreasonable.........................57

        iii.     The District Court Failed to Conduct the
                Requisite Unwarranted Disparity Analysis under
                18 U.S.C. §3553(a)(6) ...................................................59

CONCLUSION .........................................................................................60

REQUEST FOR ORAL ARGUMENT ..................................................61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Barker v. Wingo,*
 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed.2d 101 (1972) ..................51, 52

*Bloate* v. *United States,*
 559 U.S. 196 (2010)..................................................................................45, 49

*Henderson v. United States,*
 476 U.S. 321 (1986)......................................................................................50

*Hoffman v. Leeke,*
 903 F.2d 280 (4th Cir. 1990) ........................................................................21

*LSLJ Partnership v. Frito-Lay,*
 920 F.2d 476 (7th Cir. 1990) ........................................................................23

*McClinton v. United States,*
 143 S. Ct. 2400 (2023)..................................................................................56

*Rosemond v. United States,*
 572 U.S. 65 (2014)........................................................................................32

*Stanko v. Stirling,*
 109 F.4th 681 (4th Cir. 2024) .......................................................................23

*Strickland v. Washington,*
 466 U.S. 668 (1984)......................................................................................21

*United States v. Aguilar,*
 585 F.3d 652 (4th Cir. 2009) ........................................................................36

*United States v. Agyekum,*
 846 F.3d 744 (4th Cir. 2017). .......................................................................59

*United States v. Alerre,*
 430 F.3d 681 (4th Cir. 2005) ........................................................................30

*United States v. Blackledge*,
    751 F.3d 188 (4th Cir. 2014) ....................................................22, 23

*United States v. Clyburn*,
    1995 WL 578047 (4th Cir. Oct. 2, 1995) ....................................50

*United States v. Cronic*,
    466 U.S. 648 (1984)....................................................................20

*United States v. Davis*,
    75 F.4th 428 (4th Cir. 2023) ......................................................30

*United States v. Edwards*,
    188 F.3d 230 (4th Cir. 1999) ......................................................34

*United States v. Espinoza*,
    622 F.App'x 745 (10th Cir. 2015). ............................................51

*United States v. Gallagher*,
    90 F.4th Cir. 182 (4th Cir. 2024)................................................30

*United States v. Gillespie*,
    27 F.4th 934 (4th Cir. 2022) ......................................................55

*United States v. Habegger*,
    370 F.3d 441 (4th Cir. 2004). ....................................................30

*United States v. Head*,
    927 F.2d 1361 (6th Cir.1991) ....................................................32

*United States v. Hart*,
    91 F.4th 732 (4th Cir. 2024) ................................................47, 48

*United States v. Hedgepeth*,
    418 F.3d 411 (4th Cir. 2005) ......................................................20

*United States v. Horton*,
    693 F.3d 463 (4th Cir. 2012) ................................................21, 23

*United States v. Jarrell*,
　　147 F.3d 316 (4th Cir. 1998) ........................................................46

*United States v. Lentz*,
　　524 F.3d 501 (4th Cir. 2008) ........................................................34

*United States v. Lewis*,
　　1993 U.S. App. LEXIS 32986 (4th Cir. 1993)..............................32

*United States v. Love*,
　　767 F.2d 1052 (4th Cir. 1985) ......................................................32

*United States v. Margheim*,
　　770 F.3d 1312 (10th Cir. 2014) ....................................................50

*United States v. Maxwell*,
　　285 F.3d 336 (4th Cir. 2002) ........................................................26

*United States v. McAllister*,
　　272 F.3d 228 (4th Cir.2001) .........................................................58

*United States v. Mearis*,
　　36 F.4th 649 (5th Cir. 2022) ...................................................45, 51

*United States v. Medley*,
　　34 F.4th 326 (4th Cir. 2022) ........................................................56

*United States v. Mullen*,
　　32 F.3d 891 (4th Cir. 1994) ..........................................................23

*United States v. Ortiz-Orellana*,
　　90 F.4th 689 (4th Cir. 2024) ........................................................31

*United States v. Pair*,
　　84 F.4th 577 (4th Cir. 2023) ........................................................52

*United States v. Pena*,
　　952 F.3d 503 (4th Cir. 2020) ........................................................25

*United States v. Perry*,
    335 F.3d 316 (4th Cir. 2003) ........................................................30

*United States v. Robinson*,
    55 F.4th 390 (4th Cir. 2022) ................................................45, 50

*United States v. Rodriguez-Amaya*,
    521 F.3d 437 (4th Cir. 2008) ........................................................45

*United States v. Rogers*,
    961 F.3d 291 (4th Cir. 2020) ........................................................26

*United States v. Samad*,
    754 F.2d 1091 (4th Cir. 1984) ......................................................30

*United States v. Singletary*,
    984 F.3d 341 (4th Cir. 2021) ........................................................26

*United States v. Small*,
    988 F.3d 241 (6th Cir. 2021) ........................................................35

*United States v. Smart*,
    91 F.4th 214 (4th Cir. 2024) ........................................................48

*United States v. Smith*,
    451 F.3d 209 (4th Cir. 2006) ........................................................30

*United States v. Smith*,
    640 F.3d 580 (4th Cir. 2011) ................................................21, 22

*United States v. Tipton*,
    95 F.4th 831 (4th Cir. 2024) ........................................................31

*United States v. Velasquez*,
    52 F.4th 133 (4th Cir. 2022) ........................................................45

*United States v. Weil*,
    561 F.2d 1109 (4th Cir. 1977) ......................................................32

*United States v. Wheeler*,
   717 F.App'x 217 (4th Cir. 2018) ...................................................59

*United States v. Williams*,
   445 F.3d 724 (4th Cir. 2006) .....................................................19

*United States v. Winstead*,
   708 F.2d 925 (4th Cir. 1983) .....................................................31

*Zedner v. United States,*
   541 U.S. 489 (2006).............................................................45, 49

**Statutes & Other Authorities:**

4 Federal Trial Guide § 90.120 (Matthew Bender) .............................25

18 U.S.C. §848(e)(1)(A) .............................................................35

18 U.S.C. §924(c) .....................................................................52

18 U.S.C. §1201 .......................................................................35

18 U.S.C. § 1961 ......................................................................31

18 U.S.C. §1959(b)(2)................................................................31

18 U.S.C. §3161 ............................................................45, 46, 47, 49

18 U.S.C. §3161(c)(1)..............................................................46, 47

18 U.S.C. §3161(h)(6)..............................................................46, 49

18 U.S.C. §3161(h)(7)(A)..............................................................47

18 U.S.C. §3231 .........................................................................1

18 U.S.C. §3553(a)(6) ...................................................................54

18 U.S.C. §3553(a)(6) ...................................................................59

18 U.S.C. §3742 .........................................................................1

28 U.S.C. §1291 .........................................................................1

U.S. Const. amend VI ...........................................................*passim*

U.S.S.G. §1B1.3 ........................................................................56

U.S.S.G. §2D1.1 cmt.n.3 ...............................................................58

U.S.S.G. §2D1.1(b)(1) .................................................................57, 58

U.S.S.G. §2D1.1(b)(2) ....................................................................57

## STATEMENT OF JURISDICTION

The District Court had jurisdiction under 18 U.S.C. §3231. Every defendant timely appealed his final judgment. JA4758-4781, JA4846, JA4848, JA4756, JA4854, JA4856. This Court has jurisdiction under 28 U.S.C. §1291 and 18 U.S.C. §3742.

## STATEMENT OF ISSUES

I.      APPELLANTS WERE DENIED A FAIR TRIAL BECAUSE THE DISTRICT COURT DENIED THEIR JOINT REQUEST FOR A CONTINUANCE AFTER A LATE, VOLUMINOUS DISCOVERY DISCLOSURE.

II.     THE DISTRICT COURT ABUSED ITS DISCRETION BY DETERMINING THAT LAMBORN'S REQUEST FOR A NEW ATTORNEY WAS UNTIMELY BECAUSE IT DID NOT ADDRESS HIS PROFFER THAT HE HAD EVIDENCE THAT HE ASKED HIS ATTORNEYS TO FILE THE MOTION THREE MONTHS BEFORE THEY DID.

III.    PETER LE'S, YOO'S, AND LAMBORN'S WRITTEN JUDGMENTS CONTAIN CONDITIONS OF SUPERVISED RELEASE THAT ARE NOT PART OF THEIR SENTENCES. THUS, THIS COURT MUST VACATE THEIR SENTENCES AND REMAND FOR FULL RESENTENCING

IV.     THE DISTRICT COURT ERRED IN DENYING YOO'S RULE 29 MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT OF COUNTS 3 (VIOLENT CRIMES IN AID OF RACKETEERING – MURDER), 4 (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING RESULTING IN DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG TRAFFICKING)

V. THE DISTRICT COURT ERRED IN DENYING PETER LE'S RULE 29 MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT OF COUNTS 3 (VIOLENT CRIMES IN AID OF RACKETEERING – MURDER), 4 (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING RESULTING IN DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG TRAFFICKING)

VI. THE DISTRICT COURT VIOLATED TONY LE'S SPEEDY TRIAL ACT AND SIXTH AMENDMENT SPEEDY TRIAL RIGHTS

VII. THE DISTRICT COURT IMPROPERLY ENHANCED TONY LE'S SENTENCING GUIDELINES

## STATEMENT OF THE CASE

A. Background

This appeal arises from the convictions of Joseph Lamborn, Tony Le ("Tony"), Peter Le ("Peter"), and Young Yoo after a jury trial on a 37 count Indictment alleging a RICO conspiracy involving the "Reccless Tigers" ("RT") and affiliates which conspired to traffic marijuana and other controlled substances. JA304. The Government alleged that RT members engaged in violence to command respect and obedience, but testimony suggested that RT affiliates were only loosely connected, and individuals often committed violence for purely personal reasons. Likewise, drug sales characterized by the government as "gang activity" were often conducted by and for individuals

In or around 2009-2010 in Centreville, Virginia, Richard Pak—then a member of Young Korean Lokos—formed RT as his own gang, which was made

up nearly exclusively of Asian young men and boys and sold marijuana and cocaine in Northern Virginia JA1005, JA1007, JA1009-1011, JA3072, JA3254, JA3693. Some members also sold guns. JA1033. Early members and associates of RT included Tony (a member of Asian Boyz but with close relationships, including drug-business, with RT), Lamborn, and Yoo, as well as trial witnesses Ha Lim Chung, Kyu Hong, and Kevin Aagesen. JA1029, JA1076, JA3255. Approximately 5-6 years later, two other groups formed, Club Tiger ("CT") and Tiger Side ("TS"). JA1223-1225. TS arose out of a discussion between Richard Pak and Tony in which they parted ways. JA3286, JA3320-3321, JA3513-3514, JA4238. Yoo, Soung Park, and others who left RT joined TS, which focused less on "gang life" and more on making money. JA3286.

CT was also born of the separation of Pak's and Le's drug businesses, and it specialized in distributing marijuana and THC products. JA3257. CT advertised on social media, sold branded merchandise, and was made up of young men who loved all-things marijuana, including the money it makes. Peter was a prominent member of CT and was, at least during the latter period, JA2016-2018, in charge of its marijuana distribution.

Inconsistencies abound as to who was a member of which group and when. For example, only Spencer Pak, younger brother of Richard, felt that Peter was a member of all three groups at the same time. JA3364. Others said Peter did not

really speak of RT, JA1486, or that they understood CT to be a prospect group for RT, JA3056, JA3269, JA3432, JA3970. No one testified to having "graduated" *to* RT *from* CT. In fact, the two groups were often at odds, and every witness identified *himself* as having been (and having only been *able to* be) a member of one group at a time. JA1223, JA3432, JA3445, JA3461, JA3474, JA3604, JA3643. It was seemingly, *only* Appellants' memberships that were ambiguous and overlapping. *See, e.g.,* JA3631-3633.

Park provided insight into movement *among* the groups, and confirmed they operated independently. Park and Peter were the original members of CT. JA3432. Park later joined TS to "get right with Tony" after first rejecting TS, and joined RT to sell cocaine with Hong. JA3445-3446, JA3461. Park was no longer a CT member at that point, and when he joined TS, he was no longer a member of RT. JA3452, JA3461. Park's experience illustrates the true dynamic among the groups - that despite any commonality, significant differences and even serious conflicts existed. JA3352, JA3450-3451, JA3469, JA3471, JA3513-3514, JA3533-3534, JA3687, JA3689-3690, JA3694, JA3696, JA3704-3705.

Park explained that it was "known" that Richard Pak and Tony, leaders of "different groups," "weren't getting along" and "had some issues." JA3450-3451, JA3513. Park distanced himself from Peter and CT because he disliked new non-Asian high-school aged members. JA3471. Hong—a founding member of RT—

4

described how Peter was not liked in RT. He and other members of RT beat Peter up. JA3690-3691, JA3699. Dane Hughes and Park testified that Peter and Yoo "fought all the time;" Yoo even beat Peter with a baseball bat after he tried to attack Yoo. JA1780-1781, JA3532.

## B. Differences In How the Groups Operated

### i. *Drugs of Choice*

By the time there were three groups, RT's drug distribution—led by the Pak brothers—included a lot of cocaine. JA1003, JA3254-3255, JA3804-3805. TS focused on marijuana production; CT focused on marijuana distribution. JA3075, JA3256, JA3632. Sometimes, CT would tap into RT as a source for other drugs for customers, but Peter generally discouraged dealing cocaine. *See* JA2234, JA2242, JA2262. The CT business model was to "front" quality marijuana on bulk discount to heavy users and/or already-established dealers. JA1550, JA1586, JA1597.

### ii. *Use or Threat of Violence*

While RT had a dangerous reputation, CT was known as a party group; "soft," and "weak." CT was not interested in "gangster life," so not much was expected of them. JA3524, JA3631, JA3694-3696, JA3971. Those who crossed RT were likely to fall victim to beatings or fire-bombings. *E.g.,* JA1952, JA2512. Those who stole from, snitched on, or owed CT, might have rocks thrown at their house, but more often faced either no consequence or were offered a job driving,

making deliveries, or working at the California farm that supplied marijuana. JA1493, JA3383, JA3394. Everyone who took a "job" quit when he wanted, and most never paid their debt. *See, e.g.,* JA1503. Nearly every witness who owed CT a debt *still* owes it, and none were targeted for beatings, let alone murder. *E.g.,* JA352.

### iii. Brandon White

*Many* non-members—including Abdoullah Sayf and Brandon White aka "Bahim" associated with RT members. Sayf was a lifelong friend of Fahad Abdulkadir ("Fahad") of RT, who sold marijuana he obtained from Peter. JA2846, JA2947-2950. Sayf was not in either group, and hated "the Tigers," JA2879, especially Peter, from whom he stole twice and planned to do so again. JA2879-2880. White was Sayf's Percocet and Xanax dealer. JA2846. White also owed a small marijuana debt to Yoo—from 2013 or 14. JA3278.

In Summer 2018, David Nguyen assaulted White, JA2565, JA2575, as punishment for the debt to Yoo, despite Yoo's not asking him to and White's assurance that it had been resolved. JA2562-2563. Yoo specifically *rejected* advice to kill White. JA3697-3698, JA3703. White testified against Nguyen in November 2019 after attempts for an accord and satisfaction failed, JA2628-2630, at which time White told Sayf and Dillon Abston he was "talking to the feds" about "the Tiger incident." JA2570, JA2850.

C.     Motions to Dismiss and Continue Based on Discovery

Over four years and five indictments, approximately 20 defendants were charged. JA304. While only four went to trial, many pretrial issues arose due to the volume of discovery. The court appointed a Coordinating Discovery Attorney (CDA), but the volume compounded with the pandemic caused counsel great difficulty in reviewing discovery with their clients.

On December 14, 2021, the government filed a Notice indicating that they did not have significant discovery from Fairfax County P.D, JA546, and could not be certain when they would get it. JA549-550. The government filed a Memo on January 4, 2022, outlining the type of discovery it anticipated. JA556. It indicated that it had already provided approximately 67,000 documents and 368 gigabytes of discovery, in addition to "countless hours of telephone calls, video footage of gang activity, statements to law enforcement and relevant video from the [night] when the [defendants] were alleged to have kidnapped . . . White." JA557.

On January 4, 2022, trial was continued to March 28, 2022. JA600.

On February 25, 2022, defendants filed a Joint Motion to Dismiss, JA602, JA609-614, citing the volume of discovery produced since January which necessitated further tolling of Speedy Trial provisions. JA602.

At another status hearing, on March 8, 2022, JA 632, the CDA indicated that discovery received *since January 5, 2022,* contained an additional 632 gigabytes

consisting of 28 new phone dumps, bringing the total to 101 phones and 23 more categories of evidence, which the CDA's team typically organizes into separate files to facilitate searching. JA638. The files were so large that a single file could take "hours" to open. JA639. Regarding telephone dumps, the CDA's office normally generates a file for each, with those files grouped so that attorneys can "search against all devices in one place." *Id*. Additionally, the new discovery contained 1,796 new jail calls, 4 Instagram accounts and other chat programs . . ." JA640. The approximate duration of the audio and video files in the new discovery was 349 hours. *Id*. The CDA advised the Court that it would take her office approximately 2 to 2 ½ weeks from the date of the hearing to synthesize the new discovery into a searchable database. JA641. The new discovery not only included newly obtained material but also material that the government thought it had disclosed in June and September of 2021, in Productions 11 and 12. JA650. It also contained the *Jencks* and *Giglio* that the government provided 40 days prior to the March 28 hearing. JA664.

Counsel pointed out that the difficulty in reviewing the discovery was compounded by an inability to identify folders and files, JA606, JA660, and confirmed that some files were so cumbersome that they took *extremely* long to open, *if* they opened. JA663.

When asked the reason for the late disclosures, the government told the court that it did not provide certain material because it was unaware of what defenses would be presented. JA642. It contended that Defendants had not made any demands for specific information ". . . no questions, no concerns, no complaints," *id.,* which was not true; counsel had asked after the medical examiner's and forensic anthropologist's reports months prior.

The government opined that much of the material was not relevant, and the court agreed. JA645, JA666, JA672. The *government* concluded that the new discovery was neither as extensive nor as important as it appeared, suggesting that counsel should not have the difficulty anticipated; the court agreed again. JA672.

Given the volume of the new discovery and the CDA's projected date for processing it, the Court denied the Motion to Dismiss and continued the case until April 11—a mere 2 weeks. JA678.

On April 8, 2022, the defendants filed a Renewed Motion to Continue detailing the difficulty counsel faced with the recent disclosure. JA746. The volume caused technical difficulties, and the format made keyword searches impossible; *e.g.*, the *index* of *folder*s–not files–was 30 pages long. The discovery contained vital *Jencks* and *Giglio*, but counsels' inability to access, review, and discuss this material crippled effective representation. The issues are detailed in the Renewed Motion, which was denied, JA746-754, JA757, and renewed each day of

trial. JA763, JA985, JA1323, JA1640, JA1909, JA2191, JA2448, JA2725, JA2938, JA3367, JA3554, JA3863.

D.     Lamborn's Attorneys' Motion to Withdraw

On April 5, 2022, Lamborn's counsel filed motions to withdraw and for appointment of new counsel alleging, *inter alia,* "irreconcilable difference which prevents effective representation." JA679, JA681.[1] The United States opposed based solely on the timing. JA682.

At a hearing, counsel said that "Lamborn had, in previous occasions, intimated that he was not happy with our services, both individually and collectively." JA727. They did not, however, file their motions to withdraw until four days before trial. JA679, JA681.

Lamborn himself proffered that

- When the case began, Mr. Yamamoto did not contact him for six months. JA729.

- His attorney did not give him discovery, claiming it was not ready, though at least one co-defendant had been given discovery months prior. He continued to ask for this discovery for months. *Id*.

- His attorney said that his office would "comb through" the multi-defendant discovery to mark for him the sections that applied to him. But even a cursory review of that "combed through" discovery revealed places where he "was mentioned but not bookmarked." JA730.

---

[1] Counsel technically filed the motions, but they filed them at Lamborn's request, so they are referred to as Lamborn's motions.

- His attorney did visit him for a period of three or four months, but then "the visits slowed down, and they just stopped altogether." JA731.

- Counsel stopped bringing him discovery "so to this day, [he's] seen less than one percent of [his] discovery." *Id*.

- But when he told counsel months before trial that he still needed his discovery—for which he had been asking for three years—counsel said that he thought that he had already provided it. When Lamborn expressed confusion, counsel "quickly changed his answer and said 'COVID complications. Oh, now I remember, it was COVID complications.'" *Id*. But, as Lamborn continued, COVID did not explain why his lawyers could not use that time to "comb through" his discovery and get it ready for him. *Id*.

- Overall, his lawyers exhibited a pattern of abandoning him. As he states, "[s]o the first time I got a visit, it was almost -- it was probably over a year that I didn't have any visit, any call, any notification, no letters, anything to my family, nothing from my lawyers." JA733-734.

Thus, Lamborn, about three months before trial and after nine months of no contact from counsel, told them, through his sister, to file a motion to withdraw and for new counsel. JA734. At that point, counsel started to visit, but he told them "I wanted a hundred percent put in a motion to get Mr. Yamamoto off my case because of this." JA735. As he noted, "the only time my lawyers chose to visit me is when I'm about to fire them, and I just don't feel like that makes a lot of sense to me." JA738.

He argued he was not trying to create a delay, but he still wanted "a fair chance" to go over his discovery. *Id*. He emphasized he "really need[ed] time to go over [the discovery] because [he] believe[d] there's exculpatory evidence . . . that

[he] [has not] even got a chance to peek at yet." *Id*. And, as he explained, "that's not my fault. . . . because I've been asking for the discovery for years, you know." *Id*.

The court denied the motion, indicating that counsel had put a lot of work into his case "based on the work that I've seen." JA742. The court emphasized that "the motion is untimely. We're five days from trial or less." *Id*.

Lamborn interjected "Your Honor—" and the court said "Stop, stop, stop, stop, You're done. I'm telling you that they won't do things that you requested, . . ." JA733.

But Lamborn continued, disputing that the late filing should be held against him:

> THE DEFENDANT: I am telling you that -- I told you that. I asked them to file for a motion for new counsel three months ago, and I got that in the text message that my sister sent to them.
>
> THE COURT: Okay.
>
> THE DEFENDANT: So I got that in black and white, so if you want to see it, I'll show it to you. I can get my sister to come down and –
>
> THE COURT: Stop. You could have written me a letter. If you wanted, other counsel could have done that. And I've heard you made conflicting statements about "I decided to wait" after you first said you wanted new counsel, and you decided because they said that they were going to work on your behalf.
>
> THE DEFENDANT: I never said that

.

JA743-744.

The court did not further inquire about Lamborn's assertion that he had asked counsel to file the motion three months earlier, nor did it address his offer to bring written and testimonial proof of his request.

The court issued a short order reiterating that the motion was not timely filed because of the imminent trial date. JA4864. It also indicated that it did not perceive a breakdown in the relationship between Lamborn and counsel. JA4865. And it indicated that "[t]he Court is confident that Lamborn and counsel will be able to present a meaningful defense." JA4864.

The court's confidence was unfounded. Lamborn's relationship with his counsel was irrevocably broken, to the point Lamborn almost physically attacked his lawyer on the 10th day of trial. JA3229. He ended up representing himself for the remainder of the proceedings. *See* JA3230, *et seq*.

Lamborn did his best but could not present an adequate defense. His closing argument was disjointed because the government and court interrupted and stopped him eight times because he made mistakes. JA4612, JA4613, JA4618, JA4619, JA4621, JA4624, JA4629, JA4630.

E.    Trial and the Verdicts

The jury convicted each Appellant of **Count 1**, Engaging in a Conspiracy to Aid Enterprise Racketeering Activity. JA4671-4715.

The jury convicted Peter, Lamborn, and Yoo of **Count 3**, Murder in Aid of Racketeering, **Count 4** Kidnapping Conspiracy, **Count 5**, Kidnapping Resulting in Death, **Count 6**, Narcotics Conspiracy, **Count 7**. Additionally, the jury convicted Lamborn of **Count 13**, Firearms Murder. *Id.*

The jury also convicted Peter of **Counts 8-10**, Maintaining a Drug-Involved Premises, **Counts 11-12**, Distribution of a Controlled Substance, **Count 16**, Using, Carrying and/or Possessing a Firearm or Destructive Device in Furtherance of a Crime of Violence and **Count 21**, Money Laundering. *Id.*

The jury also convicted Tony Le of **Count 6**, Narcotics Conspiracy. JA4716.

F.   Sentencing

    i.   Peter Le

Life sentences on counts 1, 3, 4, 5 and 7; 30 years on count 6; 240 months on count 8, 12, 21 all to be served concurrently and 60 months on count 16 to be served consecutively to counts 1, 3-7, 8-12 and 21. JA4781.

    ii.   Joseph Lamborn

Life sentences on counts 1, 3-5, 7; 180 months on count 6, all to be served concurrently and a life term on count 13, to be served consecutively to counts 1 and 3-7. JA4765.

### iii. Young Yoo

Life sentences on counts 1, 3-5, 7 and 20 years on count 6, all to be served concurrently. JA4773.

### iv. Tony Le

312 months on counts 1 and 6, with those sentences to be served concurrently. JA4854.

### G. Special Conditions of Pretrial Release Imposed on Peter, Lamborn, and Yoo

As part of the sentences for Peter, Yoo, and Lamborn, the court announced special conditions of supervised release. JA4750 (Le); JA4753 (Yoo); JA4757 (Lamborn). Each judgment order included conditions of supervised release that were not part of their sentence. JA4784 (Le); JA4776 (Yoo); JA4768 (Lamborn).

This appeal followed.

## SUMMARY OF ARGUMENT

ISSUE I:

The denial of the motions to continue after the government's late disclosure of terabytes of discovery denied Appellants' 6th Amendment rights to trial counsel, as the ability to put the prosecution's case to a meaningful adversarial test was stifled by an inability to review the material prior to trial.

ISSUE II:

The system abandoned Lamborn. The system would not even listen to him. Four days before trial, his attorneys filed a motion to withdraw and for the appointment of new counsel, alleging a breakdown in the attorney-client relationship. The court denied the motions as tardy.

Lamborn responded that he had asked counsel three months earlier to file the motions but they ignored him. He told the court that his sister had a record of this request. He offered to submit a copy and/or his sister's testimony. But the court did not hold a hearing. Instead, it issued an Order saying that the motions were late and counsel was fine, and denying the motions.

Lamborn deserved more. When a defendant indicates he has a conflict with counsel, a district court has an obligation to address it. The court did not, which was an abuse of its discretion.

This Court must vacate Lamborn's conviction and remand for a new trial with new counsel. In the alternative, this Court must vacate the conviction and remand for a hearing to determine whether Lamborn asked counsel to withdraw three months before they filed the motions.

ISSUE III:

A defendant has the right to be present at sentencing. Thus, if a written judgment includes conditions of supervised release not announced at sentencing, it is erroneous. The remedy is full resentencing.

Peter's, Yoo's, and Lamborn's written judgments contain conditions of supervised release that are not part of their sentences. This Court must vacate their sentences and remand for full resentencing.

ISSUE IV:

The evidence was insufficient for the jury to find, beyond a reasonable doubt, Yoo guilty of Counts 3, 4, 5 and 7; the court, therefore, erred in denying his Rule 29 motion.

As to Counts 3 and 7, the evidence did not prove that Yoo committed a murder, an essential element of VICAR murder and killing while engaged in drug trafficking. Moreover, the evidence did not prove Yoo knew or had reason to know that others intended to kill the victim. As to Counts 4 and 5, the evidence did not establish that Yoo planned or executed the plot to inveigle the victim to arrive at the site where the kidnapping was executed, or to seize him once the victim was there. There was also insufficient evidence to prove Yoo participated in the continuing detention and the killing of the victim once the participants and others arrived in Richmond.

ISSUE V:

The evidence was insufficient for a jury to find beyond a reasonable doubt that Peter planned, knew, had reason to know, or agreed that White was to be kidnapped let alone killed, or that he knowingly participated in either act. The evidence as to what happened in the Giant parking lot was at best in equipoise as to whether Peter had contact with White or caused him to get into the car. Peter had no weapon, and precisely what occurred in Richmond remains unknown. In no accounting did Peter perpetrate deadly violence against White.

ISSUE VI:

In response to Tony's motion to dismiss based on Speedy Trial Act violations the court failed to provide justification for the denial of the motion and granting of continuances, as required by the Supreme Court and this Court. Further the "co-defendant" clause under the Speedy Trial Act fails to toll the speedy trial clock in this case because continuances of the case for all defendants suffered from the same infirmities. Two-and-a-half years between Tony's first appearance and trial, after numerous demands to protect his speedy trial rights and to sever the cases, is simply too long under the Act.

The district court failed to render any decision on 6th Amendment grounds. This failure requires a remand to the district court for resolution of the motion.

ISSUE VII:

At sentencing, the court treated Tony as if he had been convicted of all
charges, imposing a trial penalty and enhancing his sentencing guidelines based on
acquitted conduct. The court further imposed sentencing enhancements that were
unsupported by the evidence. Additionally, the court failed to make a proper
assessment of unwarranted disparities, imposing a sentence far greater than those of
more culpable co-defendants. The procedural and substantive defects in the
sentencing decisions require that the judgment be reversed and the case remanded
for resentencing.

## ARGUMENT

I.   APPELLANTS WERE DENIED A FAIR TRIAL BECAUSE THE
     DISTRICT COURT DENIED THEIR JOINT REQUEST FOR A
     CONTINUANCE AFTER A LATE, VOLUMINOUS DISCOVERY
     DISCLOSURE

A.   Standard of Review

This Court reviews a trial court's denial of a continuance for abuse of

discretion. *United States v. Williams*, 445 F.3d 724, 738-39 (4th Cir. 2006).

Generally, the trial court's decision will be upheld unless it was based on an

unreasoning and arbitrary insistence upon expeditiousness in the face of a

justifiable request for delay. *Id.* Even if an abuse of discretion is found, the

defendant must show prejudice, or that the denial had a detrimental effect on their

ability to present a defense or receive a fair trial. *See United States v. Hedgepeth*, 418 F.3d 411, 423 (4th Cir. 2005).

B.     Argument

"The presumption that counsel's assistance is essential requires us to conclude that a trial is unfair if the accused is denied counsel at a critical stage of his trial. *United States v. Cronic*, 466 U.S. 648, 659-60 (1984). Similarly, if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of 6th Amendment rights that makes the adversary process itself presumptively unreliable . . .." *Id.* "[C]ircumstances of that magnitude may be present on some occasions when although counsel is available to assist the accused during trial, the likelihood that any lawyer, even a fully competent one, could provide effective assistance is so small that a presumption of prejudice is appropriate without inquiry into the actual conduct of the trial." *Id.*

In fact, counsel admitted to failing to provide effective assistance during trial. JA359. In one specific instance, counsel for Peter indicated that she neither consulted with nor retained a forensic anthropologist to assist in challenging the government's key evidence as to the White's injuries. *Id.* While the standard for determining ineffective assistance of counsel permits counsel to "make a reasonable decision that makes particular investigations unnecessary," counsel in this case were *unable* to make the permissible strategic decisions, as they were not

aware of everything in the discovery prior to, and far enough in advance of, trial to

even *view* it all, let alone digest it and make effective use of it. *Strickland v.*

*Washington,* 466 U.S. 668, 691 (1984). *See* JA359-360.

II.     THE DISTRICT COURT ABUSED ITS DISCRETION BY
        DETERMINING THAT LAMBORN'S REQUEST FOR A NEW
        ATTORNEY WAS UNTIMELY BECAUSE IT DID NOT ADDRESS HIS
        PROFFER THAT HE HAD EVIDENCE THAT HE ASKED HIS
        ATTORNEYS TO FILE THE MOTION THREE MONTHS BEFORE
        THEY DID.

A.      Standard of Review

        This Court reviews this claim for an abuse of discretion. *United States v.*

*Horton*, 693 F.3d 463, 466 (4th Cir. 2012).

B.      The District Court Abused its Discretion

        "In all criminal prosecutions, the accused shall enjoy the right . . . to have the

Assistance of Counsel for his defense." U.S. Const. Amend. VI. This right

"guarantees a defendant in a criminal case the *effective* assistance of *competent*

counsel." *Hoffman v. Leeke*, 903 F.2d 280, 285 (4th Cir. 1990) (emphasis added).

        Thus, when the relationship between a defendant and his appointed attorney

breaks down to the point where counsel can no longer provide effective

representation, the defendant has "the right to appointment of substitute counsel"

which "spring[s] directly from the indigent defendant's right to counsel" under the

6th Amendment. *United States v. Smith*, 640 F.3d 580, 588 (4th Cir. 2011).

When a district court denies a defendant's motion for substitute counsel, this Court's "review . . . has focused on three inquiries: (1) the timeliness of the motion; (2) the adequacy of the court's subsequent inquiry; and (3) whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense." *Id.* (internal citations and quotations omitted). Reviewing these factors reveals that the district court abused its discretion in denying the motion without further inquiry.

As the United States itself acknowledges, "one of the key factors in deciding a motion to withdraw is the timeliness of the request." JA682 (citing *Smith*, 640 F.3d at 588). And, indeed, the court denied Lamborn's motion primarily on the untimeliness of the motion.

Lamborn agrees that if he had told his attorneys to bring this motion only days before trial, it would have been untimely. *See United States v. Blackledge*, 751 F.3d 188, 194 (4th Cir. 2014) (holding that a motion brought three days before trial was untimely).[2] But, critically, he told the court that he asked his attorneys to file the motion three months earlier. Had they filed the motion then, it would have been timely. *See id.* (noting that motions filed two weeks and three weeks before trial had been considered timely).

---

[21] *Blackledge* involved a civil commitment proceeding, but this Court applied the Sixth Amendment criminal right to counsel to Mr. Blackledge's claim. *Blackledge*, 751 F.3d at 197.

And Lamborn did not merely assert that he asked his attorneys to withdraw. He told the district court that he had a written record of that communication and a witness who would testify about it. The court had an obligation to inquire further as part of its discretionary determination. "[T]he abuse of discretion standard implies that the judge must actually exercise his discretion." *LSLJ Partnership v. Frito-Lay*, 920 F.2d 476, 479 (7th Cir. 1990) (internal quotation omitted).

The system placed Lamborn in an untenable position. He had to object to his attorneys' performance through his attorneys. This Court has "note[d] the circularity of requiring a defendant who is by hypothesis represented by counsel . . . to object to that representation through said counsel." *Stanko v. Stirling*, 109 F.4th 681, 686 n.1 (4th Cir. 2024) (discussing counsel with a conflict of interest). Here, the court denied Lamborn's motion based on untimeliness when Lamborn claimed that the very untimeliness at issue stemmed from his attorneys.

"When a defendant raises a seemingly substantial complaint about counsel, the judge has an obligation to inquire thoroughly into the factual basis of defendant's dissatisfaction." *United States v. Mullen*, 32 F.3d 891, 896 (4th Cir. 1994) (internal quotation omitted). Thus, the court needed to further inquire into Lamborn's proffered evidence.

Because if Lamborn's evidence showed what he claimed—that he unequivocally asked his attorneys to file a motion to withdraw and they sat on that

request for three months—then it would directly affect all three of the relevant factors: the court (1) failed to conduct an adequate inquiry into (2) the timeliness of the motion; and (3) whether the attorney/client conflict was so great that it had resulted in total lack of communication preventing an adequate defense.

Because the court did not inquire into Lamborn's proffer, "this Court is essentially left with an incomplete record upon which to determine the third factor: the extent of the breakdown in communication and whether it was so great that it prevented an adequate defense." *Horton,* 693 F3d at 467. And the courts have an obligation to address that factor. The court mentioned several times that it was familiar with Lamborn's counsel and that it considered them very good lawyers. But that assessment—even if true—is not enough. "[A]n attorney's competence cannot cut short the inquiry because, even if a defendant's counsel is competent, a serious breakdown in communication can result in an inadequate defense." *Blackledge*, 751 F.3d at 195 (internal quotation omitted).

The court abused its discretion in failing to conduct an adequate inquiry and basing its holding on its inadequate review.

## C.     The Error Was Not Harmless

This Court reviews a district court's erroneous denial of a motion for substitute counsel for harmless error. *See, e.g., Horton,* 693 F3d at 467. "In order to prevail on harmlessness, the government must show that an error did not affect a

defendant's substantial rights." *United States v. Pena*, 952 F.3d 503, 512 (4th Cir. 2020) (internal quotation omitted). The government cannot make that showing.

First, without an adequate record, the government cannot show how badly the error prejudiced Lamborn. He claimed that his attorneys would go months and years without contacting him. He claimed that they did not send him discovery even when other defendants had theirs. He claimed that he asked them to file a motion to withdraw that they sat on for months. If true, these allegations would reveal a complete breakdown in communications that affected Lamborn's substantial rights.

And, because the district court denied Lamborn's motion, he ended up physically attacking his attorney and going pro se—revealing that the court likely *would* have found a fundamental breakdown in the attorney-client relationship had it properly inquired into it. When Lamborn went pro se, he gave his own closing argument before the jury, which was disjointed and had to be constantly interrupted by the government and the court. "Some lawyers and experts in trial communication consider the concluding phase of a closing argument to be the most critical few minutes of the closing argument, and possibly of the entire trial process." 4 Federal Trial Guide § 90.120 (Matthew Bender). The government cannot show that a more competent closing would not have resulted in a different outcome.

25

The district court abused its discretion. This Court must vacate Lamborn's conviction and remand for a new trial with new counsel or for the district court to re-conduct the inquiry into Lamborn's motion with the proper fact finding.

III. PETER LE'S, YOO'S, AND LAMBORN'S WRITTEN JUDGMENTS CONTAIN CONDITIONS OF SUPERVISED RELEASE THAT ARE NOT PART OF THEIR SENTENCES. THUS, THIS COURT MUST VACATE THEIR SENTENCES AND REMAND FOR FULL RESENTENCING

A. Standard of Review

This Court reviews "the consistency of [an] oral sentence and the written judgment de novo, comparing the sentencing transcript with the written judgment to determine whether an error occurred as a matter of law." *United States v. Rogers,* 961 F.3d 291, 296 (4th Cir. 2020) (internal quotation omitted).

B. Argument

"The terms and conditions of supervised release are a substantial imposition on a person's liberty." *United States v. Maxwell*, 285 F.3d 336, 342 (4th Cir. 2002). And "all non-mandatory conditions of supervised release must be announced at a defendant's sentencing hearing." *Rogers*, 961 F.3d at 296. "This conclusion flows naturally from a fundamental precept: A defendant has the right to be present when he is sentenced." *Id.* If the written conditions differ from the sentence imposed, then the proper remedy is to remand for full resentencing. *United States v. Singletary,* 984 F.3d 341, 346 & n.4 (4th Cir. 2021).

Here, the written judgments for Peter, Yoo, and Lamborn contain written conditions of supervised release that are not part of their sentences. *Compare* JA4750, JA4753, JA4757 *with* JA4784, JA4776, JA4768. Thus, this Court must vacate their sentences and remand for full resentencing.

IV.    THE DISTRICT COURT ERRED IN DENYING YOO'S RULE 29 MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT OF COUNTS 3 (VIOLENT CRIMES IN AID OF RACKETEERING – MURDER), 4 (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING RESULTING IN DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG TRAFFICKING)

A.    Statement of Additional Facts

Yoo was a member of TS, JA2394, a loose group, not run by one person, JA2412, that dealt marijuana. White owed Yoo money for marijuana he had fronted. JA2736-2739. Although other gang members offered to intervene, Yoo declined their assistance. JA1838-1839, JA1890-1893**.**

Independent of Yoo, Fahad and Sayf initiated a plan to "deliver" White to Peter. JA2847-2860, JA2902, JA2906. According to Fahad, his good friend Sayf, who owed Peter a drug debt, was also a customer of White's, and so Fahad asked Sayf to help set up White. JA2850-2851, JA2961-2964. They devised a plan to deliver White to Peter and Lamborn. JA2852-2865, JA2907, JA2911.

Fahad and Sayf inveigled White to join them on a fictitious errand. JA2854-2856, JA2964-2969. They brought him to a rendezvous with Peter, Lamborn, and

27

others at Loehmann's Plaza. JA2861-2866, JA2965-2979, JA3101-3103. There was

no evidence that Yoo was involved with instigating or planning the plot, or that

there was a plan to kill White. Yoo expressed surprise when White appeared at the

Plaza: "Oh shit, that's him. That's [White]." JA3103.

When White arrived, Lamborn gestured to White, suggesting he had a gun.

JA2866, JA2872. White was pushed into a vehicle driven by Carlisle ("Wolf"),

along with passengers Peter and Lamborn. JA2864-2866. Yoo remained in another

car. JA2866, JA2978-2980, JA3103, JA3105. While Sayf said that Peter and

Lamborn were wearing latex gloves, JA2866, JA2877, JA2980, no one testified

that Yoo did. Fahad, Sayf, and Aegeson all thought that the object of the plan was

to beat or "jump" White. JA2892, JA3101.

The car driven by Wolf drove to Richmond. The car with Yoo, Aegesen, and

Fahad followed. JA3105-3106. Once there, both cars parked at a traffic circle.

JA3108-3109. Peter and Lamborn "headed towards the woods with White" and

only after they were in the woods did Yoo exit the car and follow. JA3031-3033,

JA3177-3179. After a few minutes, Aegesen heard gunshots. JA3036. All but

White emerged from the woods and they left.

Pak testified that Yoo told him he and "Joe" "got Bahim from a parking lot."

After indicating no one else "got him," he testified, with prompting by the

prosecutor, that "two black guys" and Peter were also there. The prosecutor then

misrepresented his testimony as to who was present and what they did – "did he say anything else other than Peter, Joe Yoo (sic), Trigger and YG [Yoo] got him into another car" - but Pak instead insisted, over the prosecutor's attempts to elicit different testimony - that Yoo *had not* told him that Peter was *not* "present in the parking lot," and had instead told Yoo "he had Bahim," and Yoo should come get him. JA3281-3283. Pak also claimed that Yoo told him Peter handed Yoo a knife with which Yoo stabbed White before "Joe" shot him. JA3284.

Suong Park testified that sometime after the killing, he saw Yoo and Douglas Martinez conversing. Yoo looked distraught and kept saying it was all "just bad." Later, Lamborn said "he killed the dude," that he took White into the woods and shot him. JA3281-3283. Park also testified Lamborn had told him he had to lay low because he (Lamborn) had murdered White. JA3284.

Hong testified that Yoo did not want to do "missions" or live a "gangster life," and tried to talk gang members out of violence. JA3695-3696. And, according to Hong, Yoo did not want to kill White; he wanted to pay him instead for his injuries when a gang member beat him. JA3703.

A pathologist testified that there were gunshot and sharp force wounds, but he could not say that arteries or organs were cut by sharp force. JA3765.

B.    Standard of Review

Yoo's Rule 29 motion was denied. JA 4128-4130. This court reviews the denial of a Rule 29 motion *de novo*. *United States v. Alerre*, 430 F.3d 681, 693 (4th Cir. 2005).

While "[c]onvicted defendants who challenge the sufficiency of the evidence . . . face 'a heavy burden'" *United States v. Davis*, 75 F.4th 428, 437 (4th Cir. 2023) (quotation marks removed), this is not an insurmountable burden. *United States v. Habegger*, 370 F.3d 441, 444-445 (4th Cir. 2004). This Court must view the evidence in the light "most favorable to the prosecution" and assume the jury resolved all credibility disputes in the government's favor. *United States v. Perry*, 335 F.3d 316, 320 (4th Cir. 2003). However, a jury is entitled to make only reasonable inferences from the evidence. *See, United States v. Samad*, 754 F.2d 1091, 1097 (4th Cir. 1984).

"[The Court] must uphold the jury's verdict if it is supported by 'substantial evidence,' which means 'evidence that a reasonable finder of fact could accept as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt.' *United States v. Smith,* 451 F.3d 209, 216 (4th Cir. 2006)." *United States v. Gallagher*, 90 F.4th Cir. 182, 190 (4th Cir. 2024).

C.    <u>Argument</u>

The evidence was insufficient to prove the murder-based charges beyond a reasonable doubt and the court erred in denying Yoo's Rule 29 motion.

i.    <u>Violent Crime in Aid of Racketeering – Murder (Count 3)</u>

"VICAR murder requires: (1) there be an enterprise' as defined in 18 U.S.C. §1959(b)(2); (2) the enterprise be engaged in 'racketeering activity,' as defined in §1961; (3) the defendant committed a murder; (4) the murder violated state or federal law; and (5) the murder was committed for a pecuniary purpose or for the purpose of gaining entrance to or maintaining or increasing position in the enterprise. *See, United States v. Ortiz-Orellana*, 90 F.4th 689, 701 (4th Cir. 2024)." *United States v. Tipton*, 95 F.4th 831, 847 (4th Cir. 2024). The evidence was insufficient to prove the third element beyond a reasonable doubt.

> To prove the crime of aiding and abetting the government must show that the defendant knowingly associated himself with and participated in the criminal venture. *Nye & Nissen v. United States*, 336 U.S. 613, 619, 620, 93 L.Ed. 919, 69 S.Ct. 766 (1949); *United States v. Beck*, 615 F.2d 441, 448 (7th Cir. 1980); *United States v. Pearlstein*, 576 F.2d 531, 546 (3d Cir. 1978); *United States v. Di Stefano*, 555 F.2d 1094, 1103 (2d Cir. 1977). To prove the element of association, the government must show that the defendant shared in the principals' criminal intent. *United States v. Beck*, 615 F.2d at 449. This requires evidence that the defendant be aware of the principals' criminal intent and the unlawful nature of their acts. *United States v. Pearlstein*, 576 F.2d at 546.

*United States v. Winstead*, 708 F.2d 925, 927 (4th Cir. 1983). "[A] criminal defendant's mere presence at the scene of the crime or his knowledge of that crime

is insufficient to establish that he joined a conspiracy or aided and abetted in the commission of the crime. Instead, the defendant's *active, knowing participation* is required before a conviction may be entered." *United States v. Love*, 767 F.2d 1052, 1059 (4th Cir. 1985) (emphasis added) (citing *United States v. Weil*, 561 F.2d 1109, 1112 (4th Cir. 1977)). *See, also, United States v. Lewis*, 1993 U.S. App. LEXIS 32986, \*4 (4th Cir. 1993) (unpublished) ("Mere presence at the scene of the crime and guilty knowledge of the crime are not enough to convict a defendant of aiding and abetting. In such cases, the prosecution must show that the defendant 'acted or failed to act with the specific intent to facilitate the commission of a crime by another.' *United States v. Head*, 927 F.2d 1361, 1373 (6th Cir.1991), *cert. denied*, 112 S. Ct. 144 (1991)"). *See, also, Rosemond v. United States*, 572 U.S. 65, 71, 188 L.Ed.2d 248, 134 S.Ct. 1240 (2014) (". . . those who provide *knowing aid* to persons committing federal crimes, with the intent to facilitate the crime, are themselves committing a crime") (emphasis added) (citation omitted).

There was no evidence that Yoo instigated or planned the inveiglement of White or his seizure. The kidnapping was instigated by Fahad and Sayf, who devised a plan to deliver White to Peter. JA2847-2860, JA2902, JA2906, JA2956. Indeed, Yoo expressed great surprise when White arrived at Loehmann's Plaza. JA3103.

Yoo also played no role in the execution of the plan. The inveiglement of

Yoo also played no role in the execution of the plan. The inveiglement of White was done by Fahad and Sayf, who "delivered" White to Loehmann's Plaza. JA2852-2865, JA2869-2871. Nothing indicated their intent was to kill him. Both Fahad and Aegeson thought that White was just going to be beaten or "jumped." JA2850-2851, JA2892-2893, JA3892, JA3021, JA3101.

The cars drove from Loehmann's Plaza to a neighborhood in Richmond. Peter and Lamborn exited their vehicle with White and headed into nearby woods. Only after they were in the woods did Yoo exit the car and follow. JA3031-3033, JA3177-3179. Thus, Yoo did not cause or encourage White to exit the vehicle, nor did he escort, lead, entice or direct White to the woods. Fahad testified that he did not see Yoo with a weapon. JA3036. Consequently, the evidence did not establish that Peter and Lamborn intended to kill White when they entered the woods, nor that Yoo would have assumed that Peter and Lamborn intended to kill White, just as Aegeson and Fahad did not.

After Yoo had followed Peter, Lamborn and White into the woods, Fahad heard gunshots. JA3037-3038. White was, in fact, killed by gunshots. JA3765. It would be improper to credit Pak's testimony as to Yoo's alleged descriptions of White's kidnapping or his alleged admission he stabbed White, because it is inconsistent with the testimony of Fahad and Aagesen, who were actually present. JA286, JA3029-3030, JA3174, JA3278, JA3358-3359. Moreover, it cannot be

assumed that the jury accepted his testimony, since it may have improperly found Yoo guilty based upon his accompaniment of Peter and Lamborn to Richmond and his entry into the woods before White was killed.

Given the scant evidence about what happened in the woods, and the testimony of the government's own witness that Yoo did not want to do "missions" or live a "gangster life," discouraged violence by gang members, and wanted to just pay White for his injuries, JA3695-3696, JA3703, there was no reasoned basis for concluding, beyond a reasonable doubt, that Yoo committed, or aided or encouraged the murder by Peter. Therefore, the evidence did not support the third requirement – that Yoo committed a killing as required for a VICAR murder.

### ii. Conspiracy to Commit Kidnapping and Kidnapping Resulting in Death (Counts 4 and 5)

"To prove a conspiracy, . . . , the government must establish an agreement to commit an offense, willing participation by the defendant, and an overt act in furtherance of the conspiracy." *United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999).

"[K]idnapping resulting in death []. . . require[s] the government to prove as essential elements: (1) that the victim was seized, confined, inveigled, decoyed, kidnapped, abducted or carried away; (2) that the victim was held; (3) that the victim was transported interstate; and (4) that death resulted," *United States v. Lentz*, 524 F.3d 501, 512 (4th Cir. 2008), or, in place of interstate travel, the

government may prove that "the offender travels in interstate or foreign commerce or uses the mail or any means, facility, or instrumentality of interstate or foreign commerce in committing or in furtherance of the commission of the offense." 18 U.S.C. §1201. *See, United States v. Small,* 988 F.3d 241, 251 (6th Cir. 2021).

As discussed in relation to Count 3, Yoo did not instigate or participate in the planning of the scheme to kidnap White. Likewise, he played no role in the inveiglement of White, or in his being seized and wrestled into Wolf's car. Yoo's trailing the car carrying White to Richmond does not satisfy the requirement that he knowingly joined a kidnapping conspiracy or aided and abetted the kidnapping.

Once in Richmond, Yoo remained in the car while Peter and Lamborn went with White into the woods. Only once they were in the woods did Yoo exit the car and follow. JA3034-3035, JA3179. Although Pak testified that Yoo admitted to stabbing White, that would not mean he aided and abetted White's seizure, detention, confinement, inveiglement, carrying away, abduction or kidnapping; it would simply mean that he committed an aggravated wounding.

iii.  Killing While Engaged in Drug Trafficking (Count 7)

§848(e)(1)(A) provides:

> any person engaging in or working in furtherance of a continuing criminal enterprise, or any person engaging in an offense punishable under section 841(b)(1)(A) of this title or section 960(b)(1) of this title who intentionally kills or counsels, commands, induces, procures, or causes the intentional killing of an individual and such killing results, shall be sentenced to . . . .

35

To obtain a conviction, the government must prove that one of the reasons for the killing was related to the drug conspiracy. *See, United States v. Aguilar*, 585 F.3d 652, 659-660 (4th Cir. 2009).

For the reasons set forth above as to Count 3, the evidence was insufficient to prove, beyond a reasonable doubt, that Yoo intentionally killed White himself or that he aided and abetted his killing. And most certainly the government did not prove that Yoo counseled, commanded, induced, procured, or caused White's killing.

Yoo's convictions on Counts 3, 4, 5 and 7 should be reversed and dismissed.

V. THE DISTRICT COURT ERRED IN DENYING PETER LE'S RULE 29 MOTION BECAUSE THE EVIDENCE WAS INSUFFICIENT TO PROVE HIM GUILTY BEYOND A REASONABLE DOUBT OF COUNTS 3 (VIOLENT CRIMES IN AID OF RACKETEERING – MURDER), 4 (KIDNAPPING CONSPIRACY), 5 (KIDNAPPING RESULTING IN DEATH), AND 7 (KILLING WHILE ENGAGED IN DRUG TRAFFICKING)

A. Statement of Additional Facts

In the days prior to January 31, 2019, Sayf and Fahad hatched an unsolicited plan to "deliver" White to Peter to pay off marijuana debts (though both Sayf and Fahad claim it was the other's idea). JA2851, JA2892, JA2998. On that night, Fahad and Sayf were with friends whom they told they planned to pick up White and deliver him for a beating. JA2892. The friends wanted no part, so Fahad expedited a previously planned "purchase" of a vehicle from Peter—an older

Mercedes registered to and in the possession of Jonathan Kinney. JA2893. Under the guise of a drug deal, Sayf arranged for him and Fahad to pick up White at White's grandmother's. JA2852, JA2856. They did so, and at that point had no idea where they were going to bring him, since all of this—although discussed days earlier—occurred on the "spur of the moment" because Sayf and Fahad were "bored." JA3023.

The Mercedes broke down, and the trio wound up leaving the car at Exxon and heading to McDonald's, where Fahad says he called Peter to tell him about the car. JA2974, JA3026. Although *Fahad and Sayf* planned to "deliver" White to Peter, their decision to do so that day was impulsive and unplanned, and they had never arranged said "delivery" with Peter:

> I mean, it wasn't really, like, like an organized plan, like. It was just a time of the moment, so whenever the car broke, it was just -- it wasn't no certain location for me to take or drop -- meet up with Peter Le, Savage, it was just –

JA2974-2975.

While Fahad and Sayf were finding their unplanned kidnapping thwarted by a broken-down car, Peter, Aagesen, and Wolf were "chilling" at Peter's apartment, smoking marijuana. JA3099, JA3138. Yoo and Lamborn arrived from Maryland, where they had left Park, indicating they were going on a mission and that he didn't need to come with them. JA3475-3476. Yoo, Lamborn, Peter, Aagesen, and Carlisle, left Peter's in two cars and drove to a Giant parking lot near McDonald's.

37

JA3101. The cars parked in front of the store which was open and well-lit. JA3102, JA3143. Fahad and Sayf walked with White from McDonald's across the parking lot toward Giant to meet the group. Upon arrival, Yoo was surprised to see White, JA3871-3872, and Sayf—to whom he alleged he *planned* to *deliver* White to Peter—felt "*set up*" when he saw Peter, who was not supposed to be there. JA2901-2902.

Shortly after the groups met up, White was pushed into one of the cars (two witnesses say the blue car, one says the white) by two people; Sayf and Fahad both say it was Fahad and Lamborn, but Aagesen says it was Peter and Lamborn. JA2866, JA2979, JA3104. Sayf ran away. JA2867. The rest traveled in both cars to Richmond, where at some point Lamborn, Peter, and White walked off into an area that was not visible to the others. JA2984. According to Fahad, Yoo remained in the car as the others walked into the woods, and then said, "Oh, man" and ran after them. JA3035. Aaegesen testified that Yoo didn't get out of the car until the other three had entered the woods. JA3178-3179. Two to three gunshots were heard, and all but White returned to the vehicles. JA2984, JA3111-3112.

No witness saw what happened to White, whose body was not discovered until December 5, 2019. JA3725. The skeletal remains were wrapped in a tarp, and a bullet was found nearby. JA3733. A second bullet was discovered inside the tarp by the medical examiner. JA3748. A forensic anthropologist found evidence of at

least three gunshot wounds, as well as defects to a rib, the bones of the arm, and bones in the neck which indicated "sharp force injuries." JA3759-3760, JA3783-3784, JA3787-3788, JA3790. Such injuries, according to the witness, are usually caused by a knife, JA3788, JA3790.

Three witnesses claimed to have been told details about the murder of White by Yoo or Lamborn. Yoo allegedly told Spencer Pak what happened. JA3282-3283. Pak's version of events neatly implicated all three individuals charged with the murder, despite there being only two weapons. Pak said that, according to Yoo, Peter handed Yoo a knife, Yoo stabbed the victim, and Lamborn shot him. JA3284. Aagesen, however, who was in the white car with Yoo on the night of White's disappearance, testified that Yoo had a firearm on him on the way to *and* from Richmond. JA3107, JA3111. Pak's version didn't explain why Yoo didn't use a gun, whether he "loaned" a gun to Lamborn, or why he took direction from Peter, who was not RT, and with whom he never got along.

Park claimed to have heard Yoo saying something was "all bad," with Douglas Martinez who was asking "is he dead?" JA3478. But Lamborn was said to have discussed shooting White directly with both Park and Hong. JA3483, JA3607. Park claims to have burned a suitcase full of clothes and buried a knife for Yoo, but the knife could not be found when Park showed law enforcement where he buried it. JA3485. Hong suggested that the body be moved, and on February 25, 2019,

went to the scene with Park, Lamborn, and Richard Pak to move White's body. JA3486-3495.

CAST analysis on phones associated with Lamborn, Yoo, Sayf, Fahad, Hong, and Park concluded movement of those phones consistent with the movements of the relevant parties on January 31 as well as February 25, 2019. JA4061-4093.

B.    Standard of Review

As previously noted, this court reviews the denial of a Rule 29 motion *de novo*. *Alerre*, *supra*.

C.    Argument

Yoo correctly states the law applicable to this court's determination of the sufficiency of the evidence with respect to Counts 3, 4, and 5. A defendant's mere presence at the scene of crime is insufficient to prove participation in a crime, conspiracy to commit that crime, or aiding and abetting. For the sake of expedience, Peter incorporates by reference, Yoo's discussion of "mere presence" as set forth herein-above, and respectfully refers the Court to the same authority.

As noted above, the evidence at trial established that Peter did not plan, solicit, or instigate the kidnapping of White, and there was insufficient evidence that he participated in the murder of White. He was not in possession of a weapon nor did he make any indication at any time that he desired to see White harmed.

Fahad and Sayf testified that it was *their idea* to kidnap White. JA2891, JA2961. After all, Sayf had done it before—to Fahad. JA2883. Sayf hated Peter, so he wasn't doing anything for Peter or at his direction. JA2890. While the old friends initially stated they were trying to work off drug debts owed Peter, they could not explain why Sayf was so surprised to see Peter that night. Ultimately, Sayf himself *admitted* he was not interested in paying off a debt. JA2890. Likewise, Peter had little to no knowledge of or interest in White. White didn't owe Peter money, and Peter–unlike Fahad–wasn't close with Nguyen.

Fahad told the implausible tale that Peter asked him out of the blue if he could "find somebody who knew Brandon White" and it just happened that his lifelong friend was that "somebody." Nevertheless, even he admitted that upon his and Sayf's self-directed "delivery" of White, he only believed White would be beaten up. JA2961, JA3002. Therefore, even taking the evidence offered in the light most favorable to the government, the two men who *did* inveigle White admitted that *they* planned to kidnap White and were not aware of any plan by *Peter* to kidnap White. It hadn't dawned on Fahad, and Sayf was surprised Peter was even present at the Giant parking lot. There was therefore insufficient evidence to prove either a plan or even a tacit agreement entered into by Peter to kidnap, let alone kill, White. JA2901, JA3096.

Furthermore, Peter was not driving or in control of *either* vehicle that went to Richmond, and he did not have a weapon. JA3040, JA3098, JA3143. Finally, no one witnessed what actually took place in the woods, and there was no physical or forensic evidence to suggest that Peter was an actual assailant against White.

## VIII. THE DISTRICT COURT VIOLATED TONY LE'S SPEEDY TRIAL ACT AND SIXTH AMENDMENT SPEEDY TRIAL RIGHTS

### A.    Statement of Additional Facts

In August of 2020, Tony was indicted under a Fourth Superseding Indictment under the RICO charge (Count One), the conspiracy charge (Count Six), and two §924(c) destructive device charges (Counts 14 and 15). JA304-357 (Indictment).

At the arraignment of Tony's co-defendants under the Second Superseding Indictment on May 2, 2019, the court requested speedy trial waivers from each defendant. JA170-173. The court found that the defendants waived their speedy trial rights, and that there was good cause to extend the trial date. JA173. There was no finding ends-of-justice propriety, nor were any balancing of interests conducted. This proceeding is relevant to Tony because, at his arraignment on November 26, 2019, the district court set his trial date for February 10, 2020 – a date outside the 70-day speedy trial limit (83 days) – "with the other co-conspirators." JA268. No other explanation was provided by the court for the setting of the trial date. JA267-268.

Tony was arrested under the Third Superseding Indictment on October 30, 2019 in California. JA43. This indictment charged Tony with conspiracy. JA263. His first appearance in Alexandria was on November 19, 2019. JA264. He was detained on that date. JA265.

Tony was arraigned on November 26, 2019. JA266. He pled not guilty and the case was set for trial "with the other co-conspirators" on February 10, 2020. JA268. This date for trial was 83 days from Tony's first appearance in Alexandria. On January 9, 2020, the district court continued the case "indefinitely," "good cause having been shown." JA278. No further findings were made. On February 14, 2020, the court held a status conference, which was re-scheduled for April 10, 2020. JA299.

The April 10, 2020, status conference was continued to June 26. JA303. On June 23, 2020, the June 26 status conference was continued to September 1, 2020. JA60. Pursuant to EDVa General Order 2020-19, jury trials were to resume September 14, 2020. Trials were resuspended between November 16, 2020, and March 1, 2021.

Counsel for Tony moved to withdraw from representation on June 25, 2020. JA60. On July 16, 2020, that request was granted, and new counsel was appointed. *Id*. A Fourth Superseding Indictment was returned on August 20, 2020, adding the

RICO charge (Count One) and the two destructive device charges (Counts 14 and 15). JA61, JA304-305.

At the status conference on September 1, 2020, Tony asserted his speedy trial rights – twice - and moved the district court to sever his case. JA381, 389. The court indicated that it was going to set the case in March 2021. JA395. However, the case was set for September 21, 2021. JA401. The court stated that the case was complex with much discovery and many counts. JA397-398. The court denied the request for severance. JA398.

At the April 13, 2021, hearing, Tony again asserted his speedy trial rights. JA442-443. The court continued the case to February 7, 2022. JA438-451. On May 6, 2021, Tony filed his speedy trial motion under 18 U.S.C. §3161 and under the 6th Amendment. JA464. The government responded stating that there was no speedy trial violation, and also argued that the charges should be dismissed without prejudice. JA470. The district court denied the motions on September 2, 2021, stating that the case was "complex." JA503, JA505. No ends-of-justice or balancing the interests justification was provided.

Trial began April 11, 2022. JA758. Tony was convicted under Counts One and Six of the Fourth Superseding Indictment and found not guilty of Counts Fourteen and Fifteen.

B.    Standard of Review

This Court reviews, *de novo*, the legal conclusions of the district court's application of the Speedy Trial Act. *See United States v. Robinson,* 55 F.4th 390, 399 (4th Cir. 2022). This Court reviews any related factual findings for clear error. *United States v. Rodriguez-Amaya*, 521 F.3d 437, 440 (4th Cir. 2008). For Tony's 6th Amendment speedy trial argument, this Court also reviews conclusions of law *de novo* and factual findings for clear error. *See Robinson,* 55 F.4th at 399; *United States v. Mearis*, 36 F.4th 649, 654 (5th Cir. 2022).

C.    Argument

i.    *Tony's Speedy Trial Act Rights were Violated*

The district court erred by failing to render findings based on the required ends-of-justice standard, and by not applying the necessary balancing test, as articulated under *Bloate* v. *United States,* 559 U.S. 196 (2010), *Zedner v. United States,* 541 U.S. 489 (2006), and *United States v. Velasquez*, 52 F.4th 133, 141 (4th Cir. 2022). The district court failed to even reference the term "ends-of-justice" – much less, perform the required balancing test – for any of the numerous continuances and extensions of trial dates for Tony or his co-defendants. When Tony filed a motion to dismiss the charges based on §3161, the district court again failed to mention "ends-of-justice" and failed to engage in the balancing test.

JA503-505. The law makes it clear that very particular and specific findings are mandatory; in the absence of such findings, the charges must be dismissed.

Under §3161(h)(6), which allows for a delay in the proceedings when "the defendant is joined for trial with a co-defendant," the 2 ½ year period between Tony's first appearance and trial of this matter do not constitute a reasonable period. Further, the time for trial under the co-defendant's statutory speedy trial rights had also run. A period well in excess of the 70-day limit under §3161(c)(1) passed without proper findings extending the speedy trial maximum time. Tony requested severance from his co-defendants on several occasions and pointed to prejudice he would suffer. The court erred in its findings, denying Tony his rights under §3161.

This issue of the district court's failure to justify continuances under the Speedy Trial Act is simple and straightforward. The words "ends-of-justice" were never referenced by the court in its grants of continuances and settings of dates for trial, nor were those words mentioned in it's Order denying Tony his requested relief. JA503-505. The court never engaged in the balancing of interests required by law. The applicable analysis under the "co-defendant" rule, §3161(h)(6), also favors Tony. The court found that, "[i]n a case involving several defendants the time excludable for one defendant is excludable for all defendants," citing to *United States v. Jarrell*, 147 F.3d 316 (4th Cir. 1998). JA505. The same concerns

with "ends-of-justice" and balancing-test findings, apply to the co-defendants. Such time of trial delay would not have been excludable under the co-defendant's §3161 calculations.

The Speedy Trial Act requires dismissal if trial is not commenced within 70 days of the initial appearance or indictment. *See* §3161(c)(1). The Act expressly excludes delay resulting from a judge continuing the case on his own motion, or on defendant's or the government's motion, "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." §3161(h)(7)(A). Courts have construed this provision very narrowly, requiring that district courts honor the legislative directive. *See Zedner*; *United States v. Hart*, 91 F.4th 732 (4th Cir. 2024).

In calculating the running of the 70-day period, and the appropriate assessment of tolling and continuance motions, the Supreme Court and this Court impose several requirements. Under *Zedner*, 547 U.S. at 506–507, the Supreme Court found that "if a judge fails to make the requisite findings regarding the need for an ends-of-justice continuance, the delay resulting from the continuance must be counted, and if as a result the trial does not begin on time, the indictment or information must be dismissed."

This Court, in *Hart*, stated:

> Under the Act, a court may exclude a period of delay if two
> things happen: (1) the "judge granted such continuance on the
> basis of his findings that the ends of justice served by taking such
> action outweigh the best interest of the public and the defendant
> in a speedy trial"; and (2) "the court sets forth, in the record of
> the case, either orally or in writing, its reasons for [the]
> finding[s]". . . . In other words, it first must be "clear from the
> record that the court conducted the mandatory balancing
> contemporaneously with the granting of the continuance." . . . .
> And, second, the court must set forth the reasons for its finding
> no later than when it rules on a defendant's motion to dismiss. . . .
> If the district court fails to meet these requirements, then the
> delay is not excluded from the speedy-trial clock.

91 F.4th at 739–740 (citations omitted). This Court pointed out that the record

failed to provide any evidence that the district court "contemporaneously conducted

ends-of-justice balancing or ever set forth reasons for that finding." *Id*. at 740.

Without such a finding in the record, this Court could not make the requisite

determination if such findings were made to justify the continuances.

The same problem is presented here. There were no contemporaneous ends-

of-justice determinations made or balancing tests performed. Nothing in the court's

orders provide such documentation. This Court has found that "it must be clear

from the record that the court conducted the mandatory balancing

contemporaneously with the granting of the continuance." *United States v. Smart*,

91 F.4th 214, 221 (4th Cir. 2024). No such findings were made in this case.

In the instant case, Tony's 70 days began at his November 19, 2019

arraignment. JA264. The Fourth Superseding Indictment was returned on August

20, 2020, containing new charges. On September 1, 2020, Tony specifically asserted his speedy trial rights and, in the alternative, asked that his case be severed. JA389. At the April 13, 2021, hearing, he again asserted his speedy trial rights. JA442-443. Tony filed his motion to dismiss over 250 days from the date the Fourth Superseding Indictment was returned, and over a year-and-a-half from the date of arrest. JA464. The court rendered its decision without any reference to the ends-of-justice findings required under *Zedner* and *Bloate*.

Under §3161(h)(6), which allows for a delay when "the defendant is joined for trial with a co-defendant," the 2 ½ year period between Tony's first appearance and trial of this matter by no means constitutes a reasonable period of time.

§3161(h)(6) provides that the following period of time is excludable under the Speedy Trial Act: "A reasonable period of delay when the defendant is joined for trial with a codefendant as to whom the time for trial has not run and no motion for severance has been granted." In this case, although no other defendant moved for dismissal under the Speedy Trial Act, the time for trial had run for all defendants. All orders governing the continuance motions for co-defendants in the case did not include the requisite "ends-of-justice" or balancing interests language required to constitute valid tolling of the Act under §3161. Therefore, the co-defendant provision under §3161(h)(6) does not toll the speedy trial clock.

The Supreme Court has held that "[a]ll defendants who are joined for trial generally fall within the speedy trial computation of the latest codefendant." *Henderson v. United States*, 476 U.S. 321, 323 n.2, (1986); *see also United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022). The speedy trial computation of the latest co-defendant is exactly the same as it was for Tony.

The district court ignored Tony's persistent demands that his rights were violated, and that his case should be severed in the absence of a speedy trial. In *United States v. Clyburn*, 1995 WL 578047, at \*2 (4th Cir. Oct. 2, 1995) (per curiam), this Court looked to the defendant's attempts to move for severance, any prejudice to the defendant, and the length of the delay to determine whether the "co-defendant" Speedy Trial Act clause applied. Tony checks all of the boxes articulated in *Clyburn*. He repeatedly moved for severance, was tried in the prejudicial setting of a death penalty eligible kidnapping/murder case as a defendant with no involvement in the murder/kidnapping, and his delay spanned 2½ years. *See, e.g., Clyburn*, 1995 WL 578047, at \*2 (147 days); *United States v. Margheim*, 770 F.3d 1312, 1319 (10th Cir. 2014) (10 months); *United States v. Robinson*, 55 F.4th 390, 399 (4th Cir. 2022) (8 months). In *Clyburn* and *Robinson* the defendants never moved for severance. *Clyburn*, 1995 WL 578047, at \*2, *Robinson*, 55 F.4th at 399.

Based on the violation of Tony's speedy trial rights, Counts 1 and 6 must be dismissed.

> ### ii. Tony's Sixth Amendment Speedy Trial Motion was not Addressed by the District Court; Remand is Required

The court failed to render a decision on Tony's 6th Amendment speedy trial rights motion to dismiss. *See* JA464-469, 503-505. The only appropriate remedy is remand for the district court's consideration and decision. Although this Court reviews the legal conclusions of the district court *de novo*, this Court must pay deference to the factual findings of the district court. *See United States v. Mearis*, 36 F.4th 649, 654 (5th Cir. 2022) ("We review the district court's factual findings for clear error and its application of the *Barker* factors *de novo.*"). Without factual findings, this Court has nothing to which it can defer. Under the *Barker* factors, findings of fact are essential. Consequently, remand for the district court's consideration is the only appropriate remedy. *See United States v. Espinoza*, 622 F.App'x 745, 748 (10th Cir. 2015).

The 6th Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial." U.S. Const. Amend. VI. In determining whether there has been a violation of this right, the court must consider: (1) the "length of the delay"; (2) "the reason for the delay"; (3) "the defendant's assertion of his right"; and (4) the "prejudice to the defendant."

*Barker v. Wingo*, 407 U.S. 514, 530, 92 S. Ct. 2182, 33 L. Ed.2d 101 (1972); *see also Robinson*, 55 F.4th at 400.

As this Court has held, "[t]he constitutional and statutory rights to a speedy trial should ideally operate in tandem." *United States v. Pair*, 84 F.4th 577, 589 (4th Cir. 2023). The district court was required to make findings regarding each of the four *Barker* factors, not just for the constitutional claim but also to consider the statutory arguments in tandem with the constitutional arguments. In the absence of such findings, there is nothing for this Court to review. Consequently, remand is required.

## VII. THE DISTRICT COURT IMPROPERLY ENHANCED TONY LE'S SENTENCING GUIDELINES

### A. Statement of Additional Facts

Tony was convicted of Counts 1 and 6 and acquitted of Counts 14 and 15. *See* JA4718, JA4719. Each of the acquitted counts had a mandatory minimum sentence, consecutive to any other conviction, of 30 years under §924(c).

The conspiracy to distribute verdict on Count 6 included special findings, that he was responsible for Marijuana, Cocaine, THC, and Marijuana Plants. JA4716. The jury did not find that he conspired to distribute LSD or Alprazolam. The jury found Tony responsible for 1,000kg or more of Marijuana, 1,000 Marijuana Plants or more, and 500g of more of Cocaine - not the 5kg of Cocaine.

JA4716-4717. The jury's verdict, 500g or more of cocaine, carries a mandatory minimum sentence of 5 years.

Notwithstanding the jury's verdicts on Counts 14 and 15, and the finding that he was responsible for more than 500g of cocaine–not 5kg–the district court treated Tony's sentencing as if he had been convicted of all charges. The court attributed Tony with 15kg of cocaine. JA5095. Tony was enhanced for acquitted conduct involving the fire-bombings; the jury found him not guilty of possessing destructive devices.

Many enhancements were attributed to Tony. His base offense level was 32 (15kg of cocaine) under §2D1.1(a)(5), in addition to the marijuana and THC quantities. *Id*. A total drug equivalency weight of 8070kg of marijuana was assessed against Tony. 3000kg of that was cocaine. *Id*. 500g of cocaine is essentially equivalent to 100kg of marijuana. *See* §2D1.1.

The following two-level enhancements were applied:

- Dangerous weapon. JA5095.

- Defendant used violence. *Id*.

- Defendant maintained a stash house. *Id*.

- Enhancement under §2D1.1(b)(16). *Id*.

A four-level enhancement was added under §3B1.1(a) for a leadership role. *Id*. The resulting adjusted offense level was 44; however, that level is capped at 43. Tony's

criminal history score was "0," with a criminal history category of I.

Tony timely objected to the leadership role, the weapon enhancement, the cocaine quantity, the threat enhancement, and the use of a minor. JA5106-5108. At sentencing, the court found that Tony possessed weapons but failed to specifically find that the weapons were connected with any drug trafficking offenses. JA4822-4824. The court also found that, "[y]ou deserve a lengthy penitentiary sentence for your conduct and the conduct you were found guilty of in the racketeering charge and in the drug charge," making a distinction between charged conduct and uncharged conduct. JA4848. Additionally, the court made no reference at sentencing to Tony's pristine criminal history, aside from simply stating he was a CHC I. *See* JA4825.

Tony raised unwarranted disparity concerns under §3553(a)(6) in his sentencing position to the court, JA5110, JA5117, and in argument at the sentencing hearing. JA4830. He pointed out that he was not involved in the murder, and discussed that several co-defendants received far lower sentences yet engaged in conduct and had criminal records at least as serious. Among those were Richard Pak (JA4628, JA4636, JA4819, JA4820); Hong (JA4830) and Carlisle (JA4831). None received sentences greater than 18 years.

The only statement the court made regarding the unwarranted disparity argument raised was the following: "I gave other sentences, as you've identified

. . . that were less than the 30 years requested by the Government in this case. But the request is being made because you were undeniably the leader." JA4848. No specific reference was made to the differences between the sentences imposed on the defendants who pleaded guilty and Tony. Some of the co-defendants who pleaded guilty were arguably more culpable than Tony, as they were involved with the more serious charges. Considering Tony's criminal history score of "0," none of these co-defendants came to the court with a more favorable criminal history. *See* JA5096-JA5097.

B.    Standard of Review

In determining whether a district court properly applied the advisory Guidelines, including application of enhancements, we review the district court's legal conclusions *de novo* and its factual findings for clear error. *United States v. Osborne,* 514 F.3d 377, 387 (4th Cir. 2008). "A sentence is procedurally unreasonable if the district court committed a serious procedural error, such as improperly calculating the Guidelines range[.]" *United States v. Gillespie*, 27 F.4th 934, 944 (4th Cir. 2022).

C.    Argument

    *i.    Acquitted Conduct*

The court treated the enhancements to Tony's federal sentencing guidelines as if he were convicted of all charges and attributed the maximum quantities

charged under the jury's findings. The jury found Tony responsible for 500g or more. Tony was held accountable for 15kg of cocaine at sentencing. JA5095. The jury acquitted Tony of possessing firebombs. His sentencing guidelines were enhanced on the basis of dangerous weapons and use of violence, in conflict with the jury's findings. JA5095. As of November 1, 2024, such enhancements are curbed under §1B1.3. On remand, the district court would be compelled to comply with this new provision of the federal sentencing guidelines.[3]

Under the Supreme Court's denial of certiorari in *McClinton v. United States*, 143 S. Ct. 2400, 2401–03 (2023), the Court noted that, "the use of acquitted conduct to increase a defendant's Sentencing Guidelines range and sentence raises important questions that go to the fairness and perceived fairness of the criminal justice system." This finding appears to reference the guideline amendment. *McClinton* found that the Sentencing Commission "will resolve questions around acquitted-conduct sentencing in the coming year." 143 S. Ct. at 2403. The Commission has done so, and their findings and amendment should be respected by this Court.

---

[3] Tony acknowledges that at the time of sentencing both this Circuit and the Supreme Court held that "a sentencing court may consider uncharged and acquitted conduct in determining a sentence, as long as that conduct is proven by a preponderance of the evidence." *United States v. Medley*, 34 F.4th 326, 335–36 (4th Cir. 2022).

The enhancements for possessing a dangerous weapon under §2D1.1(b)(1) and for "use of violence" under §2D1.1(b)(2) were contradictory to the jury's verdict of not guilty as to the fire-bombings. *See* JA5107. The court found that, despite the acquittal, "under the preponderance standard," the court found "sufficient evidence" for the enhancement. JA4823. The court pointed to "relevant conduct" to find that the fire-bombings were "absolutely foreseeable." JA4823. Foreseeability and preponderance of the evidence are no longer the only considerations when assessing acquitted conduct in this situation.

The use at sentencing of acquitted conduct violates due process, subverts the crucial role of juries in protecting constitutional rights, undermines a defendant's 6th Amendment right to a jury trial, and contributes to the trial penalty. These protections are now enshrined in the federal sentencing guidelines.

Tony asks that this Court vacate his sentence and remand to the district court for resentencing based on the "acquitted conduct" amendment to the sentencing guidelines and his constitutional rights.

> ii.    *The District Court Failed to Properly Assess and Make Necessary Findings as to Enhancements to Tony's Sentencing Guidelines; Therefore, his Sentence is Procedurally Unreasonable*

The district court applied unwarranted sentencing enhancements for a firearm and for a leadership role. To address these improper enhancements, the judgment in this case should be reversed and the case remanded for resentencing.

The firearm enhancement under §2D1.1(b)(1) was unsupported by the record or the evidence. The leadership enhancement under §3B1.1(a) was objected to by Tony; however, the court did not point to evidence sufficient to justify the 4-level enhancement. These sentencing errors of improperly calculating the guidelines rose to the level of procedural unreasonableness.

For the firearm enhancement, "[i]f a dangerous weapon (including a firearm) was possessed," the sentencing court is to "increase by 2 levels" the offense level. *Id.* §2D1.1(b)(1). The relevant Application Notes provide that the weapon enhancement "should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." §2D1.1 cmt.n.3. The government bears the burden of proving that "the weapon was possessed in connection with drug activity that was part of the same course of conduct or common scheme as the offense of conviction." *United States v. McAllister,* 272 F.3d 228, 233-34 (4th Cir.2001). No connection was made between the firearms noted and drug distribution. This enhancement should be rejected by this Court.

This Court has articulated that, in assessing the leadership enhancement, courts are to "consider: the defendant's exercise of decision-making authority, the nature of his participation in the offense, recruitment of others, any claimed right to a larger share of the profits, the degree of participation in planning of the offense, the nature and scope of the offense, and the degree of control and authority

exercised over others." *United States v. Agyekum*, 846 F.3d 744, 752 (4th Cir. 2017).

As pointed out at trial and sentencing, Tony was not a member of RT. He admitted that, in California, he became involved in the West Side Asian Boyz, but did not maintain a leadership role. JA5106. Most of his interactions with co-defendants involved selling them marijuana. Such a relationship does not qualify for a leadership enhancement.

### iii. The District Court Failed to Conduct the Requisite Unwarranted Disparity Analysis under 18 U.S.C. §3553(a)(6)

This Court should acknowledge that Tony's sentence would create an unwarranted disparity under 18 U.S.C. §3553(a)(6).

The district court provided an inadequate explanation for its denial of relief based on the unwarranted disparity between Tony's sentence and those of more culpable co-defendants. Under §3553(a)(6), the court must consider whether the sentence imposed constitutes an unwarranted disparity with defendants with analogous offense characteristics and criminal histories. As Tony had no criminal history, such a comparison in criminal histories weighs in his favor. And, as this Court has found, district courts are required to address a defendant's arguments under §3553(a)(6) as to specific relevant comparable defendants raised to explain why the disparity exists. *See United States v. Wheeler*, 717 F.App'x 217, 220 (4th Cir. 2018).

The court's only findings were related to his leadership role. JA4843. Richard Pak and Starter were significant leaders within the conspiracy. JA4818, JA4820, JA4830. The court failed to provide a sufficient explanation for imposing a sentence over 300 months when more culpable defendants received sentences of less than 18 years.

The failure to properly address unwarranted disparities rendered the sentencing proceedings procedurally unreasonable. The judgment of the district court must be reversed and the case remanded for resentencing.

## CONCLUSION

This court should reverse the judgment of the district court as to Peter Le, Yoo, and Lamborn.

Lamborn requests that his conviction be vacated and he receive a new trial or a hearing on his motion for new counsel.

Tony Le asks that this Court reverse the district court pursuant to his Speedy Trial Act motion and dismiss Counts One and Six. In the alternative he asks that, based on the district court's failure to address his constitutional speedy trial arguments, the case be remanded. The judgment should further be reversed based on sentencing errors and remanded for resentencing.

## REQUEST FOR ORAL ARGUMENT

Appellants respectfully request oral argument.

/s/ Lana Manitta\
LANA MANITTA\
LAW OFFICE OF\
  LANA MANITTA, PLLC\
140B Purcellville Gateway Drive #511\
Purcellville, Virginia 20132\
(703) 705-4428

*Counsel for Appellant P. Le*

/s/ Robert J. Wagner\
ROBERT J. WAGNER\
ROBERT J. WAGNER PLC\
101 Shockoe Slip, Suite J\
Richmond, Virginia 23219\
(804) 814-8172

*Counsel for Appellant T. Le*

/s/ G. Allen DuBois\
G. Allen DuBois\
Eric J. Brignac\
OFFICE OF THE\
  PUBLIC DEFENDER\
150 Fayetteville Street, Suite 450\
Raleigh, North Carolina 27601\
(919) 856-4236

*Counsel for Appellant Lamborn*

/s/ Gerald T. Zerkin\
GERALD T. ZERKIN\
ATTORNEY AT LAW\
2620 Stuart Avenue\
Post Office Box 5665\
Richmond, Virginia 23220\
(804) 921-4885

*Counsel for Appellant Yoo*

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No.  22-4554(L)     **Caption:**  US v. LAMBORN et al.

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT
Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

**Type-Volume Limit for Briefs if Produced Using a Computer:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 13,000 words or 1,300 lines.  Appellee's Opening/Response Brief  may not exceed 15,300 words or 1,500 lines.  A Reply or Amicus Brief may not exceed 6,500 words or 650 lines. Amicus Brief in support of an Opening/Response Brief may not exceed 7,650 words. Amicus Brief filed during consideration of petition for rehearing may not exceed 2,600 words. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include headings, footnotes, and quotes in the count. Line count is used only with monospaced type.  See Fed. R. App. P. 28.1(e), 29(a)(5), 32(a)(7)(B) & 32(f).

**Type-Volume Limit for Other Documents if Produced Using a Computer:** Petition for permission to appeal and a motion or response thereto may not exceed 5,200 words. Reply to a motion may not exceed 2,600 words. Petition for writ of mandamus or prohibition or other extraordinary writ may not exceed 7,800 words. Petition for rehearing or rehearing en banc may not exceed 3,900 words.  Fed. R. App. P. 5(c)(1), 21(d), 27(d)(2), 35(b)(2) & 40(b)(1).

**Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger.  A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch). Fed. R. App. P. 32(a)(5), 32(a)(6).

This brief or other document complies with type-volume limits because, excluding the parts of the document exempted by Fed. R. App. P. 32(f) (cover page, disclosure statement, table of contents, table of citations, statement regarding oral argument, signature block, certificates of counsel, addendum, attachments):

☑ this brief or other document contains ____13,754____ [*state number of*] words

☐ this brief uses monospaced type and contains _____ [*state number of*] lines

This brief or other document complies with the typeface and type style requirements because:

☑ this brief or other document has been prepared in a proportionally spaced typeface using
Microsoft Word 2016 _____ [*identify word processing program*] in
14 point Times New Roman _____ [*identify font size and type style*]; **or**

☐ this brief or other document has been prepared in a monospaced typeface using
_____ [*identify word processing program*] in
_____ [*identify font size and type style*].

(s) /s/ Robert J. Wagner _____

Party Name appellant _____

Dated: 2/14/2025 _____